UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:  6:12-bk-10227

IN RE:

8 MILE RANCH, LLC,

        DEBTOR.

_____/

HEARING

| | |
|---|---|
| DATE: | MARCH 3, 2015 |
| TIME: | 2:05 P.M. – 4:54 P.M. |
| BEFORE: | THE HONORABLE KAREN S. JENNEMANN |
| LOCATION: | UNITED STATES BANKRUPTCY COURT |
| | 400 WEST WASHINGTON STREET |
| | ORLANDO, FLORIDA 32801 |

2

1                    A P P E A R A N C E S

2   RICK WEBBER, ESQUIRE, AND SCOTT BAKER, ESQUIRE,

3        ON BEHALF OF THE DEBTOR

4   RUBEN JOSEPH O'BERRY AND MARSHA O'BERRY ON BEHALF OF DEBTOR

5   JOSEPH JONES, ESQUIRE, AND LEWIS KILLIAN, ESQUIRE, ON BEHALF OF

6        CREDITOR MACHADO FAMILY LIMITED PARTNERSHIP No.1 AND No.3

7   LUIS AND CEFERINO MACHADO, ON BEHALF OF CREDITOR


8

1                       I N D E X

2    DEBTOR'S EXHIBITS 1-14 AND 16-18 ADMITTED.................................................6

3    CREDITOR'S EXHIBITS 1-9 AND 11 ADMITTED .......................................7

4    TESTIMONY OF RICHARD WEBBER, ESQUIRE....................................12

5         DIRECT EXAMINATION BY MR. BAKER ....................................12

6         CROSS-EXAMINATION BY MR. KILLIAN .................................25

7         CROSS-EXAMINATION BY MR. JONES ....................................33

8    TESTIMONY OF WILLIAM BEEKMAN.......................................................50

9         DIRECT EXAMINATION BY MR. JONES ....................................50

10   TESTIMONY OF KAREN GIEL .............................................................59

11        DIRECT EXAMINATION BY MR. JONES ....................................59

12        CROSS-EXAMINATION BY MR. WEBBER.................................73

13        REDIRECT BY MR. JONES ...............................................................86

14        RECROSS EXAMINATION BY MR. WEBBER ............................87

15        FURTHER REDIRECT BY MR. JONES ...........................................89

16   TESTIMONY OF LUIS MACHADO............................................................93

17        DIRECT EXAMINATION BY MR. JONES ....................................93

18        CROSS-EXAMINATION BY MR. WEBBER.................................93

19   CERTIFICATE OF OATH.........................................................................111

20

4

1          P R O C E E D I N G S

2          THE CLERK:  THE COURT CALLS CASE NUMBER 12-10227,

3    8 MILE RANCH, LLC.

4          ALL INTERESTED PARTIES, PLEASE COME FORWARD AND

5    ENTER YOUR APPEARANCES.

6          MR. WEBBER:  GOOD AFTERNOON, JUDGE.  RICK WEBBER AND

7    SCOTT BAKER, ZIMMERMAN KISER & SUTCLIFFE, P.A., FOR THE

8    DEBTOR, 8 MILE RANCH LLC.  WE HAVE THE MEMBERS RUBEN

9    JOSEPH O'BERRY AND MARSHA O'BERRY SEATED AT COUNSEL

10   TABLE; AND MARSHA IS M-A-R-S-H-A.

11         MR. JONES:  GOOD AFTERNOON, YOUR HONOR.  JOSEPH JONES

12   FROM THE FIRM OF BERGER SINGERMAN; AND WITH ME TODAY

13   SEATED AT COUNSEL TABLE IS MR. LEWIS KILLIAN, WHO WILL BE

14   ASSISTING IN PRESENTATION.  ALSO ALONG WITH US ARE MR. LUIS

15   MACHADO AND CEFERINO MACHADO OF THE CREDITORS,

16   MACHADO LIMITED PARTNERSHIPS ONE AND THREE.

17         THE COURT:  WELCOME, EVERYONE.  WE ARE HERE TODAY IN

18   CONNECTION WITH THE EVIDENTIARY HEARING ON THE

19   REMAINING – WELL, ON THE – I THINK THE ISSUE PRIMARILY

20   RAISED BY THE CONFIRMATION ORDER AND THE INCLUSION OF A

21   PARCEL OF PROPERTY, WHETHER IT SHOULD OR SHOULD NOT BE

22   INCLUDED IN THE MEDIATED SETTLEMENT AGREEMENT; AND THE

23   SCHEDULING ORDER THAT I ISSUED IN CONNECTION WITH THE

24   MOTION TO COMPEL FILED BY THE MACHADO PARTIES.

25         SO, I THINK EVERYONE HAS COMPLIED WITH THAT ORDER,

1    BEST THAT I COULD TELL; AND THAT THE PARTIES HAVE VERY

2    DIFFERENT VIEWS.  AND I UNDERSTAND THAT WE'RE HERE ON THE

3    EVIDENTIARY ISSUE THAT I THOUGHT WE PROBABLY NEEDED TO

4    GET TO LAST TIME.  SO, MR. WEBBER OR MR. BAKER, WHO – WILL

5    YOU BE HANDLING THE EXAMINATION EXCEPT OF YOURSELF?

6         MR. WEBBER:  JUDGE, EXCEPT OF MYSELF.  MR. BAKER WILL

7    DO THAT, I FIGURED, INSTEAD OF A NARRATIVE; AND I HAD

8    SUGGESTED TO THE OTHER SIDE, AND I HAVEN'T HEARD AN

9    OBJECTION, THAT I GO FIRST.  I'LL WAIVE ANY REBUTTAL.  THERE

10   WON'T BE ANY.

11        THE COURT:  I DON'T CARE WHO GOES FIRST, BECAUSE WE'RE

12   GOING TO BE HERE UNTIL EVERYONE IS DONE.

13        MR. WEBBER:  I MEANT TO TESTIFY.

14        THE COURT:  OH.  TO TESTIFY.

15        MR. WEBBER:  YEAH, THAT'S WHAT I MEANT.  BUT WE HAVE

16   MET AND CONFERRED PURSUANT TO YOUR ORDER, EVEN THOUGH

17   IT WAS VIA E-MAIL IN TALLAHASSEE.  THAT WAS THE BEST WE

18   COULD DO.  AND I BELIEVE WE HAVE STIPULATED TO MOST OF THE

19   EVIDENCE TO HELP THE COURT, JUST SO THAT WE CAN GET TO

20   TESTIMONY AND REVIEW IT.  I BELIEVE THAT DEBTOR HAS 1

21   THROUGH 18; AND I BELIEVE THAT MACHADO STIPULATES TO

22   EVERYTHING BUT 15, WHICH IS THIS DEMONSTRATIVE EXHIBIT,

23   JUDGE, HERE; THIS CERTIFIED SURVEY MAP.  THEN WE HAVE A

24   SMALLER COLOR ONE IN THE BOOK.  BUT I BELIEVE THAT'S

25   CORRECT.

6

1        MR. WEBBER:  AND THEN –

2        THE COURT:  AND MR. – LET ME ASK, FIRST, MR. JONES OR MR.

3    KILLIAN, IS THAT CORRECT?

4        MR. JONES:  YES.  WE STIPULATE TO – I WAS JUST CHECKING

5    THE EXHIBIT LIST; AND THE DEMONSTRATIVE AIDE, NUMBER 15,

6    WE'RE GOING TO HOLD OFF ON STIPULATING TO THAT.

7        THE COURT:  WITHOUT OBJECTION, DEBTOR'S 1 THROUGH 14,

8    16 THROUGH 18, WILL BE ADMITTED.

9        MR. WEBBER:  AND ON THEIRS, LET'S SEE – WE, I THINK, HAD

10    ONLY OBJECTED TO 10.  AND WE, YOU KNOW, JUDGE, IT COULD BE

11    HEARSAY.  AND WE THINK BUSINESS RECORDS APPLY.  SO, WE'RE

12    JUST TRYING TO GET STUFF IN SO THAT YOU CAN HEAR THE

13    TESTIMONY.  SO, WE STIPULATE TO MACHADO'S 1, 2, 3, 4, 5, 6, 7, 8, 9,

14    AND 11; AND WE'LL HOLD – SO, WE EACH HAVE ONE THAT WE

15    HAVEN'T – WE DID PRETTY GOOD.

16        THE COURT:  I DON'T HAVE 11.

17        THE CLERK:  ME, EITHER.

18        THE COURT:  I'M MISSING SOMETHING.

19        THE CLERK:  I DON'T HAVE ONE, EITHER, THE 11.  NOT ON THE

20    EXHIBIT LIST.

21        THE COURT:  WE HAVE 1 THOUGH 10 SUBMITTED BY THE

22    MACHADO PARTIES.

23        MR. WEBBER:  WASN'T 11 AN ALLONGE?

24        MR. JONES:  YES.

25        THE COURT:  WE DON'T HAVE IT.

1        MR. WEBBER:  OKAY.  BUT WE DID TRY TO WORK THAT OUT,

2    JUDGE, TO HELP SPEED THINGS UP.

3        THE COURT:  JUST SO THAT WE'RE ON THE SAME NUMBERING,

4    THE OBJECTION IS JUST TO THEIR REPLY MEMORANDUM, BECAUSE

5    YOU DON'T WANT TO ADMIT WHAT THEY SAID?  OR –

6        MR. WEBBER:  NO, NO, NO.  NUMBER 10 IS THE SECOND

7    MORTGAGE.

8        THE COURT:  NO.  WE HAVE A PROBLEM, THEN.

9        MR. WEBBER:  WE DO?

10       THE COURT:  YEAH.  WE'LL HAVE TO LOOK AT – WE HAVE A

11   DIFFERENT LIST OF EXHIBITS.

12       THE CLERK:  THIS IS WHAT WAS IN YOUR BINDER.

13       MR. JONES:  IF I MAY APPROACH?

14       MR. WEBBER:  I'LL SIT DOWN.

15       [WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.]

16       THE COURT:  SO, I WILL ADMIT THE MACHADO FAMILY

17   EXHIBITS 1 THROUGH 9, AND 11, WITHOUT OBJECTION.

18       MR. WEBBER:  CORRECT.  THANK YOU.

19       THE COURT:  WHAT WERE YOU ANTICIPATING IN TERMS OF

20   EVIDENCE AND WITNESSES YOURSELF, MR. WEBBER.

21       MR. WEBBER:  WE HAVE MYSELF, SHORT, AS A SCRIVENER OF

22   SOME OF THESE THINGS, JUDGE; AND THAT'S REALLY WHAT I'M

23   GOING TO TESTIFY ABOUT.  WE HAVE MR. O'BERRY.  PROBABLY,

24   HE'S A HALF-HOUR.  I HAVE MARSHA HERE, BUT SHE'S NOT THAT

25   FAMILIAR, BUT THEY WANTED ME TO BRING HER.  SO, I MAY NOT

1    CALL HER; THEY MAY.  I NEED TO CALL MS. GIEL, THE BRANCH

2    MANAGER FROM CENTER STATE BANK WHO – BECAUSE

3    REMEMBER, THE MACHADO'S BOUGHT THE MORTGAGE –

4          THE COURT:  YES.  I ACTUALLY READ BOTH OF YOUR MEMOS

5    AND THE REPLIES AND THE RESPONSES.

6          MR. WEBBER:  OKAY.  ALL RIGHT.  SO, THAT'S WHAT WE

7    HAVE IN OUR EVIDENCE, EXCEPT FOR THE DEMONSTRATIVE IS IN.

8    AND THEN WE JUST NEED – YOU NEED TO HEAR TESTIMONY ABOUT

9    THAT.  AND –

10          THE COURT:  AND MR. SAXON, YOU'RE HERE TO HELP MS.

11    GIEL.  IS THAT CORRECT?  I DON'T WANT TO PUT YOU ON THE SPOT,

12    BUT I JUST WANTED TO SEE WHERE WE'RE GOING.

13          MR. SAXON:  THAT'S IT, YOUR HONOR.  [INAUDIBLE.]

14          THE COURT:  VERY GOOD.  MR. JONES, WHAT DO YOU

15    ANTICIPATE IN ADDITION TO THOSE WITNESSES?

16          MR. JONES:  IN ADDITION TO THOSE WITNESSES, YOUR

17    HONOR, WE ARE ALSO GOING TO HAVE MS. GIEL.  WE'RE GOING TO

18    HAVE THE SURVEYOR, MR. BEEKMAN, WHO IS OUT IN THE

19    HALLWAY; AND HE SHOULD BE RELATIVELY SHORT.  I'M THINKING

20    15 TO 20 MINUTES.  I WOULD SAY 30 AT THE MOST, NOT COUNTING

21    CROSSES, OF COURSE.  WE'LL HAVE MR. MACHADO – I ANTICIPATE

22    HE WILL BE VERY SHORT, AS WELL; 30 MINUTES AT THE MOST.

23    THAT'S PRETTY MUCH IT.  ALTHOUGH I MAY END UP CALLING MR.

24    O'BERRY.  I DO NOT KNOW THAT.

25          THE COURT:  VERY GOOD.

1       MR. JONES:  AND I WILL BE EXAMINING MR. WEBBER, AS

2   WELL.  I DID WANT TO SAY, YOUR HONOR, THAT WE – YOU KNOW,

3   WE'RE THE MOVANT HERE ON OUR MOTION.  AND OUR PREFERENCE

4   IS THAT WE SET THE ORDER OF THE WITNESSES AND THE

5   ARGUMENT AND THE HEARING – WELL, OF COURSE, THE COURT

6   WOULD ALWAYS SET THAT.

7       THE COURT:  SURE.

8       MR. JONES:  I UNDERSTAND.  BUT I NEVER STIPULATED THAT

9   MR. WEBBER COULD GO   FIRST –

10      THE COURT:  RIGHT.

11      MR. JONES:  -- AND RUN THE HEARING.

12      THE COURT:  WELL, LET ME ASK YOU THIS:  MR. WEBBER IS

13  GOING TO BE A FACT WITNESS.  MR. BAKER IS HERE TO DO THAT

14  EXAMINATION.  DO YOU CARE WHAT ORDER HE IS?  OR DO YOU

15  HAVE ANY OBJECTION TO THAT PROCESS?

16      MR. JONES:  WELL, I DON'T HAVE AN OBJECTION TO MR.

17  WEBBER TESTIFYING.  IN FACT, I KIND OF WELCOME THAT.  BUT

18  WHAT I DO HAVE AN OBJECTION TO IS MR. WEBBER IS GOING TO BE

19  A FACT WITNESS.  I INTEND ON INVOKING THE RULE AS SOON AS WE

20  START.  AND IT'S MY INTENTION TO ASK THE COURT THAT MR.

21  WEBBER LEAVE THE ROOM UNDER RULE 615.  AND BECAUSE MR.

22  BAKER IS HERE, MR. WEBBER DOES NOT MEET ANY OF THE

23  EXCEPTIONS OF 615, SUCH AS ESSENTIAL PRESENTATION OF HIS

24  CLIENT'S CASE.  SO, IT SEEMS TO ME THAT HE HAS A CHOICE TO

25  MAKE.

10

1        YOU KNOW, HE HAD MENTIONED TESTIFYING IN THE

2   NARRATIVE AND ALL OF THIS OTHER STUFF.  AND I DON'T THINK

3   THAT HE GETS THE BENEFIT OF BEING A FACT WITNESS AND

4   SITTING HERE LISTENING TO ALL OF THE TESTIMONY.  HE'S NOT A

5   PARTY; HE'S AN ADVOCATE.  THAT'S WHAT HE'S HERE TO DO.  AND

6   IT WOULD BE A DISADVANTAGE TO OUR CLIENTS, FOR SURE, TO

7   HAVE MR. WEBBER SIT HERE AND PREP HIS OWN CROSS-

8   EXAMINATION WHILE WE EXAMINE WITNESSES.

9        SO, WHEN WE DO GET STARTED, WE PLAN ON INVOKING THE

10  RULE.  AND I GUESS THAT WOULD BE A MATTER FOR THE COURT TO

11  DETERMINE.

12       THE COURT:  OKAY.  AND WITH DUE RESPECT TO ALL OF YOU,

13  I'M GOING TO SET THE ORDER OF WITNESSES, BECAUSE WHAT I DO

14  IS I LIKE TO HAVE THIRD-PARTY WITNESSES EXAMINED FIRST.  IT

15  HELPS ME ANALYZE THE PARTY WITNESSES THAT WILL COME

16  LATER.  AND GIVEN THE SOMEWHAT UNUSUAL NATURE OF AN

17  ATTORNEY TESTIFYING, MR. WEBBER, YOU GET TO GO FIRST.

18       MR. WEBBER:  THANK YOU.

19       THE COURT:  HAVING SAID THAT, THE CROSS AND THE

20  DIRECT, WE CAN KEEP IT OPEN.  YOU'RE WELCOME TO CALL

21  PARTIES BACK IF YOU WANT TO.  I DON'T MIND AFTER I SET THESE

22  OUT, THIRD PARTIES GOING FIRST, YOU'RE WELCOME TO CALL MR.

23  MACHADO, IF YOU WANT TO DO THAT FIRST.  IF YOU WANT TO

24  CALL MR. O'BERRY FIRST, YOU'RE WELCOME TO DO THAT FIRST.

25  BUT WE WILL TAKE THEM IN THIS ORDER:  IT WILL BE MR. WEBBER,

1    AND THEN IT WILL BE MS. GIEL OR THE SURVEYOR, WHICHEVER

2    THE TWO OF YOU ALL – I DON'T CARE BETWEEN THE SURVEYOR

3    AND MS. GIEL, BUT JUST SO THE THIRD-PARTY WITNESSES DON'T

4    HAVE TO WAIT FOREVER TO TESTIFY AND LISTEN TO THINGS THEY

5    PROBABLY SHOULDN'T.

6            IN CONNECTION WITH THE – YOU HAVE INVOKED THE RULE,

7    HOWEVER, SO I AM GOING TO ASK YOU GUYS TO WAIT OUT IN THE

8    HALLWAY, SINCE YOU ARE A THIRD PARTY.  WE WILL BE TO YOU

9    AS SOON AS WE FINISH EITHER THE SURVEYOR AND/OR MR.

10   WEBBER'S TESTIMONY.

11           ANY OTHER QUESTIONS – ANY OTHER QUESTIONS

12   REGARDING THE INVOCATION OF THE SEQUESTRATION RULE OR

13   OTHERWISE?

14           IN CONNECTION WITH MR. WEBBER'S TESTIMONY, I'M GOING

15   TO ALLOW – MOSTLY BECAUSE I WANT THIS TO BE A NICE RECORD.

16   I WANT IT TO BE A CLEAN RECORD.  AND SO, I'M GOING TO ALLOW

17   MR. BAKER TO EXAMINE MR. WEBBER, AND THEN FOR YOU TO

18   CROSS-EXAMINE TO THE FULL EXTENT THAT YOU WANT TO; AND

19   WE'LL CONTINUE ON UNTIL THE EXAMINATION IS COMPLETE.

20   OKAY?

21           MR. JONES:  AND, YOUR HONOR, TO BE CLEAR, WE'RE GOING

22   TO BE ALLOWED A BRIEF TIME TO OPEN AND PRESENT BEFORE WE –

23           THE COURT:  NO.  I DO NOT TAKE OPENING ARGUMENTS AT

24   ANY POINT.  I DON'T NEED THEM.  I'VE READ YOUR BRIEFS.  I KNOW

25   WHERE WE'RE GOING.

12

1    MR. JONES:  OKAY.

2    THE COURT:  AND YOU HAVE A LIMITED AMOUNT OF TIME;

3    AND WE ARE GOING TO FINISH TODAY.

4    MR. JONES:  OKAY.

5    THE COURT:  BUT I WILL WELCOME CLOSING, EITHER AT THE

6    END OR IN WRITING; WHATEVER THE PARTIES WANT.  SO, I WILL

7    WANT YOUR ARGUMENT.  I JUST DON'T WANT IT UP FRONT.

8    MR. WEBBER, IF YOU'D COME FORWARD AND BE SWORN.

9    RICHARD WEBBER, ESQUIRE,

10   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

11   FOLLOWS:

12   THE CLERK:  PLEASE STATE YOUR NAME AND ADDRESS FOR

13   THE RECORD.

14   THE WITNESS:  RICHARD BLACKSTONE WEBBER, II.  315 EAST

15   ROBINSON STREET, SUITE 600, ORLANDO, FL, 32801.

16   THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

17   MR. BAKER:  MAY I PROCEED, YOUR HONOR?

18   THE COURT:  YES, PLEASE.

19   MR. BAKER:  THANK YOU.

20   DIRECT EXAMINATION

21   BY MR. BAKER:

22   Q    GOOD AFTERNOON, MR. WEBBER.  TO START US OFF TODAY,

23   WOULD YOU PLEASE GIVE US – OR TURN TO EXHIBIT NUMBER FOUR IN

24   YOUR NOTEBOOK?

25   A    YES.

13

1      Q        AND WOULD YOU IDENTIFY WHAT THAT EXHIBIT IS FOR THE

2  COURT, PLEASE?

3      A        YES.  THIS IS THE OSCEOLA COUNTY CASE NUMBER 2011-CA-

4  001988-MF DOCKET SHEET.

5      Q        AND IS THIS THE MORTGAGE REFORMATION AND

6  FORECLOSURE LITIGATION?

7      A        FILED BY MR. AND – THE MACHADO'S.  YES.

8      Q        NOW, IS THERE AN EXHIBIT 4A AND 4B ATTACHED TO THAT

9  EXHIBIT FOUR?

10     A        THERE ARE.  FOUR "A" IS THE COMPLAINT – THE VERIFIED

11 COMPLAINT.  AND "B" – AND THESE ARE ALL CERTIFIED COPIES – WAS THE

12 SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES TO VERIFIED

13 COMPLAINT, COUNTERCLAIM, CROSSCLAIM, AND THIRD-PARTY

14 COMPLAINT.

15     Q        DOES THE DOCKET REFLECT A SUGGESTION OF

16 BANKRUPTCY?

17     A        IT DOES.  I FILED A SUGGESTION OF BANKRUPTCY ON BEHALF

18 OF THE DEBTOR ON   JULY 31, 2012.  THERE ARE, UNFORTUNATELY, NO

19 PAGE NUMBERS HERE, BUT IT'S DOCKET ENTRY NUMBER 37.

20     Q        MR. WEBBER, PLEASE TAKE A LOOK AGAIN AT THE

21 COMPLAINT; SPECIFICALLY COUNT ONE.  PLEASE READ FOR THE COURT

22 THE PARAGRAPH CONCERNING "MUTUAL MISTAKE."

23     A        IS THAT PARAGRAPH NINE, MR. BAKER?

24     Q        YES.

25     A        ON PAGE FIVE?

14

1    Q    YES.

2    A    "THE FAILURE OF THE MORTGAGE TO CORRECTLY DESCRIBE

3    PARCEL ONE AND PARCEL TWO WAS THE RESULT OF A MUTUAL MISTAKE

4    BY RUBEN JOSEPH O'BERRY, MARSHA O'BERRY, AND CENTER STATE

5    BANK AND, AS A RESULT, THE MORTGAGE DOES NOT ACCURATELY

6    EXPRESS THE TRUE INTENTION AND THE AGREEMENT OF SAID PARTIES."

7    Q    AND PLEASE, MR. WEBBER, REVIEW THE SECOND AMENDED

8    ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM.  WHAT IS THE

9    NATURE OF THAT – THAT SET OF PLEADINGS?

10    A    THE CROSSCLAIMS WERE AGAINST THE MACHADO

11    PARTNERSHIPS ONE AND THREE AND, INDIVIDUALLY, LUIS AND CEFERINO

12    MACHADO, FATHER AND SON, I BELIEVE.  THE COUNTS WERE FIDUCIARY

13    DUTY, BREACH OF CONTRACT, FRAUD – I THINK THAT'S IT.  YES.

14    Q    AND WE'VE ADMITTED TODAY AN EXHIBIT SIX IN YOUR

15    NOTEBOOK.

16    A    YES.

17    Q    PLEASE DESCRIBE WHAT THAT IS FOR THE COURT.

18    A    EXHIBIT NUMBER SIX, JUDGE, IT'S THE MEDIATED

19    SETTLEMENT AGREEMENT.  YOU ORDERED MEDIATION IN THIS CASE.  WE

20    WENT TO MEDIATION.  SCOTT SHUKER WAS THE MEDIATOR; AND THIS – I

21    THINK IT'S A 12-PAGE DOCUMENT – ENDED UP BEING THE RESULT OF A

22    FULL DAY OF MEDIATION.

23    Q    DID YOU WRITE THIS DOCUMENT?

24    A    I WAS PARTIAL SCRIVENER.  I MEAN, YOU KNOW, YOU HAVE

25    THE MEDIATOR WORKING ON IT; THEN YOU MAKE SUGGESTIONS,

1  CORRECTIONS, INSERTIONS.  SO, I WOULD SAY I'M A PARTIAL SCRIVENER.

2      Q      THERE'S A TERM IN THE EXHIBIT SIX PROPERTY IN QUOTES.

3      A      YES.  THAT'S ON PAGE TWO.  AND, JUDGE, IF YOU LOOK AT IT,

4  IT'S ROMAN NUMERAL – NOT ROMAN NUMERAL – SMALL "II" IN PAREN IN

5  THE TOP PARAGRAPH.  AND THE PROPERTY – OR, THE LEGAL

6  DESCRIPTIONS, WHICH ARE ATTACHED TO THE MEDIATED SETTLEMENT

7  AGREEMENT.

8      Q      SO, THE TERM "PROPERTY" INCLUDES THE LEGAL

9  DESCRIPTIONS –

10     A      YES.

11     Q      -- ATTACHED TO THIS AGREEMENT?

12     A      YES.

13     Q      PLEASE EXPLAIN TO THE COURT ANOTHER PHRASE USED IN

14  THIS AGREEMENT, WHICH IS "ENCUMBERED BY THE MORTGAGE."

15     A      YES.  THAT'S JUST ABOVE THAT.  THAT'S ACTUALLY IN THE

16  SAME SMALL "II" PARAGRAPH IN PARAGRAPH ONE.  THIS WAS A

17  NEGOTIATED TERM BY THE DEBTOR AND VERY IMPORTANT THAT THIS BE

18  INCLUDED IN THE MEDIATED SETTLEMENT AGREEMENT; AND THAT'S

19  ALSO WHY WE HAD ENCUMBERED BY THE MORTGAGE AND THE REAL

20  PROPERTY LEGAL DESCRIPTIONS ATTACHED.

21          MR. JONES:  JUDGE, I'M GOING TO OBJECT TO THE DISCUSSION

22          OF THE MEDIATION AND WHAT THE PARTIES WANTED.  THIS IS ALL

23          CONFIDENTIAL; AND IT SHOULD REMAIN CONFIDENTIAL.

24          THE COURT:  MR. BAKER, WHAT IS YOUR RESPONSE TO THAT?

25          MR. BAKER:  JUDGE, THAT THE CONTENTS OF THE MEDIATION

16

1       SETTLEMENT AGREEMENT HAS BEEN PUT AT ISSUE BY THE

2       OPPONENT IN THE CASE AND, THEREFORE, IT'S NO LONGER

3       SUBJECT TO CONFIDENTIALITY.

4               THE COURT:  AND YOUR RESPONSE, IF ANY, MR. JONES?

5               MR. JONES:  WELL, JUDGE, I'M NOT SURE THAT WE PUT THE

6       CONTENTS OF THE MEDIATED SETTLEMENT AGREEMENT AT ISSUE.

7       WE FILED OUR MOTION TO COMPEL COMPLIANCE WITH THE ORDER

8       CONFIRMING THE PLAN.  AND WHILE –

9               THE COURT:  THAT REFERENCES THE MEDIATED SETTLEMENT

10      AGREEMENT.

11              MR. JONES:  IT DOES REFERENCE THAT, AS DOES THE MOTION

12      TO APPROVE THE SETTLEMENT AND COMPROMISE IN THE PLAN;

13      BUT TO TALK ABOUT WHAT THE PARTIES DISCUSSED AT

14      MEDIATION AND HOW WE ARRIVED AT THIS SHOULD NOT BE

15      DISCUSSED, AND WHAT WAS IMPORTANT TO EVERY PARTY.

16              THE COURT:  THE CONFIDENTIALITY OF SETTLEMENT

17      NEGOTIATIONS IS VERY IMPORTANT.  I DON'T DISAGREE.  THE

18      PROBLEM IS THAT WHEN THERE'S AN AMBIGUITY THAT ARRIVES

19      SUBSEQUENTLY; AND GIVEN THAT YOUR RESERVATION OF

20      JURISDICTION THAT WAS IN BOTH THE CONFIRMATION ORDER AND

21      THE PROVISION THAT WE'RE SPECIFICALLY AT, I THINK,

22      UNFORTUNATELY, THE CONFIDENTIALITY WILL HAVE TO SECEDE

23      TO THE FACTUAL DISPUTE THAT IS RAISING THIS AMBIGUITY.

24              SO, I WILL OVERRULE THE OBJECTION; NOT JUST FOR THIS

25      WITNESS, BUT FOR THE ONES, TO THE EXTENT WE NEED TO ON THE

17

1        ISSUE WE'RE HERE.  OTHER ISSUES, I DON'T NEED TO GO THERE.

2        BUT IF IT RELATES TO SECTION 23 AND THAT PROPERTY, THEN WE

3        DO NEED TO – I NEED TO HEAR WHAT HAPPENED.  SO, I WILL

4        OVERRULE THE OBJECTION.

5                MR. JONES:  THANK YOU, YOUR HONOR.

6   BY MR. BAKER:

7        Q        MR. WEBBER, TO REPEAT, BOTH THE TERM "ENCUMBERED BY

8   THE MORTGAGE" AND THE TERM "PROPERTY" WERE BOTH PLACED INTO

9   THE DOCUMENT AT THE DEBTOR'S REQUEST.  IS THAT RIGHT?

10       A        YES.  AND WE BOTH WANTED THE REAL PROPERTY

11  DESCRIPTIONS ATTACHED.  BUT "ENCUMBERED BY THE MORTGAGE" WAS

12  SPECIFICALLY REQUESTED BY THE DEBTOR AND INSERTED.

13       Q        DID THE SETTLEMENT AGREEMENT WE'RE DISCUSSING

14  INCLUDE THE OSCEOLA COUNTY LITIGATION THAT YOU –

15       A        IT DID.  IF YOU LOOK BACK AT PAGE ONE OF THE MEDIATED

16  SETTLEMENT AGREEMENT, THIS WAS A GLOBAL.  WE DID FIVE – TWO

17  FLORIDA STATE COURT CASES, ONE BANKRUPTCY FRAUDULENT

18  TRANSFER ADVERSARY PROCEEDING, AND TWO TEXAS STATE COURT

19  CASES.  SO, ALL FIVE LAWSUITS WERE SETTLED.

20       Q        AND WERE THOSE LEGAL DESCRIPTIONS THAT MADE THEIR

21  WAY INTO THE SETTLEMENT AGREEMENT ALSO INCLUDED IN THE PLAN

22  OF LIQUIDATION?

23       A        YES.

24       Q        AND THAT WOULD INCLUDE THE, FOR LACK OF A BETTER

25  TERM, THE MACHADO QUIT CLAIM DEEDS?

1       A       YES.  AND THE REASON THAT PART OF THE FRAUDULENT

2    TRANSFER ADVERSARY PROCEEDING WAS ALL THESE QUIT CLAIM DEEDS

3    THAT CAME OUT; AND THEY HAVE LEGALS THAT ARE ATTACHED TO

4    THEM.  SO, WE JUST ATTACHED THOSE DEEDS, BECAUSE THEY HAD THE

5    LEGALS AND WE WANTED TO BE ALL-INCLUSIVE.

6       Q       AND THAT WOULD ALSO INCLUDE A LEGAL DESCRIPTION

7    THAT WAS ATTACHED TO THE CENTER STATE BANK MORTGAGE,

8    CORRECT?

9       A       YES.

10      Q       IF YOU COULD PLEASE TURN TO EXHIBIT NUMBER SEVEN,

11   WHICH IS THE NEXT EXHIBIT IN YOUR BINDER; AND THAT – PLEASE

12   DESCRIBE FOR THE COURT WHAT THAT DOCUMENT IS.

13      A       IT'S THE MOTION FOR APPROVAL OF THE SETTLEMENT AND

14   COMPROMISE OF CLAIM BETWEEN THE DEBTOR, THE MACHADO FAMILY

15   LIMITED PARTNERSHIP #1, AND THE MACHADO FAMILY LIMITED

16   PARTNERSHIP #3.  THIS WAS THE NOTICE TO ALL CREDITORS.  IT'S DONE

17   ON NEGATIVE NOTICE; AND IT HAD THE – WHAT I CALL THE MSA, THE

18   MEDIATED SETTLEMENT AGREEMENT, ATTACHED.

19      Q       WHO DRAFTED THIS DOCUMENT?

20      A       THIS WAS DRAFTED BY BROAD AND CASSEL, MACHADO'S

21   ATTORNEYS.

22      Q       PLEASE READ FOR THE COURT PARAGRAPH NUMBER FIVE OF

23   THIS DOCUMENT.

24      A       "THE DEBTORS AND CREDITORS (COLLECTIVELY, THE

25   PARTIES) PARTICIPATED IN MEDIATION AND THE PARTIES HAVE BEEN

19

1   ABLE TO REACH A SETTLEMENT OF THE CLAIMS AGAINST THE

2   DEFENDANTS, FULLY RESOLVING THE CREDITORS' CLAIMS AGAINST THE

3   DEBTOR AND THE DEBTOR'S CLAIMS AGAINST DEFENDANTS IN THE

4   ADVERSARY PROCEEDING, AS WELL AS ALL OTHER CLAIMS THE PARTIES

5   MAY HAVE AGAINST EACH OTHER."

6   Q     THANK YOU.  AND WAS AN ORDER ENTERED APPROVING THIS

7   --

8   A     YES.

9   Q     -- DOCUMENT?

10   A     I BELIEVE IT'S EXHIBIT NUMBER EIGHT.

11   Q     YES.

12   A     YES.  AN ORDER WAS ENTERED APPROVING THIS, DOCUMENT

13   65, ON FEBRUARY 12, 2013.  IT WAS NOT APPEALED; AND IT IS FINAL.

14   Q     THANK YOU.  PLEASE TURN TO EXHIBIT NUMBER 11.

15   A     OKAY.

16   Q     AND DESCRIBE THAT DOCUMENT FOR THE COURT.

17   A     THIS IS THE PLAN OF LIQUIDATION; AND I'M THE SCRIVENER,

18   BUT I WAS ALSO JOINED BY THE MACHADO FAMILY LIMITED

19   PARTNERSHIP NO. 1 AND THE MACHADO FAMILY LIMITED PARTNERSHIP

20   NO. 3.  THAT'S IN THE INTRO PARAGRAPH.

21   Q     PLEASE SUMMARIZE OR PROVIDE AN OVERVIEW OF

22   DEFINITIONS THAT ARE INCLUDED IN THIS DOCUMENT, IN PARTICULAR,

23   "MEDIATED SETTLEMENT," "REAL PROPERTY," AND "MEDIATED REAL

24   PROPERTY."

25   A     YES.  ON EIGHT, WE GO OVER WHAT THE MEDIATED

1   SETTLEMENT WAS.  WE JUST REVIEWED THAT.  THAT'S THE NOVEMBER 29,

2   2012, MSA AND THE MOTION TO APPROVE.  ON PAGE 10, I HAVE

3   "PROPERTY," WHICH IS GIVEN THE BROAD MEANING OF PROPERTY OF THE

4   ESTATE DELINEATED IN § 541 OF THE CODE.

5        THEN I HAVE "REAL PROPERTY" DOWN NEAR THE BOTTOM OF 10,

6   WHICH IS:  SHALL MEAN THE PROPERTY LOCATED AT 5400 8 MILE RANCH

7   ROAD, ST. CLOUD, FLORIDA, 34773.  MOST OF THAT ACREAGE OUT THERE

8   DOESN'T HAVE AN ADDRESS, SO THAT'S THE BEST WAY WE COULD

9   DESCRIBE IT WITHOUT GIVING METES AND BOUNDS.

10       AND THEN, FINALLY, AT THE BOTTOM OF 10, GOING ON TO 11:

11  "MEDIATED REAL PROPERTY" SHALL MEAN THE PROPERTY LOCATED AT

12  5400 8 MILE RANCH ROAD, ST. CLOUD, FLORIDA, 34773, THAT IS

13  ENCUMBERED BY THE MORTGAGE, AS WELL AS THE PARCELS OWNED BY

14  THE MACHADO FAMILY LIMITED PARTNERSHIP #3, WHICH DESCRIPTIONS

15  ARE ATTACHED TO THE MEDIATED SETTLEMENT AGREEMENT.

16       AND THOSE WERE THE QUIT CLAIM DEEDS THAT I HAD TALKED

17  ABOUT BEFORE.

18       Q     HOW WERE THE CLASS 2 AND CLASS 3 CLAIMS TREATED IN

19  THIS PLAN?

20       A     THEY WERE BOTH IMPAIRED.  AND THE SETTLEMENT WAS A

21  TWO-STEP, JUDGE.  IT WAS SUPPOSED TO BE A SALE.  AS THE FIRST STEP,

22  THERE WAS A SIX-MONTH MARKETING PERIOD, THREE MILLION-DOLLAR

23  STRIKE PRICE.  THAT DIDN'T HAPPEN, SO WE MOVED TO PLAN "B," WHICH

24  WAS PROVIDED.  AND THAT IS THAT THE LAND THAT WAS ENCUMBERED

25  BY THE MORTGAGE AND SETTLED IN THE MEDIATED SETTLEMENT

21

1    AGREEMENT WOULD BE TRANSFERRED ON THE ALLOWED SECURED

2    CLAIMS OF MACHADO NO. 1 AND MACHADO NO.3.  AND THOSE ARE CLASS

3    2 AND CLASS 3, RESPECTIVELY.

4          Q      PLEASE DISCUSS THE TREATMENT OF CLASS 4 UNSECURED

5    CLAIMS.

6          A      CLASS 4, THE UNSECURED CREDITORS, JUDGE, THAT

7    TREATMENT IS ON PAGE 15.  THEY WOULD RECEIVE A PRO RATA SHARE

8    OF ANY NET PROCEEDS OF THE CAUSES OF ACTION, OF WHICH THERE ARE

9    NONE -- SO, THERE ARE NO PRO RATA PROCEEDS TO COME FROM THAT –

10   OR ANY ASSETS WHICH ARE NOT ENCUMBERED BY LIENS AND NOT

11   TRANSFERRED UNDER THE PLAN.  CLASS 4 IS IMPAIRED AND ELIGIBLE TO

12   VOTE.

13         Q      AND, FINALLY, PLEASE SUMMARIZE THE CLASS 5 INSIDER

14   CLAIMS.

15         A      MARSHA AND JOE O'BERRY WERE ABLE TO RETAIN THEIR

16   EQUITY INTERESTS IN THE DEBTOR.

17         Q      THANK YOU.  WE'RE GOING TO TALK, NOW, ABOUT EXHIBIT

18   NUMBER 13.  JUST PLEASE IDENTIFY THAT DOCUMENT FOR THE COURT.

19         A      THIS IS THE ORDER CONFIRMING THE CHAPTER 11 PLAN OF

20   LIQUIDATION ENTERED BY JUDGE JENNEMANN ON SEPTEMBER 27, 2013,

21   DOCUMENT 139.

22         Q      AND PLEASE TELL US WHAT PARAGRAPH 10 SAYS, AND TELL

23   US IF YOU WROTE THIS.

24         A      YES.  THE COURT SHALL RETAIN JURISDICTION IN

25   ACCORDANCE WITH SECTION VIII OF THE PLAN AND TO ENFORCE,

22

1    MODIFY OR RESOLVE ANY TERMS OF THIS ORDER, INCLUDING; BUT NOT

2    LIMITED TO EFFECTUATE THE TRANSFER OF THE REAL PROPERTY FROM

3    THE DEBTOR TO THE MACHADO CREDITORS OR THEIR DESIGNEE AS SET

4    FORTH IN PARAGRAPH FIVE, AND CORRECTING THE PREVIOUSLY

5    DISCLOSED SCRIVENER'S ERRORS IN THE LEGAL DESCRIPTION RAISED

6    PRE-PETITION OF THE REAL PROPERTY FORECLOSURE ACTION.

7         Q    WHO WROTE THAT?

8         A    I WROTE THAT AT THE REQUEST OF MACHADO LAWYERS.

9         Q    NOW, THAT WOULD BE THE BROAD AND CASSEL FIRM,

10   CORRECT?

11        A    YES.  BROAD AND CASSEL.

12        Q    DID THEY ASK – DID THEY TELL YOU THAT ANYTHING ELSE

13   WAS NEEDED TO CORRECT A LEGAL DESCRIPTION?

14        A    NO.  I MEAN, WELL, THEY SAID THAT – THE REPRESENTATION

15   MADE TO ME, AND THE REASON THIS PARAGRAPH WAS NEEDED, WAS FOR

16   -- HAVE A SURVEY, SO THAT WE COULD HAVE PROPER LEGAL

17   DESCRIPTIONS, BECAUSE WE WERE ON PLAN "B," WHICH WAS THE DEED

18   TO MACHADOS OF THE DEBTOR'S PROPERTY THAT WAS ENCUMBERED BY

19   THE MORTGAGE.  AND MY UNDERSTANDING, AND THE REPRESENTATIONS

20   MADE TO ME THAT THE LEGAL DESCRIPTIONS WERE NOT CLOSED IN; AND,

21   THEREFORE, WE NEEDED A SURVEY.

22        Q    NOW, WAS THE OSCEOLA COUNTY LITIGATION SETTLED IN

23   THE MEDIATED SETTLEMENT AGREEMENT?

24        A    ABSOLUTELY SO; ONE OF THE FIVE LAWSUITS.

25        Q    AND DID YOU INTEND OR BELIEVE YOU WERE RESURRECTING

23

1    THAT LITIGATION WHEN YOU WROTE PARAGRAPH 10?

2        A        NO.

3        Q        DID YOU RECEIVE A SURVEY FROM –

4        A        WE DID.

5        Q        -- THE MACHADOS?

6        A        WE – NOW, THIS IS DATED WHAT?  SEPTEMBER 27, 2013.

7        Q        AND IS THAT – IS THAT NOT EXHIBIT NUMBER 16?

8        A        YES.  WE FINALLY RECEIVED EXHIBIT NUMBER 16 FROM

9    MACHADOS' COUNSEL.  AND MY EYES ARE REALLY BAD, BUT I THINK IT'S

10   AUGUST OF 2014.  I HONESTLY CAN'T READ THAT LITTLE MIDDLE DATE

11   RIGHT NOW.  BUT I THINK AUGUST 2014 IS ACCURATE.

12       Q        WHY IS THIS SURVEY IMPORTANT?

13       A        TO CLOSE IN THE LEGALS SO THAT WE COULD EXECUTE A

14   DEED THAT WOULDN'T BE A PROBLEM FOR THE MACHADOS.

15       Q        NOW, TELL ME, IF WE COULD BACK UP TWO EXHIBITS TO

16   NUMBER 14.  PLEASE IDENTIFY THAT EXHIBIT FOR THE COURT.

17       A        THIS IS A MARCH 24, 2014, LETTER.  ANDREW ROY SIGNED IT,

18   ATTORNEYS FOR CENTER STATE BANK, PUTTING STEWART TITLE ON

19   NOTICE.  CENTER STATE BANK HAD THE TITLE POLICY ISSUED WHEN

20   THEY GOT THE 1.4 MILLION-DOLLAR MORTGAGE; AND THAT WAS LATER

21   ASSIGNED TO MACHADO.  BUT YOU'LL NOTE THAT IT REFERENCES THE

22   MACHADOS' ASSIGNMENT IN THIS LETTER IN THE FIRST PARAGRAPH.

23            AND THEN IT SAYS:  "AMONG OTHER THINGS" – THIS IS IN THE

24   SECOND PARAGRAPH, SECOND SENTENCE – "AMONG OTHER THINGS, THE

25   LEGAL DESCRIPTIONS IN THE MORTGAGE DO NOT APPEAR TO PROVIDE

24

1   COHESIVE INSTRUCTIONS TO FORM AN ENCLOSED PARCEL."

2      Q      THANK YOU.  NOW, YOU REFERENCED A DEED TO THE

3   MACHADO FAMILY, OR THE LIMITED PARTNERSHIPS.

4      A      YES.

5      Q      IS THAT EXHIBIT NUMBER 17?

6      A      IT IS.

7      Q      AND WHEN WAS THAT DEED DELIVERED OR –

8      A      WELL, IT HASN'T BEEN –

9      Q      -- EXECUTED?

10      A      -- IT HASN'T BEEN DELIVERED.  AND I WANT TO MAKE SURE

11   THAT THAT'S REALLY CLEAR.  THE JUDGE HAD ASKED ME AT THE LAST

12   HEARING IF WE WOULD EXECUTE A QUIT CLAIM DEED WITHOUT SECTION

13   23; AND I INFORMED THE COURT THAT WE WOULD.  AND ON JANUARY 29,

14   2015, THE DEED WAS EXECUTED AND THE COPY – I HAVE THE ORIGINAL IN

15   THE COURTROOM.  BUT MR. O'BERRY AND I WANTED TO MAKE SURE

16   THAT ALL THE – I MEAN, SECTION 23 OBVIOUSLY WASN'T INCLUDED; SO

17   THAT WAS EASY.  BUT WE WANTED TO MAKE SURE THAT ALL THE

18   LEGALS THAT WERE ATTACHED AS "EXHIBIT A" – AND THERE ARE

19   SEVERAL PAGES – WERE CORRECT.

20          AND, INDEED, THEY – WE DISCOVERED ERRORS IN 2, 10, 11, 13, AND

21   14; 14 BEING THE BIGGEST PROBLEM, BECAUSE IT'S OWNED PROPERTY

22   OTHER THAN 8 MILE RANCH.

23      Q      AND IS THAT THE REASON YOU FEEL LIKE THIS DEED

24   CANNOT BE DELIVERED?

25      A      IF WE DELIVER IT, IT'S JUST GOING TO CREATE THE

1    MACHADOS MORE TROUBLE.  AND I THINK THAT THESE NEED TO BE

2    CORRECTED.  I MEAN, IF THE COURT WANTS US TO CORRECT IT AND

3    DELIVER IT, WE'LL BE HAPPY TO.  WE – MR. O'BERRY SPENT A LOT OF

4    TIME IN THE OSCEOLA COUNTY LAND RECORDS OFFICE GOING OVER

5    THESE LEGALS.  AND YOU CAN SEE, JUDGE, THAT THERE ARE PAGES OF

6    PROBLEMS THAT CAN ALL BE FIXED.  I THINK WE HAVE THE CORRECTED.

7    BUT I WANTED TO SHOW THE COURT THAT WE TRIED.

8              MR. BAKER:  THANK YOU, MR. WEBBER.  YOUR HONOR, I

9         HAVE NO FURTHER DIRECT QUESTIONING.

10             THE COURT:  THANK YOU.

11             MR. KILLIAN:  I'M GOING TO START OUT.

12             THE COURT:  CERTAINLY, MR. KILLIAN.

13                        CROSS-EXAMINATION

14    BY MR. KILLIAN:

15        Q    GOOD AFTERNOON, MR. WEBBER.

16        A    GOOD AFTERNOON, MR. KILLIAN.

17        Q    YOU RECEIVED THE DEED FROM MR. JONES IN OCTOBER.

18        A    YES.

19        Q    IS THAT RIGHT?

20        A    A DRAFT.  YES.

21        Q    AND WHEN WAS THAT RESPONDED TO?

22        A    I DON'T REMEMBER.

23        Q    AND WHEN WAS THE DEED SENT?  THE DEED THAT YOU

24    PREPARED SENT OVER TO MR. JONES?

25        A    I DIDN'T PREPARE A DEED.  WE WERE WAITING FOR A

26

1    SURVEY.  WE GOT THE SURVEY, FINALLY.  THEY PREPARED THE DEED;

2    AND IT HAD SECTION 23 IN IT.  WE SAID "NO."  THEY REMOVED SECTION

3    23, BUT YOU COULD SEE THE OTHER PROBLEMS.

4         Q        AND SECTION 23, THAT'S REALLY THE ISSUE HERE.  THAT –

5         A        IT CERTAINLY IS.

6         Q        -- THAT'S A HUNDRED – 161 ACRES.

7         A        YES.  AND IF YOU LOOK AT THIS DEMONSTRATIVE EXHIBIT,

8    IT'S RIGHT THERE.  IT'S THE NORTHEAST QUARTER OF SECTION 23; SO,

9    THAT WOULD BE RIGHT THERE.

10        Q        AND THE PROBLEM WITH THE DEED IS THAT IT DESCRIBED

11   THE NORTHEAST SECTION OF 24?

12        A        WELL, 24 IS NEXT DOOR.  I MEAN, RIGHT ABOVE IS 24, SO I

13   DON'T –

14        Q        WELL, SECTION 24, I BELIEVE, IS OVER TO THE EAST – THE

15   RIGHT.

16        A        IT IS TO THE EAST.  IT IS TO THE EAST.

17        Q        SO, IS THAT CONCOMITANT SECTION OF PROPERTY IN 24

18   RATHER 23, IS THAT PART OF THE – WAS THAT PART OF THE MACHADO –

19   OR, PART OF 8 MILE RANCH?  8 MILE LLC?

20        A        AND COVERED BY CENTER STATE MORTGAGE; YES.

21            THE COURT:  OKAY.  POINT OUT EXACTLY WHAT YOU'RE

22        TALKING ABOUT.  AND MR. KILLIAN, YOU TELL ME IF YOU

23        DISAGREE WITH WHAT YOU'RE TALKING ABOUT.

24            MR. KILLIAN:  THAT'S THE PROPERTY THAT –

25            THE WITNESS:   TWENTY-THREE.

27

1          THE COURT:  THAT'S THE 163 ACRES – 161 ACRES?  AND 24 –

2          THE WITNESS:   TWENTY-FOUR.

3          MR. KILLIAN:  THAT – WELL, I THINK THE SURVEYOR WILL

4    DISAGREE WITH THAT.

5          THE COURT:  OKAY.

6          THE WITNESS:   BUT THAT'S MY UNDERSTANDING, JUDGE.

7          THE COURT:  I JUST WANT TO SEE – I UNDERSTAND YOUR

8    TESTIMONY.  SO, THAT'S YOUR TESTIMONY.

9    BY MR. KILLIAN:

10         Q     AND YOU'RE NOT A REAL ESTATE LAWYER, ARE YOU, MR.

11   WEBBER?

12         A     NO, I'M NOT.  I'M NOT.

13         Q     THAT MAY BE WHAT PART OF THE – PART OF THE PROBLEM

14   HERE IS WE GOT NON-REAL ESTATE LAWYERS HERE.  BUT –

15         MR. KILLIAN:  YOUR HONOR, WE HAVE A GRAPH HERE, IF THE

16   COURT – A DEMONSTRATIVE –

17         THE COURT:  SURE.

18         MR. KILLIAN:  I THINK THAT MAY HELP.

19   BY MR. KILLIAN:

20         Q     BUT, MR. WEBBER, THIS PARCEL 23, IS THERE ANY DOUBT

21   THAT THIS WAS EVER PART OF THIS BANKRUPTCY ESTATE?

22         A     OH, NO DOUBT AT ALL.

23         Q     AND THAT IS – THAT IS COVERED AT – ENCOMPASSED IN THE

24   DEFINITION OF "REAL PROPERTY" IN THE PLAN AS BEING ALL PROPERTY

25   OF THE ESTATE –

28

1      A      ABSOLUTELY.

2      Q      -- REAL PROPERTY OF THE ESTATE LOCATED AT 5400 8 MILE

3    RANCH ROAD.

4      A      YEAH.  AND THAT – SINCE IT HAS NO ADDRESS, WE JUST USE

5    THAT ONE ADDRESS.  BUT, MR. KILLIAN, EXHIBIT NUMBER TWO, WHICH IS

6    INTO EVIDENCE, IS THE WARRANTY DEED.  AND SECTION 23 IS OWNED BY

7    THE DEBTORS.

8      Q      WELL, THAT – SO, NO QUESTION.  I JUST WANTED TO MAKE

9    SURE I UNDERSTAND.  THERE'S NO QUESTION THAT THIS IS PROPERTY OF

10   THE ESTATE.  AND THE – AND MY RECOLLECTION, BASED ON THE

11   SCHEDULES IN THIS CASE, THE – ALL – YOU SCHEDULED ALL THIS

12   PROPERTY AS WORTH ROUGHLY $10 MILLION.

13     A      BASED ON SOME APPRAISALS, YES.

14     Q      BASED ON – AND SO, WE'RE TALKING ABOUT –

15            THE COURT:  AND JUST SO THAT I UNDERSTAND, YOU MEAN

16     ALL THE PROPERTY?

17            MR. KILLIAN:  ALL THE – YES, YOUR HONOR.  ALL THE

18     PROPERTY.

19            THE COURT:  NOT JUST ONE SECTION OR THE OTHER.

20   BY MR. KILLIAN:

21     Q      SO, EXTRAPOLATING DOWN, THIS PARCEL OF PROPERTY

22   WOULD – AND THE PETITION VALUES WOULD HAVE A VALUE ROUGHLY A

23   MILLION DOLLARS.

24     A      I DON'T KNOW THAT.  I DON'T KNOW THAT.

25     Q      DO YOU KNOW HOW MUCH ACREAGE IS IN THE TOTAL?

1       A       I THINK AROUND 12 OR 1,300 ACRES, I THINK.

2       Q       OKAY.  SO, A HUNDRED AND SIXTY ACRES, YOU KNOW, WHEN

3   YOU DO THE MATH, IT MAY BE MORE THAN A MILLION.  SO, WE'RE

4   TALKING ABOUT A MILLION DOLLARS-WORTH OF PROPERTY.

5       A       WHATEVER THE MATH IS.  I'LL AGREE WITH YOU.

6       Q       YEAH.  THAT'S RIGHT.  AND IN THE PLAN, YOU DEFINED –

7   YOU DEFINED REAL PROPERTY AS ALL THE PROPERTY AT 5400 8 MILES

8   RANCH ROAD.

9       A       AND THAT INCLUDED SECTION 23.  YES.

10      Q       AND THE – THE TREATMENT OF CLASSES 2 AND 3, IS

11  SATISFIED BY EITHER SALE OF THE MEDIATED – THE MEDIATED REAL

12  PROPERTY IS DEFINED AND THE REAL PROPERTY IS DEFINED.  AND IF THE

13  MEDIATED REAL PROPERTY DOESN'T SELL, THEN THE REAL PROPERTY --

14  CAPITAL R, CAPITAL P -- IS TO BE TRANSFERRED TO MACHADO.

15      A       AND IT DOES SAY THAT; BUT IF YOU LOOK AT THE MEDIATED

16  SETTLEMENT REAL PROPERTY, IT MODIFIES.

17      Q       OKAY.  BUT THAT'S WHAT THE – THAT'S WHAT THE PLAN

18  SAYS:  THE REAL PROPERTY WILL BE DEEDED.  AND THERE'S MEDIATED

19  REAL PROPERTY AND REAL PROPERTY DEFINED.

20      A       YEAH.  BUT IF YOU READ FURTHER IN THE PLAN, YOU'LL SEE

21  IT SAYS "ENCUMBERED BY THE MORTGAGE;" AND, OBVIOUSLY, THAT

22  WAS AN MSA TERM AS WELL.  AND WHILE NOT AS ARTFUL AS I MIGHT

23  LIKE SITTING HERE TODAY, IT WAS DEFINITELY THE INTENT THAT THE

24  MEDIATED SETTLEMENT REAL PROPERTY –

25      Q       WELL, THAT – THAT'S A – YOU KNOW, THAT'S YOUR

30

1    TESTIMONY AS TO THE INTENT.

2        A      AS THE SCRIVENER.

3        Q      I THINK THERE – I THINK THERE WILL BE DIFFERENT --

4        A      OKAY.

5        Q      -- I THINK THERE WILL BE DIFFERENT TESTIMONY.  SO, UNDER

6    THE – UNDER THIS AGREEMENT, THE MACHADOS, WHO ARE OWED ABOUT

7    $3 MILLION, AGREED TO PUT THEIR PROPERTY TOGETHER WITH THE 8

8    MILE LLC PROPERTY AND TRY TO SELL IT – SELL IT ALL FOR MORE THAN

9    $3 MILLION, AND YOU'D SPLIT THE EXCESS IF IT SOLD FOR MORE THAN

10   THREE MILLION.

11       A      RIGHT.  BUT, YOU KNOW THE QUIT CLAIM DEEDS WERE

12   FRAUDULENTLY TRANSFERRED OUT WHILE MACHADO WAS IN CONTROL.

13       Q      I UNDERSTAND, BUT THAT'S THE SCHEME.  PUT IT ALL

14   TOGETHER AND SELL IT; AND IF IT'S ABOVE THAT, THEN –

15       A      YES.

16       Q      -- THEN YOU SPLIT THE DIFFERENCE.  IF IT DOESN'T SELL –

17       A      THEY GET THE MEDIATED PROPERTY.

18       Q      -- THEN – THEN THEY GET LESS THAN WHAT THEY CLAIM IS

19   UNDER THE MORTGAGE.  THEY'RE ENTITLED TO –

20       A      I THINK WHAT JUDGE JENNEMANN HAS TO DECIDE IS –

21       Q      THAT'S WHAT SHE –

22       A      -- WAS IT COVERED BY THE MORTGAGE OR NOT?

23       Q      THAT'S RIGHT.

24       A      THAT'S WHAT SHE HAS TO DECIDE.

25       Q      AND WHAT – WHAT WE'VE TALKED ABOUT A SCRIVENER'S

1    ERROR THROUGHOUT THIS.  DO YOU KNOW WHAT THESE SCRIVENER'S

2    ERROR THAT WE'RE TALKING ABOUT IS?

3        A        THAT YOU MAINTAIN?  THAT MACHADO MAINTAINS?

4        Q        YES, SIR.

5        A        YES.  THAT THE 24 SHOULD BE A 23.

6        Q        SO, THERE'S ONE – ONE DIGIT?

7        A        ONE DIGIT.

8        Q        ONE DIGIT --

9        A        THAT'S MY UNDERSTANDING.

10       Q        -- IS THE – IS THE ERROR.   AND IN THE – IN THIS PLAN, THE

11   UNSECURED CREDITORS GOT NOTHING.

12       A        THAT'S NOT TRUE.  WE HAVE TO TAKE CARE OF THIS FIRST,

13   BECAUSE THE UNSECURED – WE DIDN'T GET THE EQUIPMENT.  WE HAD A

14   TRIAL WITH JUDGE JENNEMANN; AND WE DIDN'T GET THE EQUIPMENT.

15   AND THAT WAS GOING TO BE LIQUIDATED.  THERE ARE NO CAUSES OF

16   ACTION.  SO, TO DATE, THERE HAS BEEN NO DISTRIBUTION, BECAUSE WE

17   NEED TO RESOLVE THIS FIRST.  BUT THERE CAN BE CATTLE RUN ON THAT

18   PROPERTY.  THAT PROPERTY CAN BE RENTED; AND UNSECURED

19   CREDITORS WILL BE TAKEN CARE OF.

20       Q        BUT I'M – IN REVIEWING THE TRANSCRIPT OF THE

21   CONFIRMATION HEARING, THERE WAS A GOOD BIT OF DISCUSSION –

22   WELL, NOT A LOT, BUT THERE WAS DISCUSSION ABOUT, OKAY, THIS WAS

23   A LIQUIDATION.  BUT THERE'S NO PROVISION – IS THERE ANY PROVISION

24   IN THE PLAN FOR LIQUIDATING NON-EXEMPT REAL – OR, NON-

25   ENCUMBERED REAL PROPERTY?

32

1        A        NO.

2        Q        THERE'S NO MENTION – I COULDN'T FIND ANYWHERE IN

3    HERE ANY MENTION OF THIS 160 ACRES AS BEING UNENCUMBERED

4    PROPERTY THAT'S GOING TO BE LIQUIDATED FOR THE BENEFIT OF

5    UNSECURED CREDITORS.

6        A        THAT'S THE DEFINITION OF REAL PROPERTY; AND THAT'S

7    WHY IT WAS IN THE PLAN.  THAT WAS THE PROPERTY, THE BIG SUBSET,

8    THE BIG – THE WHOLE SET.  THEN YOU TAKE THE MEDIATED SETTLEMENT

9    AGREEMENT.  I'M GOING TO LOSE THE 161 ACRES.

10       Q        BUT I NEVER SAW ANYTHING IN THERE ABOUT 160 ACRES

11   BEING AVAILABLE.

12       A        IN THE TRANSCRIPT, YOU DID.

13       Q        ALL I SAW IN THE TRANSCRIPT – IN THE TRANSCRIPT OF THE

14   CONFIRMATION HEARING, I SAW MENTION THAT THE – YOU KNOW, THIS

15   IS A LIQUIDATION.  THE UNSECURED – THERE'S NOTHING FOR THE

16   UNSECURED CREDITORS.  THE DEBTOR'S NOT GOING TO HAVE ANY REAL

17   PROPERTY.  THERE'S NO SUGGESTION ABOUT – THAT I COULD FIND,

18   ABOUT LIQUIDATING – ABOUT SELLING 160 ACRES, A MILLION DOLLARS-

19   WORTH OF REAL PROPERTY.

20       A        IT DOESN'T HAVE TO BE LIQUIDATED TO PAY THEM.  I TOLD

21   YOU YOU CAN RUN CATTLE OR RENT IT.  NOW, REMEMBER, YOU DID READ

22   THE –

23       Q        WELL, THIS IS A LIQUIDATING PLAN.

24       A        SO?

25       Q        SO, THE DEBTORS AREN'T GOING TO RETAIN ANY PROPERTY.

33

1        A        IF THEIR UNSECURED CREDITORS ARE PAID OFF, WHY

2   COULDN'T THEY?  AND RIGHT HERE, IF YOU LOOK AT THE TRUST

3   PROPERTY – AND, JUDGE, THIS IS WHAT'S CALLED THE TRUST PROPERTY.

4   THAT'S OUTSIDE OF THE COLORED LINES DOWN AT THE BOTTOM, SOUTH.

5   THE EASEMENT THAT WAS REQUESTED THAT WAS DENIED AND THE

6   DEBTOR FINALLY WITHHELD ON WAS ACROSS THIS PIECE.  AND IT WAS

7   CLEAR.  THERE WAS A 161-ACRE PIECE THAT THE DEBTOR WANTED AN

8   EASEMENT TO GO ACROSS – A MACHADO PROPERTY THAT THEY WOULD

9   GET.  AND MACHADO SAID, "NO."  SO, THE ONLY WAY THE DEBTOR CAN

10  GET THERE IS TO GO AROUND HERE; AND WE FINALLY GAVE ON THAT.

11       BUT THAT'S WHERE THE EASEMENT WAS.  THIS WAS CLEARLY

12  DISCUSSED IN THE CONFIRMATION TRANSCRIPTS.

13            THE COURT:  ANY OTHER QUESTIONS FOR MR. WEBBER?

14            MR. KILLIAN:  JUST ONE MINUTE, YOUR HONOR.

15            THE COURT:  NO PROBLEM.

16            MR. KILLIAN:  MR. JONES HAS A COUPLE QUESTIONS, YOUR

17  HONOR.

18            THE COURT:  GO AHEAD, MR. JONES.

19                    CROSS-EXAMINATION

20  BY MR. JONES:

21       Q        MR. WEBBER, I HEARD YOU JUST TESTIFY THAT YOU DIDN'T

22  KNOW WHEN WE SENT THE DEED TO YOU FOR YOUR REVIEW.

23       A        I SAID I DIDN'T RECALL.

24       Q        OKAY.  IS THERE ANYTHING THAT YOU WOULD KNOW THAT

25  WOULD REFRESH YOUR RECOLLECTION?

34

1    A    I THINK IT WAS ALL BY E-MAIL.

2    Q    OKAY.

3         MR. JONES:  IF I MAY, YOUR HONOR?

4         THE COURT:  CERTAINLY.

5         THE WITNESS:  THIS IS AN E-MAIL DATED OCTOBER 16TH TO

6    ME FROM YOU.

7    BY MR. JONES:

8    Q    YEAH.  AND IF YOU WOULD GO TO THE BACK PAGE AND

9    START BACKWARDS TO FORWARDS, PLEASE?

10   A    OCTOBER 7TH, FROM YOU TO ME.

11   Q    OKAY.  COULD YOU READ THAT, PLEASE?

12   A    READ WHAT?  THIS IS NOT –

13   Q    THE TEXT OF THE E-MAIL.

14   A    -- THIS ISN'T IN EVIDENCE.

15   Q    WELL, I CAN ASK YOU ABOUT IT.

16   A    I THOUGHT YOU WERE ASKING ME ABOUT THE DATES.

17   Q    WELL, I AM ASKING YOU.  WHAT WAS THE PURPOSE OF THAT

18   E-MAIL?

19   A    YOU WERE SENDING ME A DRAFT DEED.

20   Q    FOR WHAT PURPOSE?

21   A    TO COMPLY WITH THE PLAN OF LIQUIDATION.  YOU HAD

22   FINALLY RECEIVED A SURVEY.  AND WHEN I SAY "YOU," I MEAN

23   MACHADO.

24   Q    OKAY.

25   A    AND YOU HAD DRAFTED UP A QUIT CLAIM DEED.

35

1  Q  AND ISN'T IT ACCURATE THAT I SENT THIS DEED TO YOU FOR

2 REVIEW AND COMMENT?  ISN'T THAT WHY YOU SENT IT TO YOU?

3  A  YES.

4  Q  I DIDN'T PRESENT IT AS THE FINAL PRODUCT, DID I?

5  A  NO.

6  Q  OKAY.  AND WOULD YOU PLEASE READ UP ON THE NEXT E-

7 MAIL?  WHAT DATE WAS THAT?

8  A  THIRTEEN?

9  Q  NO.  GO ONE BACK.

10  A  TEN?

11  Q  TEN.  AFTER READING THAT, ISN'T IT ACCURATE THAT ON

12 OCTOBER 10TH I FOLLOWED UP WITH YOU REGARDING THE E-MAIL ABOUT

13 THE DEED?

14  A  YOU DID.

15  Q  OKAY.

16  A  AND I HAD JUST RETURNED FROM A VACATION IN CANADA.

17  Q  OKAY.  NOW, INTERESTINGLY, IN THIS E-MAIL, WHAT YOU

18 SAY IS YOU HAD JUST RETURNED FROM AN ANNIVERSARY VACATION IN

19 CANADA; AND YOU ASKED ME FOR A LEGAL DESCRIPTION OF THE 180

20 ACRES SAYING, "MY REAL ESTATE DEPARTMENT ATTORNEY SAID THIS

21 WOULD MAKE HIS LIFE EASIER REGARDING THE LEGAL DESCRIPTIONS IN

22 THE DEED."

23  A  AND THAT SHOULD HAVE BEEN THE 160 ACRES; AND I WAS

24 OBVIOUSLY BEHIND AND GOING QUICKLY, AND MY REAL ESTATE

25 ATTORNEY IS MR. BAKER, WHO IS HERE.

1      Q      OKAY.  AND DID I RESPOND TO YOU SHORTLY AFTER THAT?

2      A      TEN?

3      Q      YES.  OKAY.

4      A      AND YOU CALLED IT 180 ACRES.

5      Q      RIGHT.  AND WHAT I SAID WAS, "I DON'T KNOW WHAT THAT

6   SECTION IS."

7      A      OKAY.

8      Q      OKAY.  SKIPPING FORWARD TWO E-MAILS ON OCTOBER 16TH, I

9   SENT YOU ANOTHER E-MAIL.  ISN'T THAT ACCURATE?

10     A      YES.

11     Q      OKAY.  AND I SENT YOU THIS E-MAIL BECAUSE, ONCE AGAIN,

12  I'M FOLLOWING UP ON THE DEED THAT I HAD SENT TO YOU, RIGHT?

13     A      TRUE.  AND I'M BEHIND BEING BACK FROM VACATION.  YES.

14  THAT IS VERY TRUE.

15     Q      AND WHAT I SAID WAS, "WE WANT TO MOVE FORWARD AND

16  WE DON'T WANT TO GET THE COURT BACK INTO THE MIX."

17     A      THAT'S WHAT YOU SAID.

18     Q      SO, IT'S ACCURATE THAT WE WERE DOING OUR PART TO

19  PUSH THIS ALONG.  I DON'T THINK THERE'S ANY DISPUTE ABOUT THAT.

20  YOU WEREN'T FOLLOWING UP WITH ME TIMELY.

21          THE COURT:  OKAY.  I'M GOING TO STOP.  BECAUSE REALLY,

22      ALL I CARE ABOUT IS THE AMBIGUITY THAT EXISTED AT OR ABOUT

23      THE TIME OF THE MEDIATED SETTLEMENT AGREEMENT AND THE

24      CONFIRMATION ORDER.

25          MR. JONES:  OKAY.

37

1          THE COURT:  I UNDERSTAND THAT THERE WERE

2     COMMUNICATIONS LATER; AND TO THE EXTENT THEY'RE

3     RELEVANT TO DEMONSTRATE THE INTENT IN THE PRIOR DATE,

4     THAT'S GREAT.  BUT THESE WERE COMMUNICATIONS IN OCTOBER

5     2014.  WE'RE HERE AT THE FINAL EVIDENTIARY HEARING ON

6     MARCH THE 3RD.  ATTRIBUTING DELAY IS NOT GOING TO GIVE

7     ANYBODY ANY POINTS.

8          MR. JONES:  OKAY.

9          THE COURT:  SO – BUT IF YOU HAVE ANYTHING RELEVANT

10     THAT GOES TO INTENT, I WILL BE GLAD TO LISTEN TO IT.

11     BY MR. JONES:

12          Q     MR. WEBBER, AT ANYTIME THROUGHOUT THIS CASE, DID

13     YOU PRESENT A LEGAL DESCRIPTION OR A SURVEY TO THE MACHADO

14     COUNSEL?

15          A     I THINK THEY SUPPLIED ONE TO ME, BUT I CAN'T REMEMBER.

16          Q     WHEN?

17          A     THAT'S A VAGUE – VAGUE RECOLLECTION A COUPLE YEARS

18     AGO.  AND I SAY THAT WITH SOME HESITATION.

19          THE COURT:  AND WHO IS "THEY?"

20          THE WITNESS:  EITHER NICOLETTE VILMOS OR ROY KOBERT.

21     I'M SORRY.  AT BROAD AND CASSEL, JUDGE.  SORRY.

22          THE COURT:  THANK YOU.

23     BY MR. JONES:

24          Q     NOW, AS WE JUST – AS WE JUST KIND OF WENT THROUGH

25     SOME ROUGH MATH, THIS EQUATED, AT LEAST UNDER THE VALUES IN

38

1    THE PETITION AND THE PLAN, TO ABOUT A MILLION-DOLLAR ISSUE.

2          A      IF THE APPRAISED VALUE IS 10 MILLION; AND THAT WAS

3    ESTIMATED, BUT YES.

4          Q      OKAY.  AND IF THIS WAS ABOUT A MILLION-DOLLAR ISSUE,

5    WHY IS IT THAT THERE'S NOTHING IN THE RECORD ANYWHERE, OTHER

6    THAN SOME VAGUE MENTIONS OF 160 OR 180 ACRES?  WHY DOESN'T IT

7    APPEAR ANYWHERE?

8          A      I DON'T UNDERSTAND YOUR QUESTION.  IF CREDITORS ARE

9    BEING PAID IN FULL, WHAT DOES VALUE MATTER?  I MEAN, I'M NOT SURE

10   I UNDERSTAND YOUR QUESTION.

11         Q      WELL, I WOULD THINK THAT IF THERE'S A MILLION-DOLLAR

12   ISSUE OUT THERE TO YOUR CLIENT'S BENEFIT, IT SHOULD HAVE

13   APPEARED SOMEWHERE.  ISN'T THAT ACCURATE?

14         A      THERE'S A LIQUIDATION ANALYSIS ATTACHED TO THE

15   DISCLOSURE STATEMENT.

16         Q      RIGHT.  THERE IS.

17         A      I HAVE IT HERE AS AN EXHIBIT, IF THAT WOULD HELP YOU.

18   IT'S EXHIBIT NUMBER 12.

19         Q      OKAY.  LIQUIDATION ANALYSIS, WHICH IS PAGE 24 OF 24.

20   LET'S FLIP TO THAT.

21         A      I'M THERE.

22                THE COURT:  AND I'M SORRY, I DIDN'T HEAR THE PAGE

23         NUMBER.

24                THE WITNESS:  TWENTY-FOUR OF TWENTY-FOUR, JUDGE.  THE

25         LAST PAGE OF THE EXHIBIT – OF 12.

1          THE COURT:  OKAY.  IT JUST DOESN'T HAVE – OKAY.  GOT IT.

2   BY MR. JONES:

3      Q      IT APPEARS TO US THAT THE DISTRIBUTION AVAILABLE FOR

4   UNSECURED CREDITORS IS ZERO.  WHY IS THAT?

5      A      BECAUSE MACHADO IS GOING TO GET MOST OF THE LAND,

6   BUT YOU'LL SEE THAT THERE'S SOME EQUIPMENT OF SEVENTY – AND IF

7   YOU LOOK AT THE – FIRST OF ALL, YOU GUYS HAVE BEEN TALKING 10

8   MILLION.  WE GOT 4,685,700.  SO, THAT'S ABOUT HALF.

9      Q      LET ME STOP YOU RIGHT THERE.

10          THE COURT:  AND AGAIN – AND AGAIN, I'M GOING TO STOP

11      BOTH OF YOU.  THE VALUE IS IRRELEVANT.

12          THE WITNESS:  OKAY.

13          THE COURT:  IT'S ABSOLUTELY IRRELEVANT.  SO, LET'S MOVE

14      ON.

15          MR. JONES:  WELL, JUDGE, THE POINT IS THAT NOWHERE IN

16      THE RECORD IS THERE ANY MENTION OF THIS –

17          THE COURT:  THAT'S A VALID QUESTION.  THAT'S A VALID – I

18      MEAN, I'M NOT TRYING TO DIRECT IT, BUT THERE IS – THERE IS A $6

19      MILLION STRIKE POINT.  THERE'S THIS LIQUIDATION ANALYSIS.

20      THERE WAS THE PRE-BANKRUPTCY APPRAISAL.  IT'S A BUNCH OF

21      LAND.  IT'S GOT SOME VALUE.  THE AMOUNT OF THE VALUE IS

22      IRRELEVANT IN TERMS OF ANY SPECIFICITY.  BUT IF YOU WANT TO

23      GET AN ANSWER TO YOUR QUESTION AS TO WHY IT WASN'T

24      EXPLICITLY ASKED, THAT'S A GOOD QUESTION.  CAN YOU – DO YOU

25      HAVE AN ANSWER FOR THAT ONE, MR. WEBBER?

40

1        THE WITNESS:  WHAT – WHAT, JUDGE?

2        THE COURT:  WHY DIDN'T YOU MENTION THE 160 IN THE

3    DISCLOSURE STATEMENT?  THE 160 ACRES?

4        THE WITNESS:  WE THOUGHT THAT IT WAS ENCUMBERED IN

5    THE REAL PROPERTY DESCRIPTION, THE – WHEN I WENT REAL

6    PROPERTY BECAUSE OF THE WARRANTY DEED, WHICH WAS OF

7    RECORD, JUDGE, WHICH INCLUDED ALL OF THE PROPERTY, WHICH

8    IS ABOUT 1,300 ACRES.  YOU WILL HEAR, JUDGE, THAT ONLY A

9    THOUSAND IS COVERED BY THE CENTER STATE BANK MORTGAGE.

10   BY MR. JONES:

11       Q    MR. WEBBER, PLEASE TURN TO PAGE FIVE OF THE

12   DISCLOSURE STATEMENT.  FIRST OF ALL, DID YOU REVIEW THIS

13   DISCLOSURE STATEMENT BEFORE IT GOT FILED?

14       A    I DID.

15       Q    SECOND PARAGRAPH UNDER SUB "A," YOU REPRESENT THAT

16   THE DEBTOR'S REAL PROPERTY CONSISTS OF APPROXIMATELY 1,600

17   ACRES IN OSCEOLA COUNTY.  NOW –

18       A    I THINK IT'S ABOUT 1,300 NOW; AND THAT'S A MISTAKE, SO . .

19   .

20       Q    SO, YOU'RE ADMITTING THAT'S A MISTAKE AND REALLY –

21       A    I THINK THAT'S AN ERROR.  I'LL TAKE RESPONSIBILITY FOR

22   THE ERROR.

23       Q    NOW, ONE OF THE THINGS THAT YOU MENTIONED IN YOUR

24   BRIEF OR SOMEWHERE IS THAT THE SECTION 23 LAND IS NOT COVERED

25   BECAUSE IT'S NOT LOCATED AT 5400 8 MILE RANCH ROAD.  DO YOU STILL

1   MAINTAIN THAT POSITION?

2       A       OH, ABSOLUTELY.  AND YOU'LL HEAR MS. GIEL TESTIFY TO

3   THE SAME EFFECT.  THERE'S NO ADDRESSES OUT THERE FOR THIS LAND.

4       Q       SO, TO BE CLEAR, IS SECTION 23 LOCATED AT 5400 8 MILE

5   RANCH ROAD?

6       A       5400 IS THE HOMESTEAD ADDRESS OF THE DEBTOR, WHICH IS

7   DOWN TO THE EAST OF EVEN THIS PICTURE.  AND THAT'S HOW

8   GENERALLY WE DESCRIBED ALL THAT INSTEAD OF HAVING METES AND

9   BOUNDS.

10      Q       OKAY.  SO, TO BE CLEAR, YOU DESCRIBED ALL OF THE

11  DEBTOR'S REAL PROPERTY ASSETS AS BEING LOCATED AT 5400 8 MILE

12  RANCH ROAD FOR THE PURPOSES OF THE RECORD.

13      A       YEAH, FOR GENERAL REFERENCE.  ABSOLUTELY.

14      Q       ONCE AGAIN, MR. WEBBER, I'M NOT A BANKRUPTCY LAWYER

15  LIKE YOU'RE NOT A REAL ESTATE LAWYER; AND I JUST WANT TO GET AN

16  UNDERSTANDING.  IT'S YOUR CONTENTION THAT IN THIS LIQUIDATION A

17  DEBTOR THAT COMES IN WITH REAL PROPERTY LEAVES WITH REAL

18  PROPERTY –

19      A       IF ALL CREDITORS –

20      Q       -- WITHOUT – WITHOUT ANYTHING ELSE BEING MENTIONED

21  ABOUT IT OR WRITTEN ANYWHERE IN THE PLAN OR THE DISCLOSURE

22  STATEMENT?  IT JUST HAPPENS.

23      A       WELL, UNSECURED CREDITORS VOTED YES.  MACHADO

24  VOTED "YES" AND CHANGED THEIR "NO" VOTES.  TAXES WERE PAID.

25  MACHADO GETS THE LAND.  UNSECURED CREDITORS ARE PAID.  IF

42

1    THERE'S SOMETHING LEFT FOR THE DEBTOR, PERFECT.

2        Q      AND ISN'T THAT BECAUSE – ISN'T THAT BECAUSE, MR.

3    WEBBER, THAT THERE'S NO PROVISION IN HERE FOR THE DEBTOR

4    RETAINING 161 ACRES OR ABOUT A MILLION DOLLARS?  ISN'T THAT WHY

5    THEY VOTED "NO" – I MEAN "YES" FOR THE PLAN?

6        A      I MEAN, IF YOU LOOK AT IT, FIRST OF ALL, I DISPUTE A

7    MILLION.  MAYBE IT'S 500,000 OR LESS.

8        Q      OKAY.  CALL IT WHATEVER YOU WANT.  IT DOESN'T MATTER.

9    THE JUDGE SAID IT DIDN'T MATTER.

10       A      BUT ABSOLUTELY, THEY RETAIN THEIR MEMBERSHIP

11   INTEREST.  AND IF OTHER CREDITORS ARE PAID, THERE'S NOTHING

12   WRONG WITH THAT.  IT DOESN'T EVEN VIOLATE THE ABSOLUTE PRIORITY

13   RULE.

14       Q      WELL, IT DOESN'T – IT ALSO DOESN'T MAKE ANY PROVISION

15   FOR THE RETENTION OF LAND BY THE DEBTOR, DOES IT?

16       A      MEMBERSHIP INTERESTS ARE RETAINED.  IF THE DEBTOR –

17       Q      OKAY.

18       A      -- OWNS LAND –

19       Q      LET'S STOP THERE, THEN.  LET'S STOP THERE.  MEMBERSHIP

20   INTERESTS ARE RETAINED.

21       A      CORRECT.

22       Q      RIGHT.  IN THE DEBTOR –

23       A      IN THE DEBTOR.

24       Q      -- MEANING THE O'BERRYS RETAIN THEIR INTEREST IN THE

25   DEBTOR, RIGHT?

43

1    A    YES.

2    Q    OKAY.  THAT'S COMPLETELY SEPARATE THAN THE

3  OWNERSHIP OF THE LAND, ISN'T IT?

4    A    THEY'RE THE MEMBERS OF 8 MILE RANCH.

5    Q    I UNDERSTAND.  BUT –

6    A    THEY DON'T OWN IT INDIVIDUALLY.

7    Q    THAT'S CORRECT.

8    A    THE DEBTOR OWNS IT.  THEY OWN THE DEBTOR.

9    Q    I UNDERSTAND THAT.  BUT IF THE DEBTOR HAS NO ASSETS,

10  THEY DON'T OWN ANYTHING.

11    A    TRUE.

12    Q    THAT'S WHAT MR. KOBERT ARGUED IN THE CONFIRMATION

13  HEARING, ISN'T IT?

14    A    WELL, NO, THAT'S NOT EXACTLY TRUE.

15    Q    I THINK IT'S TRUE.  BUT THE POINT BEING THAT THIS PLAN

16  WAS CONFIRMED WITHOUT ANY SEPARATE PROVISION BEING MADE

17  SPECIFICALLY FOR THE DEBTOR RETAINING THE 161 ACRES.  ISN'T THAT

18  ACCURATE?

19    A    I'M NOT SURE THAT'S EXACTLY ACCURATE.  IS IT CLEAR?

20  NO.

21    Q    WHY ISN'T IT EXACTLY ACCURATE?

22    A    BECAUSE THEY RETAIN THEIR MEMBERSHIP INTERESTS.

23    Q    THOSE ARE TWO DIFFERENT THINGS.

24    A    THE CREDITORS ARE PAID IN –

25    Q    OKAY.

44

1    A    I DON'T MEAN TO ARGUE WITH YOU.  BUT IF THE CREDITORS

2    ARE PAID IN FULL, AND THE DEBTOR RETAINS OWNERSHIP INTEREST, AND

3    ALL THE CREDITORS HAVE BEEN SATISFIED, THAT DOESN'T VIOLATE ANY

4    BANKRUPTCY RULES.

5    Q    I'M NOT ASKING YOU ABOUT VIOLATING THE RULES.  I'M

6    ASKING YOU ABOUT WHAT THE PLAN SAYS.

7    A    OH, THAT'S WHAT I THOUGHT YOU WERE ASKING.

8    Q    AND WHAT THE ORDER CONFIRMS –

9    A    MEMBERSHIP INTERESTS ARE RETAINED.

10   Q    MR. WEBBER, I'D LIKE YOU TO TURN TO THE CONFIRMATION

11   ORDER.  I BELIEVE IT'S YOUR EXHIBIT 13.

12   A    I'M THERE.

13   Q    I'D ALSO LIKE YOU TO SIMULTANEOUSLY OPEN THE PLAN.  IN

14   THE PLAN, I'D LIKE YOU TO GO TO PAGE TEN.  IN THE CONFIRMATION

15   ORDER, I WOULD LIKE YOU TO GO TO THE SECOND PAGE, PARAGRAPH

16   SEVEN.

17   A    WHAT EXHIBIT IS THE PLAN?

18        THE COURT:  ELEVEN.

19        THE WITNESS:  THANK YOU.  WHAT PAGE OF THE PLAN?

20        MR. JONES:  TEN.

21        THE WITNESS:  OKAY.

22   BY MR. JONES:

23   Q    ARE YOU THERE?  NOW, MR. WEBBER, WE JUST – WE JUST

24   WENT THROUGH THE FACT THAT YOU DESCRIBED ALL OF THE PROPERTY

25   -- EVERYTHING OUT THERE, BECAUSE THINGS DON'T HAVE AN ADDRESS –

45

1    AS 5400 8 MILE RANCH ROAD.

2         A        ABSOLUTELY.

3         Q        AND THAT INCLUDED SECTION 23.  IS THAT RIGHT?

4         A        YEP.

5         Q        OKAY.  ISN'T IT ACCURATE TO SAY THAT ON PAGE 10 OF THE

6    PLAN, REAL PROPERTY IS A DEFINED TERM?

7         A        YES.

8         Q        OKAY.  AND REAL PROPERTY SHALL MEAN THE PROPERTY

9    LOCATED AT 5400 8 MILE RANCH ROAD, ST. CLOUD, FLORIDA, 34773.  ISN'T

10   THAT WHAT IT SAYS?

11        A        ABSOLUTELY, THAT'S WHAT IT SAYS.

12        Q        OKAY.  NOW, IN THE ORDER CONFIRMING THE PLAN, DID YOU

13   – DID YOU REVIEW THIS AT ALL BEFORE THE COURT ENTERED IT?  DID

14   YOU DRAFT IT WITH THE COURT JOINTLY?

15        A        I THINK IT WAS JOINTLY DRAFTED, BUT I DON'T – I THINK

16   THAT BROAD AND CASSEL AND I WORKED ON IT TOGETHER.  OF COURSE,

17   IT DOESN'T INCORPORATE ANY OF THE DEFINITIONS FROM THE PLAN IN

18   THE ORDER, WHICH IS – YOU CAN DO OR NOT DO.  THIS DOESN'T.

19        Q        WELL, I'M GOING TO ASK YOU THE QUESTIONS.  SO, ARE YOU

20   SAYING THAT THINGS GET SUBMITTED TO THE COURT IN THIS CASE

21   WITHOUT YOUR REVIEW?

22        A        THAT'S NOT WHAT I SAID.

23        Q        WELL, YOU SAID YOU DIDN'T KNOW IF YOU REVIEWED IT.  SO,

24   IF YOU DIDN'T DRAFT IT AND YOU DIDN'T REVIEW IT, THEN –

25        A        THAT'S NOT WHAT I SAID.

46

1    Q    -- BROAD AND CASSEL DID IT THEMSELVES.

2    A    I SAID I REVIEWED IT.  I JUST DIDN'T –

3    Q    OH, OKAY.

4    A    -- KNOW –

5    Q    I'M SORRY.  I MISHEARD YOU.

6    A    -- I DIDN'T KNOW IF WE JOINTLY DRAFTED IT, WAS MY

7    ANSWER.

8    Q    SO, PARAGRAPH SEVEN, THEN, FROM THE PLAN THAT YOU

9    JUST SAID YOU REVIEWED, CLEARLY SAYS:  "THE REAL PROPERTY" –

10    CAPITAL R, CAPITAL P.

11    A    RIGHT.  BUT THAT'S THE MEDIATED SETTLEMENT PROPERTY.

12    THAT'S EXACTLY WHAT THAT MEANS.

13    Q    WELL, AGAIN, NOT BEING A BANKRUPTCY LAWYER – AND

14    MR. KILLIAN, FEEL FREE TO JUMP IN – THIS IS AN ORDER CONFIRMING THE

15    PLAN.  IS THAT RIGHT?

16    A    IT CERTAINLY IS.

17    Q    AND THIS IS THE PLAN, RIGHT?

18    A    ABSOLUTELY.

19    Q    AND THE PLAN, IN AND OF ITSELF, HAS THE TERM "REAL

20    PROPERTY" IN IT.

21    A    IT DOES.

22    Q    AND IT ALSO HAS THE TERM "MEDIATED REAL PROPERTY" IN

23    IT.

24    A    IT DOES.

25    Q    OKAY.  SO, THIS ORDER CONFIRMED THE PLAN.  IT SAYS THE

47

1    REAL PROPERTY SHALL BE DEEDED TO THE MACHADO CREDITORS,

2    DOESN'T IT?

3        A    YEAH.  BUT THIS DOESN'T INCORPORATE THE DEFINITIONS

4    FROM THE PLAN IN THIS ORDER.

5        Q    WELL –

6        A    SO, WHEN I SAY "REAL PROPERTY," YOU GO BACK TO CLASS 2

7    AND CLASS 3; AND THAT'S MEDIATED SETTLEMENT.

8        Q    WELL, WHERE DOES IT SAY IN THE ORDER CONFIRMING THE

9    PLAN THAT YOU GO BACK TO MEDIATED SETTLEMENT AGREEMENT AND

10   LOOK FOR CLASS 2 AND CLASS 3?

11       A    THAT'S WHY THERE WOULD BE A DEED TO SATISFY CLASS 2

12   AND CLASS 3.  SO, YOU'D HAVE TO GO BACK AND LOOK AT THAT PART OF

13   THE PLAN; AND IT SAYS "MEDIATED SETTLEMENT AGREEMENT."

14       Q    SO, IS IT YOUR TESTIMONY THAT DEFINED TERMS THAT THIS

15   COURT ENTERED IN AN ORDER AND ALL THE CREDITORS RELIED ON ARE

16   NOT THE TERMS OF THIS PLAN?  SO, THE ORDER CONFIRMING THE PLAN IS

17   NOT USING THE DEFINED TERMS THAT ARE IN THE PLAN?

18       A    THAT'S EXACTLY RIGHT.  THIS SHOULD HAVE SAID

19   "MEDIATED REAL PROPERTY."  IT DOESN'T.

20       Q    OKAY.  SHOULD HAVE SAID.

21       A    SHOULD HAVE SAID.  YEAH.

22       Q    OKAY.  SO, WE JUST WENT FROM:  THIS IS WHAT IT MEANS TO

23   NOW IT SHOULD HAVE SAID.

24       A    WELL, THAT'S WHAT I'M SAYING HAD TO HAVE BEEN A

25   PERFECTLY SCRIVENER.  YOU KNOW, LIKE I SAID, I'M SITTING HERE

48

1   TODAY.  THE REAL PROPERTY IS NOT DEFINED IN THIS ORDER, THOUGH.

2      Q      MR. WEBBER, IS THIS ORDER FINAL?

3      A      IT ABSOLUTELY IS.

4      Q      IS IT APPEALABLE?

5      A      NOT ANYMORE.

6      Q      DOESN'T IT SAY THAT THE REAL PROPERTY SHALL BE

7   CONVEYED TO THE MACHADO CREDITORS – CAPITAL R, CAPITAL P?

8      A      THAT'S WHAT IT SAYS.

9             MR. JONES:  NO FURTHER QUESTIONS.

10            THE COURT:  MR. BAKER, DO YOU HAVE ANYTHING FURTHER

11   FOR MR. WEBBER?

12            MR. BAKER:  NO, YOUR HONOR.

13            THE COURT:  THANK YOU, MR. WEBBER.

14            THE WITNESS:  THANK YOU, JUDGE, FOR LETTING ME GO

15   FIRST.

16            THE COURT:  AND BETWEEN THE SURVEYOR AND MS. GIEL, I

17   DON'T HAVE ANY PREFERENCE, OTHER THAN I WOULD LIKE THEM

18   TO BE THE NEXT TWO WITNESSES.  DO THE PARTIES HAVE ANY

19   PREFERENCES BETWEEN THOSE TWO?

20            MR. WEBBER:  JUDGE, IT WOULD BE NICE TO LET THE BANKER

21   GO.

22            THE COURT:  IT'S UP TO YOU GUYS.  I DON'T CARE.  WHAT

23   WOULD YOU PREFER, MR. JONES  ---  OR MR. KILLIAN?

24            MR. JONES:  ACTUALLY, I THINK THE SURVEYOR WILL BE

25   QUICKER AND IT LAYS A BETTER FOUNDATION.

49

1    THE COURT:  THAT'S FINE.  THAT'S – I DON'T DISAGREE WITH

2    YOU.  I SORT OF WOULD LIKE TO UNDERSTAND THE SURVEY A

3    LITTLE BIT MORE, MYSELF, SO LET'S DO THAT.  LET'S CALL THE

4    SURVEYOR AND THEN WE'LL TAKE A SHORT BREAK AFTER THAT.

5    AND THEN WE'LL CONTINUE BACK WITH MS. GIEL.  SO, SOMEBODY

6    NEEDS TO GO GET THE SURVEYOR.  THANK YOU.

7        IF YOU DON'T MIND, MS. GANN HERE WILL SWEAR YOU IN,

8    SIR.

9                    WILLARD BEEKMAN,

10   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

11   FOLLOWS:

12       THE CLERK:  PLEASE STATE YOUR NAME AND ADDRESS FOR

13   THE RECORD.

14       THE WITNESS:  WILLARD BEEKMAN, 3050 SOUTH INDIANS

15   AVENUE, ST. CLOUD, FLORIDA.

16       THE CLERK:  PLEASE HAVE A SEAT.

17       THE COURT:  AND YOU'LL NEED TO HAVE A SEAT RIGHT

18   OVER THERE.  AND IF YOU DON'T MIND TELLING ME YOUR NAME

19   AGAIN.  I DIDN'T HEAR IT.

20       THE WITNESS:  WILLARD BEEKMAN.

21       THE COURT:  WHO WILL – WILL YOU DO THIS EXAMINATION,

22   MR. JONES?

23       MR. JONES:  YES, YOUR HONOR.  I WAS JUST LOOKING FOR MY

24   TABLE OF CONTENTS.

25       THE COURT:  NO PROBLEM.

50

1          THE CLERK:  SIR, CAN I GET YOU TO SPELL YOUR LAST NAME?

2          THE WITNESS:  B E E K M A N.

3          THE CLERK:  THANK YOU.

4                          DIRECT EXAMINATION

5    BY MR. JONES:

6          Q        GOOD AFTERNOON, MR. BEEKMAN.

7          A        GOOD AFTERNOON.

8          Q        THANK YOU FOR APPEARING TODAY.  WE APPRECIATE IT.

9    AND HOPEFULLY, THIS WILL PUT AN END TO IT.  BEFORE WE GET STARTED

10   WITH THE QUESTIONING, WHAT I'D LIKE TO DO BRIEFLY IS JUST HAVE

11   YOU GO THROUGH YOUR – JUST VERY BRIEFLY, YOUR BACKGROUND AND

12   YOUR QUALIFICATIONS AS A SURVEYOR AND HOW LONG YOU'VE BEEN

13   DOING IT HERE, IF YOU WOULD, PLEASE.

14         A        OKAY.  I'M A LICENSED SURVEYOR.  I'VE BEEN LICENSED

15   SINCE 1986, SO I'VE DONE A LITTLE BIT OF EVERYTHING, BOUNDARY,

16   CONSTRUCTION, WHATEVER, YOU KNOW.  TRYING TO MAKE A LIVING

17   SURVEYING.

18         Q        I UNDERSTAND.  AND SINCE 1986, HAVE YOU – YOU HAD

19   OCCASION TO SURVEY, AT LEAST ONCE, THE PROPERTY OUT THERE OFF

20   OF 8 MILE RANCH ROAD?

21         A        YES.  WELL --

22         Q        THE O'BERRY PROPERTY?

23         A        THE O'BERRY PROPERTY.  YES.

24         Q        APPROXIMATELY HOW MANY TIMES HAVE YOU SURVEYED

25   THAT LAND, IF YOU CAN RECALL?

51

1       A     WELL, REALLY, JUST KIND OF ONE TIME THAT I – IT WAS A

2    DRAWN-OUT THING, BECAUSE WE WERE DOING ELEVATIONS AND

3    DIFFERENT THINGS.

4       Q     OKAY.  AND SINCE THAT TIME – WHEN WAS THAT?  WHEN

5    WAS THAT SURVEY?

6       A     I DON'T KNOW.  SIX, SEVEN YEARS AGO.  EIGHT YEARS AGO.  I

7    DON'T KNOW NOW.

8       Q     OKAY.  AND SINCE THAT TIME, HAVE YOU BEEN CALLED

9    UPON AT VARIOUS TIMES TO PRODUCE SKETCHES OR OTHER TYPES OF

10   NON-SEALED SURVEYS, IF YOU WILL?

11      A     YES.  MACHADOS ASKED FOR – MR. MACHADO ASKED FOR

12   COPIES OF THE SURVEY.

13      Q     OKAY.  AND WHAT ABOUT MR. O'BERRY?  HAS HE EVER COME

14   TO YOU AND ASKED?

15      A     NO.  NOT – NO, NOT SINCE THEN, NO.

16      Q     OKAY.  WHAT ABOUT CENTER STATE BANK?

17      A     NO.

18      Q     OKAY.  HOW ABOUT FIRST NATIONAL BANK OF OSCEOLA

19   COUNTY?

20      A     NO.

21      Q     OKAY.  MR. BEEKMAN, I'VE JUST HANDED YOU CREDITOR'S

22   EXHIBIT NUMBER THREE; AND I WANT TO TALK ABOUT THAT BRIEFLY,

23   BUT BEFORE I DO, I WANT TO ASK YOU A COUPLE OF QUESTIONS JUST IN

24   GENERAL.  DO YOU KNOW WHAT THIS DISPUTE IS ABOUT?

25      A     NOT EXACTLY.

52

1    Q    OKAY.  HAVE YOU HAD ANY CONVERSATIONS WITH MR.

2    WEBBER?

3    A    NO.  OH, NO.  I DON'T EVEN KNOW WHO HE IS.  NO.

4    Q    ALL RIGHT.  WHAT I'VE JUST HANDED YOU IS A SKETCH OF

5    DESCRIPTIONS THAT WAS PRODUCED TO ME BY CENTER STATE BANK FOR

6    THE LOAN FILE – FROM THE LOAN FILE.  AND WHAT I'D LIKE YOU TO DO IS

7    TAKE A LOOK AT THE BOTTOM LEFT-HAND CORNER.

8        MR. JONES:  DID I SEE SOMEBODY GIVE THE LOAN FILE TO

9        SOMEBODY?

10       MR. WEBBER:  THAT'S THE CENTER STATE BANK LOAN FILE,

11       YOUR HONOR.

12   BY MR. JONES:

13   Q    MR. BEEKMAN, DO YOU RECOGNIZE –

14   A    THIS IS A SKETCH PREPARED BY US.  YES.  KISSIMMEE

15   VALLEY.

16   Q    OKAY.  DO YOU RECALL PREPARING THAT SKETCH?

17   A    YEAH, I KIND OF REMEMBER.  AND ACTUALLY, I DO

18   REMEMBER IT WAS A BANK, I BELIEVE, BECAUSE IT WAS JUST A SKETCH

19   BECAUSE WE WEREN'T FINISHED WITH ALL THE BOUNDARY OR ANY OF

20   THAT STUFF.  SO, BASICALLY, THAT'S WHAT IT WAS.

21   Q    OKAY.  AND WHEN YOU SAY YOU PREPARED IT FOR THE

22   BANK, WHAT DO YOU MEAN BY THAT?

23   A    WELL, I PREPARED IT FOR JOE, BUT I THINK HE SAID HE WAS –

24   I – I – IF YOU'LL NOTICE, THERE'S NO CERTIFICATIONS ON IT.  IT JUST

25   SAYS "JOE."  IF IT HAD BEEN PREPARED STRICTLY FOR THE BANK AND A

53

1    TITLE COMPANY, AND THEY WOULD HAVE HAD THEIR NAMES ON IT.

2        Q        OKAY.  SO, YOU PREPARED IT FOR MR. O'BERRY.  I'M

3    ASSUMING THAT'S JOE.

4        A        YES.

5        Q        SEPTEMBER 21, 2006.  SKETCH OF DESCRIPTIONS.  WHAT IS

6    THE DIFFERENCE BETWEEN A SKETCH OF DESCRIPTIONS AND A SURVEY?

7        A        WELL, THIS WASN'T A BOUNDARY SURVEY.  I WAS NEVER

8    COMPLETE DOING IT.

9        Q        OKAY.

10        A        YOU KNOW WHAT I'M SAYING?  I MEAN, WE HAVE DONE

11    SOME OF THE – BASICALLY, IT'S KIND OF A DRAWING ALMOST LIKE FROM

12    THE TAX ROLLS, JUST ABOUT.  AND THAT'S WHAT WAS DONE AND HOW IT

13    WAS DONE.

14        Q        OKAY.  NOW, WHAT IS THE PURPOSE UP AT THE TOP OF THIS

15    SKETCH OF DESCRIPTIONS, THE TEXT WHERE IT SAYS " 'A' LEGAL

16    DESCRIPTION" AND THEN IT GOES THROUGH SOME DIFFERENT THINGS,

17    "B" AND "C"?

18        A        WELL, YOU HAVE THREE DIFFERENT AREAS.  YOU HAD A, B,

19    AND C, WHICH SHOWS –

20        Q        OKAY.

21        A        -- THEIR LEGAL DESCRIPTIONS FOR THOSE PARCELS.

22        Q        OKAY.  SO, IF YOU WOULD, PLEASE LOOK AT THE VERY TOP,

23    THE " 'A' LEGAL DESCRIPTION," OKAY?  BEGINNING WITH THE FIRST LINE

24    BEGINNING WITH "THE NORTHEAST QUARTER SECTION 23."  COULD YOU

25    PLEASE READ THAT OUT LOUD?

54

1    A    "NORTHEAST QUARTER SECTION 23, TOWNSHIP 27 SOUTH,

2  RANGE 31 EAST, LESS THE NORTH HALF OF THE SOUTHWEST QUARTER OF

3  THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION

4  23."

5    Q    OKAY.  CAN YOU LOCATE THAT ON THE SKETCH?

6    A    IT'S OVER HERE IN THE SECTION 23.

7    Q    OKAY.  IS THERE SOMETHING WRONG WITH THAT PICTURE?

8    A    YES.  THERE'S A SCRIVENER'S ERROR ON IT SAYS "THE

9  NORTHEAST QUARTER OF SECTION 24."

10   Q    OKAY.

11   A    BUT IT'S IN SECTION 23.

12   Q    IS IT POSSIBLE FOR – I'M A REAL ESTATE LAWYER, BUT I

13  DON'T KNOW IF IT'S POSSIBLE – IS IT POSSIBLE FOR SECTION 24 LAND TO

14  BE IN SECTION 23?

15   A    NO.

16   Q    WHY?

17   A    IT'S SECTIONAL LAND.  I MEAN, 24 IS SECTION 24; SECTION 23

18  IS SECTION 23.

19   Q    OKAY.  SO, CLEARLY, THAT WAS A SCRIVENER'S ERROR?

20   A    RIGHT.

21   Q    WHEN YOU – HAVE YOU PRODUCED OTHER SIMILAR

22  SKETCHES, YOU KNOW, FOR BANKS AND THINGS?

23   A    WELL, WE'VE DONE SURVEYS FOR BANKS AND THINGS LIKE

24  THAT.  AND I – AND I HAVE DONE SKETCH OF DESCRIPTIONS BEFORE FOR

25  DIFFERENT THINGS.

1        Q        IS IT – IS IT TYPICAL – WELL, ACTUALLY, LET ME BACK UP.

2    SO, WE DO HAVE A DISPARITY BETWEEN THE UP TOP " 'A' LEGAL

3    DESCRIPTION" AND THE PICTURE WHERE THE SCRIVENER'S ERROR IS.

4    THERE'S A DIFFERENCE.

5        A        RIGHT.  YES.

6        Q        OKAY.  WOULD A BANK TYPICALLY RELY ON THE PICTURE?

7                MR. WEBBER:  OBJECTION.  WHAT A BANK WOULD

8        TYPICALLY DO.

9                THE COURT:  SUSTAINED.

10    BY MR. JONES:

11        Q        IN YOUR EXPERIENCE.

12        A        IN MY EXPERIENCE, POSSIBLY, YES.

13                MR. JONES:  THIS IS EXHIBIT FIVE.

14    BY MR. JONES:

15        Q        MR. BEEKMAN, WHAT I'VE JUST HANDED YOU IS A

16    MORTGAGE THAT WAS GIVEN ON SOME LAND OWNED BY JOE O'BERRY

17    AND MARSHA O'BERRY AT 5400 8 MILE RANCH ROAD TO CENTER STATE

18    BANK TO SECURE SOME INDEBTEDNESS.  I'M NOT GOING TO ASK YOU

19    ABOUT THE CONTENTS OF THE MORTGAGE, BUT I DO WANT TO FOCUS ON

20    THE VERY LAST PAGE OF THAT, WHICH WOULD BE WHERE THE LEGAL

21    DESCRIPTION IS.  DO YOU SEE THAT?

22        A        OKAY.

23        Q        PARCEL ONE, DOES THE LEGAL DESCRIPTION OF THIS PARCEL

24    ONE TRACK THE LEGAL DESCRIPTION – MATCH THE LEGAL DESCRIPTION

25    OF YOUR SKETCH OF DESCRIPTIONS?

56

1      A      NO.

2      Q      WHY?

3      A      WELL, ON PARCEL ONE, THE SOUTH HALF OF SECTION 13,

4  TOWNSHIP 27 SOUTH, RANGE 31 EAST, THAT SHOULD HAVE BEEN ONE

5  LINE.

6      Q      WHAT DO YOU MEAN ONE LINE?

7      A      OF – AND THEN IT SAYS "OF THE NORTHEAST, COMMA, OF

8  THE NORTHEAST QUARTER OF SECTION 24, TOWNSHIP 27 SOUTH, RANGE

9  31 EAST." THAT'S –

10     Q      LET ME ASK YOU –

11     A      -- I MEAN, I DIDN'T.  YEAH.

12     Q      DID YOU WRITE THIS?

13     A      NO.

14     Q      WHAT I – ACTUALLY, WHAT I'D LIKE YOU TO DO, START WITH

15 THE "OF THE NORTHEAST QUARTER." I'D LIKE YOU TO FINISH READING

16 THAT ONE PARAGRAPH, AND I'M GOING TO ASK YOU SOME QUESTIONS

17 ABOUT THAT.

18     A      "OF THE NORTHEAST QUARTER OF SECTION 24, TOWNSHIP 27

19 SOUTH, RANGE 31 EAST, LESS THE NORTH HALF OF THE SOUTHWEST

20 QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER

21 OF SECTION 23."

22     Q      MR. BEEKMAN, WHY – WHY WOULD THIS, BEGINNING WITH

23 "OF THE NORTHEAST QUARTER OF SECTION 24" LESS OUT SECTION 23?

24     A      IT WOULDN'T.  IT SHOULDN'T.

25     Q      DOES THAT MAKE ANY SENSE TO YOU AS YOUR EXPERIENCE

57

1       AS A SURVEYOR?

2          A       NO.

3          Q       WHAT'S THE ERROR?

4          A       WELL, I DON'T KNOW.  WE'RE DEALING WITH TWO DIFFERENT

5    SECTIONS; AND I'M NOT – I DON'T HAVE A BREAK IN MY LINES WHERE I'M

6    DISTINGUISHING BETWEEN THE TWO.

7          Q       OKAY.

8          A       YOU SEE – YOU KNOW WHAT I'M SAYING?

9          Q       RIGHT.  BUT FOR THAT WHERE IT SAYS "SECTION 24" – "THE

10   NORTHEAST QUARTER OF SECTION 24," ISN'T THAT TAKEOUT THE SAME

11   LESS AND EXCEPT AS THE SECOND LINE DOWN OF YOUR SKETCH OF

12   LEGAL DESCRIPTIONS?

13         A       WELL –

14         Q       THE ONLY DIFFERENCE –

15         A       THE ONLY DIFFERENCE IS – YES.

16         Q       THE ONLY DIFFERENCE IS IT SAYS "SECTION 23" INSTEAD OF

17   "SECTION 24."

18         A       SECTION 24.

19         Q       RIGHT.

20         A       AND ON THE SKETCH, IN WHERE IT SAYS THE NORTHEAST

21   QUARTER OF SECTION 24 IS LYING IN SECTION 23.

22         Q       AND THAT MAKES NO SENSE.  YOU –

23         A       NO.  THAT MAKES NO – THAT'S WHERE THE ERROR WAS AT.

24         Q       AND YOU SAID YOU DIDN'T PREPARE THIS?

25         A       NO.

58

1    Q    DO YOU HAVE ANY IDEA WHERE IT CAME FROM?

2    A    NO.

3    Q    ANY THOUGHTS?

4    A    NO.  I MEAN, THIS IS WHAT I PREPARED.

5    Q    OKAY.

6    A    IT'S TWO DIFFERENT –

7         THE COURT:  WHAT ARE YOU POINTING TO, MR. BEEKMAN?

8    I'M SORRY.  I CAN'T SEE.

9         THE WITNESS:  OH, I PREPARED THIS.

10        THE COURT:  THE SKETCH?

11        THE WITNESS:  THE SKETCH.

12        MR. WEBBER:  IT'S NUMBER THREE.

13        THE WITNESS:  YES.

14        MR. JONES:  I DON'T HAVE ANY FURTHER QUESTIONS OF YOU,

15   MR. BEEKMAN.

16        MR. WEBBER:  NO QUESTIONS.

17        (WHEREUPON, THERE WAS A DISCUSSION OFF THE RECORD.)

18        THE COURT:  AND SOME OF YOU – LET ME CLARIFY, GUYS.

19   ANY OTHER QUESTIONS FOR MR. BEEKMAN?

20        MR. WEBBER:  I'M SORRY, JUDGE.  NO.

21        THE COURT:  MR. BEEKMAN, WE APPRECIATE YOUR TIME.  I

22   REALLY APPRECIATE YOUR INPUT.  THANK YOU SO MUCH FOR

23   WAITING TODAY.  IF ONE OF YOU WOULD LET MS. GIEL KNOW,

24   WE'LL BE BACK WITH HER – IT IS 3:21 – ABOUT 3:30.  THAT WILL

25   GIVE US TIME TO STRETCH AND TAKE A SHORT BREAK.

1          MR. WEBBER:  I WILL LET HER KNOW.

2          THE COURT:  AND THEN WE'LL START AGAIN.  COURT'S IN

3     RECESS.

4          (WHEREUPON, A BRIEF RECESS WAS TAKEN FROM 3:21 P.M. TO

5     3:34 P.M.)

6          THE COURT:  ANYTHING WE NEED TO DISCUSS BEFORE WE

7     PROCEED?  MS. GIELS – GILES – YOU'LL TELL ME HOW TO

8     PRONOUNCE IT, BUT COME ON UP AND WE'LL SWEAR YOU IN.

9          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.  DO YOU

10    SOLEMNLY SWEAR THE TESTIMONY YOU'RE ABOUT TO GIVE WILL

11    BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

12          THE WITNESS:  [INAUDIBLE]

13                         KAREN GIEL,

14    HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15    FOLLOWS:

16          THE CLERK:  PLEASE STATE YOUR NAME AND ADDRESS FOR

17    THE RECORD.

18          THE WITNESS:  KAREN GIEL, 3840 CHAPLAIN ROAD, ST.

19    CLOUD, FL, 34772.

20          THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

21          THE COURT:  RIGHT OVER HERE.

22                    DIRECT EXAMINATION

23    BY MR. JONES:

24          Q     GOOD AFTERNOON, MS. GIEL.  IT'S GOOD TO SEE YOU AGAIN.

25    THANK YOU FOR COMING TODAY.

60

1        A        YOU'RE WELCOME.

2        Q        BEFORE WE GET STARTED TODAY, I'D JUST LIKE TO HAVE

3   YOU GO OVER BRIEFLY YOUR BACKGROUND IN TERMS OF WORKING WITH

4   YOUR CURRENT EMPLOYER.

5        A        I HAVE BEEN EMPLOYED BY CENTER STATE UNDER PREVIOUS

6   NAMES SINCE JUNE OF 1990.

7        Q        OKAY.  AND WHAT IS YOUR – WHAT IS YOUR JOB?

8        A        MY ROLE AT THIS TIME IS BRANCH MANGER OF A BRANCH IN

9   ST. CLOUD.  OVER THE YEARS, I'VE BEEN A COMMERCIAL LENDER, AS

10  WELL AS A CONSUMER LENDER.

11       Q        OKAY.  AND WE FIRST MET A COUPLE OF WEEKS AGO.  I

12  GUESS IT WAS FEBRUARY 17TH AT YOUR DEPOSITION.   IS THAT CORRECT?

13       A        YES, SIR.

14       Q        SINCE THAT TIME, HAS ANYBODY FROM THE DEBTOR'S SIDE

15  HAD ANY CONVERSATIONS WITH YOU ABOUT THIS CASE?

16       A        MR. O'BERRY AND MRS. O'BERRY HAVE BEEN IN THE BANK,

17  BUT JUST TO MAKE DEPOSITS.  I'VE JUST HAD GREETINGS WITH THEM.

18       Q        OKAY.  I'D LIKE TO ASK YOU ABOUT THE BANKING

19  RELATIONSHIP WITH MR. AND MRS. O'BERRY.  IS MR. – MR. AND MRS.

20  O'BERRY, YOU JUST SAID THEY CAME IN TO MAKE DEPOSITS, SO I'M

21  ASSUMING THEY'RE A CURRENT CUSTOMER OF THE BANK.

22       A        YES, SIR.

23       Q        WHEN – WHEN DID THEY BECOME A CUSTOMER OF THE

24  BANK, IF YOU KNOW?

25       A        THEY FIRST BECAME CUSTOMERS OF WHAT WAS THEN FIRST

61

1  NATIONAL BANK OF OSCEOLA COUNTY IN 1992.

2        Q        AND AT THAT POINT IN TIME, WERE YOU THE RELATIONSHIP

3  MANAGER OR THE CLIENT CONTACT OF THE O'BERRYS?

4        A        YES.

5        Q        OKAY. WHAT – AS THE RELATIONSHIP OR CLIENT MANAGER,

6  WHAT TYPES OF THINGS DID YOU DO FOR MR. O'BERRY?

7        A        ANYTHING – THE BANK WAS VERY SMALL BACK AT THE

8  BEGINNING, SO ANYTHING FROM MAKING – HELPING MAKE DEPOSITS OR

9  TALK TO HIM ABOUT ANY LOAN REQUEST HE MAY HAVE. SO, YOU KNOW,

10  PRINT A STATEMENT, ANY OF THOSE THINGS.

11        Q        OKAY. OBVIOUSLY, BECAUSE OF YOUR DEPOSITION YOU

12  KNOW THAT WE'RE GOING TO BE TALKING A LOT ABOUT THE LOAN THAT

13  WAS MADE BY THE BANK IN 2006; AND I JUST WANT TO GO AHEAD AND

14  JUMP AHEAD TO THAT. DID MR. O'BERRY COME IN AND MAKE

15  APPLICATION FOR A LOAN IN MAY OR JUNE OF 2006?

16        A        YES, SIR. BY MAKING APPLICATION, HE CAME IN AND

17  DISCUSSED THE FACT THAT HE WOULD LIKE TO BORROW MONEY AND

18  OUTLINED THE REASONS.

19        Q        AND HOW MUCH MONEY DID MR. O'BERRY SAY HE WANTED

20  TO BORROW?

21        A        I BELIEVE THE AMOUNT OF THE LOAN IS 1.4 MILLION.

22        Q        OKAY. AND DID MR. O'BERRY FILL OUT A LOAN

23  APPLICATION?

24        A        THE PROCESS FOR A COMMERCIAL LOAN REQUEST IS FOR A

25  BORROWER TO PROVIDE A PERSONAL FINANCIAL STATEMENT AND

62

1    CURRENT TAX RETURN INFORMATION FOR THE PAST THREE YEARS.

2         Q    AND I'M ASSUMING THAT MR. O'BERRY WENT AHEAD AND

3    GAVE THAT INFORMATION TO YOU TO GET THE PROCESS STARTED.  IS

4    THAT ACCURATE?

5         A    I DON'T RECALL IF HE DID IT THAT DAY, BUT YES, HE DID DO

6    IT IN ORDER TO PROCEED WITH THE APPLICATION.

7         Q    WHAT – WHAT TYPE OF COLLATERAL WAS MR. O'BERRY

8    PROPOSING TO GIVE THE BANK TO SECURE THE OBLIGATION?

9         A    IT WOULD BE LAND HE OWNS IN HOLOPAW, FLORIDA.

10        Q    OKAY.  DO YOU KNOW IF HE STILL OWNS THAT LAND TODAY?

11        A    I DON'T KNOW THE DISPOSITION OF ALL OF HIS LAND

12   HOLDINGS.

13        Q    AND WHEN YOU FOUND OUT THAT HE WAS GOING TO

14   PROPOSE TO GIVE LAND AS COLLATERAL, DID THE BANK ORDER AN

15   APPRAISAL?

16        A    WE DID.

17             MR. JONES:  THIS WILL BE EXHIBIT ONE.

18   BY MR. JONES:

19        Q    MS. GIEL, I'VE HANDED YOU WHAT WE'RE CALLING EXHIBIT

20   ONE TODAY, WHICH IS AN APPRAISAL DATED JUNE 7TH; DATE OF REPORT

21   JUNE 16TH, PREPARED BY OSCEOLA APPRAISAL.  DO YOU RECOGNIZE THIS?

22        A    YES, SIR.

23        Q    DID YOU ORDER THIS APPRAISAL?

24        A    MY RECOLLECTION IS, BASED ON THE FACT THAT IT IS

25   ADDRESSED TO ME.

63

1      Q     AND, IN GENERAL TERMS, WHY DOES – WHY DOES THE BANK

2  ORDER AN APPRAISAL?

3      A     TO DETERMINE A THIRD-PARTY VALUE ON THE COLLATERAL

4  BEING OFFERED.

5      Q     OKAY.  I'D LIKE YOU TO FLIP FORWARD TO PAGE SIX.

6  BOTTOM OF THE PAGE, SUBHEADING "SITE DESCRIPTION."  DO YOU SEE

7  THAT?

8      A     YES, SIR.

9      Q     THE FIRST PARAGRAPH OF THAT LAST SENTENCE, WOULD

10  YOU PLEASE READ THAT ALOUD?

11      A     "TOTAL LAND AREA IS ESTIMATED TO CONTAIN 427.45 ACRES,

12  MORE OR LESS."

13      Q     FOUR HUNDRED AND TWENTY-SEVEN POINT FOUR FIVE

14  ACRES, WAS THAT CONSISTENT WITH WHAT MR. O'BERRY PROPOSED TO

15  GIVE THE BANK AS COLLATERAL?

16      A     NO, SIR.

17      Q     WHY?  WHAT WAS WRONG WITH THAT?

18      A     IT WAS NOT THE TOTAL AMOUNT OF ACRES BASED ON WHAT

19  IS IN THE FILE.  I HAVE TO SAY I CAN'T REMEMBER EVERYTHING THAT

20  HAPPENED, BUT MY RECOLLECTION AFTER REVIEW OF THE FILE IS THAT

21  A THOUSAND ACRES WAS OFFERED AND THIS IS ONLY 427 ACRES.

22      Q     OKAY.  AND WHEN YOU SAW THAT THE – THAT IT WAS

23  DEFICIENT IN TERMS OF ACREAGE, DID YOU PICK UP ON THAT?  OR WAS

24  THAT THROUGH THE BANK REVIEW PROCESS OR . . .

25      A     I DO NOT RECALL.

64

1    Q    OKAY.  AND WHEN IT WAS DISCOVERED THAT THERE WASN'T

2  ENOUGH ACREAGE IN THAT APPRAISAL, WHAT DID THE BANK DO?

3    A    A SECOND APPRAISAL WAS ORDERED TO ENCOMPASS THE

4  FULL AMOUNT.

5         MR. JONES:  THIS IS EXHIBIT NUMBER TWO.

6  BY MR. JONES:

7    Q    MS. GIEL, I'VE JUST HANDED YOU WHAT'S BEEN MARKED AS

8  CREDITOR'S EXHIBIT NUMBER TWO; AND THE FIRST PAGE READS:  THE

9  DATE OF VALUATION WAS AUGUST 25, 2006.  THE DATE OF REPORT WAS

10  SEPTEMBER 1, 2006; AND IT WAS PREPARED BY OSCEOLA APPRAISAL

11  COMPANY.  DO YOU RECOGNIZE THIS DOCUMENT?

12    A    I DO.

13    Q    AND HOW DO YOU RECOGNIZE THIS DOCUMENT?

14    A    I DON'T UNDERSTAND THE QUESTION.

15    Q    IS THIS THE SECOND APPRAISAL –

16    A    YES, SIR.

17    Q    -- THAT WE WERE JUST TALKING ABOUT?  OKAY.  AND THIS

18  APPRAISAL, JUST TO BE CLEAR, WAS ORDERED BECAUSE THE FIRST

19  APPRAISAL DID NOT CONTAIN ENOUGH LAND, CORRECT?

20    A    CORRECT.

21    Q    COINCIDENTALLY, I WOULD LIKE YOU TO TURN TO PAGE SIX

22  OF THIS APPRAISAL, AS WELL.  MIDDLE OF THE PAGE – WELL, LET ME

23  KNOW WHEN YOU'RE THERE.

24    A    I AM.

25    Q    UNDER "SITE DESCRIPTION," THE SECOND PARAGRAPH, FIRST

1    SENTENCE, WOULD YOU PLEASE READ THAT OUT LOUD?

2        A        "THIS SITE IS APPROXIMATELY 38,623,300 SQUARE FEET OR

3    APPROXIMATELY 886.67 ACRES."

4        Q        SO, THIS APPRAISAL, COUPLED WITH THE FIRST APPRAISAL,

5    WHICH YOU TESTIFIED WAS 427.45 ACRES, YIELDED, BY MY

6    CALCULATION, SLIGHTLY MORE THAN 1,300 ACRES.  IS THAT ACCURATE?

7        A        I DIDN'T DO THE ADDITION, BUT I WOULD THINK THAT'S

8    ROUGHLY CORRECT.

9        Q        I THINK THAT WE HAD DISCUSSED THIS BEFORE, BUT I WANT

10   TO JUST ASK THE QUESTION AGAIN.  WHEN YOU HAD THE OPPORTUNITY

11   TO LOOK AT THESE DURING YOUR DEPOSITION, MY RECOLLECTION IS

12   YOU CAME TO THE CONCLUSION THAT THESE APPRAISALS WERE FOR

13   TWO SEPARATE PIECES OF LAND, ONE NOT INCLUSIVE WITH THE OTHER.

14   IS THAT STILL WHAT YOUR TESTIMONY IS?

15       A        YES.  BASED ON, AT THE TIME, I BELIEVE I REVIEWED THE

16   LEGALS TO SEE – I DIDN'T HAVE THE ANSWER UNTIL I REVIEWED THEM.

17       Q        OKAY.  BUT NOW THAT YOU'VE REVIEWED THEM, IS YOUR

18   ANSWER STILL THAT THESE APPRAISALS DEAL WITH TWO SEPARATE

19   PIECES OF LAND, NOT INCLUSIVE?

20       A        YES, SIR.

21       Q        SO, AT THIS POINT IN TIME RIGHT AROUND THE END OF

22   AUGUST, BEGINNING OF SEPTEMBER, THE BANK NOW HAS ITS TWO

23   APPRAISALS IN-HOUSE.  AND I'M ASSUMING THAT AT THAT POINT YOU

24   WERE GETTING READY TO MOVE TOWARDS CLOSING.  IS THAT

25   ACCURATE?

66

1      A      BASED ON WHAT NORMALLY HAPPENS, YES.

2      Q      DID THAT HAPPEN IN THIS CASE?

3      A      AFTER REVIEW OF THE FILE, I RECALLED THAT THE LOAN

4  DOCUMENTS WERE DATED, BUT THE FUNDING DIDN'T OCCUR UNTIL THE

5  NEXT YEAR IN APRIL.

6      Q      OKAY.

7             MR. JONES:  EXHIBIT THREE.

8  BY MR. JONES:

9      Q      MS. GIEL, I'VE HANDED YOU WHAT'S BEEN MARKED AS

10  CREDITOR'S EXHIBIT NUMBER THREE; AND, AS I HAD SAID TO YOU

11  BEFORE – ACTUALLY, IT WAS BEFORE I SAW YOUR LOAN FILE.  THIS WAS

12  OBTAINED BY US FROM THE BANK'S PRODUCTION TO US AS A REQUEST

13  FOR THE LOAN FILE.  DO YOU RECOGNIZE THIS SKETCH?

14      A      I DO.

15      Q      OKAY.  AND WAS THIS SKETCH MADE PART OF THE LOAN

16  FILE?

17      A      IT WAS IN THE LOAN FILE.  IT WAS USED TO DETERMINE THE

18  LEGAL DESCRIPTION –

19      Q      OKAY.

20      A      -- BECAUSE OF THERE BEING SOME QUESTION.

21      Q      OKAY.  UP UNTIL – UP UNTIL THE POINT IN TIME THAT THIS

22  SKETCH WAS PRODUCED, OR GIVEN TO THE BANK, DID YOU HAVE ANY

23  SURVEYS OF THE PROPERTY?

24      A      NO, SIR.

25      Q      DID YOU REQUEST ANY SURVEYS?

67

1      A      NO, SIR.

2      Q      OKAY.  SO, IS IT ACCURATE TO SAY THAT WHEN YOU SAW

3  THIS SKETCH, THIS WAS REALLY THE FIRST TIME THAT YOU HAD AN

4  UNDERSTANDING OF WHAT THE PROPERTY—WHAT YOUR COLLATERAL

5  WAS GOING TO LOOK LIKE?

6      A      YES.

7      Q      OKAY.  AND DID YOU RELY ON THIS SKETCH TO ILLUSTRATE

8  YOUR COLLATERAL TO SHOW YOU?

9      A      CAN YOU CLARIFY "RELY?"

10      Q      WELL, LET ME ASK YOU THIS:  IF MR. O'BERRY DID NOT GIVE

11  THIS SKETCH TO YOU, WOULD YOU HAVE FUNDED THIS LOAN?  LET ME

12  TAKE THAT – LET ME RETRACT – LET ME STRIKE THAT QUESTION.  IF YOU

13  HAD NO KNOWLEDGE OF WHAT THIS COLLATERAL LOOKED LIKE IN

14  TERMS OF A PICTURE, A GRAPHIC, WOULD YOU HAVE BEEN

15  COMFORTABLE FUNDING THIS LOAN?

16      A      I THINK THE GOAL WAS TO GET THE TITLE COMPANY

17  COMFORTABLE WITH WHAT WE AT THE BANK, BASED ON THE

18  APPRAISALS, HAD FELT THE COLLATERAL WAS.

19      Q      OKAY.  SO, LET'S TALK ABOUT THE SKETCH.  AT THE TOP

20  WHERE IT SAYS THE SKETCH OF DESCRIPTIONS UNDER "A" WITH

21  QUOTATIONS, WHERE IT STARTS "THE SOUTH HALF OF SECTION 13," WAS

22  THAT TO BE YOUR COLLATERAL?

23      A      AFTER REVIEWING THIS AFTER I WAS SUBPOENAED, IT WAS –

24  AND NOTED MY NOTES I MADE ON THIS SKETCH, YES, I DETERMINED

25  THAT "A" IS THE LEGAL DESCRIPTION.

1    Q    OKAY.  AND JUST SO WE CAN HAVE A CLEAR RECORD, AND I

2    APOLOGIZE ASKING YOU TO DO THIS AGAIN, WOULD YOU PLEASE READ

3    IN FOR THE RECORD UNDER " 'A' LEGAL DESCRIPTION" AND JUST – YOU

4    CAN STOP AFTER THE SECOND LINE.

5    A    PARDON ME?

6    Q    YOU CAN STOP AFTER THE SECOND LINE.

7    A    "THE SOUTH HALF OF SECTION 13, TOWNSHIP 27 SOUTH,

8    RANGE 31 EAST, NORTHEAST QUARTER SECTION 23, TOWNSHIP 27 SOUTH,

9    RANGE 31 EAST, LESS THE NORTH HALF OF THE SOUTHWEST QUARTER OF

10   THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 23.

11   NORTH HALF" –

12   Q    THAT'S FINE.  THANK YOU.  AND DIRECTLY BELOW THAT,

13   UNDER " 'B' LEGAL DESCRIPTION," BEGINNING WITH "THE SOUTH 2,150

14   FEET," LOOKING DOWN AT THE GRAPHIC, WAS THAT TO BE INCLUDED OR

15   EXCLUDED FROM YOUR COLLATERAL?

16   A    EXCLUDED.

17   Q    OKAY.  SO, TO BE CLEAR, "B" WAS NOT GOING TO BE

18   ENCUMBERED BY THE MORTGAGE?

19   A    CORRECT.

20   Q    OKAY.  AND "C," BEGINNING WITH "THE EAST TWELVE

21   SEVENTEEN THIRTY-FIVE FEET," WAS THAT TO BE INCLUDED OR

22   EXCLUDED FROM YOUR MORTGAGE?

23   A    EXCLUDED.

24   Q    OKAY.  I WANT TO – I'M SORRY.  I SHOULD HAVE ASKED YOU

25   THIS WHILE WE HAD THE DOCUMENT OPEN.  COULD YOU PLEASE GO

69

1    BACK TO EXHIBIT – EXHIBIT TWO, WHICH IS THE APPRAISAL DATED

2    AUGUST 25, 2006.  I WOULD LIKE YOU TO MOVE FORWARD TO PAGE 18.

3    OKAY?

4         A     YES, SIR.

5         Q     THE FIVE-YEAR SALES HISTORY, WOULD YOU PLEASE READ

6    THAT?  AND I'M GOING TO ASK YOU A COUPLE OF QUESTIONS ABOUT

7    THAT.

8         A     "THE SUBJECT HAS BEEN OWNED BY" –

9         Q     I'M SORRY, MISS.  YOU CAN READ THAT TO YOURSELF.

10        A     OH.  OKAY.

11        Q     OKAY.  DID YOU NOTIFY THE APPRAISERS THAT JOE O'BERRY

12   DID NOT, AT THE TIME THIS APPRAISAL WAS DONE, THAT JOE O'BERRY

13   DID NOT OWN THE PROPERTY?

14        A     I DON'T RECALL.

15        Q     YOU DON'T RECALL IF HE OWNED IT OR HE DIDN'T OWN IT?

16        A     CORRECT.

17        Q     OKAY.  WOULD YOU HAVE GIVEN – GIVEN THE LOAN AND

18   USED THE LAND AS COLLATERAL IF HE DIDN'T OWN THE PROPERTY?

19        A     I'M NOT TRYING TO BE –

20        Q     NO, I UNDERSTAND.

21        A     -- HE CAN'T BORROW AGAINST SOMETHING HE DOESN'T OWN.

22        Q     OKAY.  DO YOU HAVE ANY RECOLLECTION AS TO WHEN THE

23   BANK RECEIVED THIS SKETCH OF DESCRIPTIONS?

24        A     I DO NOT.

25        Q     OKAY.  WAS IT – WAS IT IN 2006?

1        A        PURELY ESTIMATING, YES.

2                 MR. JONES:  EXHIBIT NINE.

3    BY MR. JONES:

4        Q        OKAY.  MS. GIEL, I'VE JUST HANDED YOU WHAT'S BEEN

5    MARKED AS CREDITOR'S EXHIBIT NINE; AND IT IS A SETTLEMENT

6    STATEMENT.  THE NAME OF THE BORROWER IS RUBEN JOSEPH O'BERRY,

7    MARSHA O'BERRY.  THE NAME OF THE LENDER IS FIRST NATIONAL BANK

8    OF OSCEOLA COUNTY; AND THE DATE ON THIS PARTICULAR DOCUMENT –

9    WELL, THE SETTLEMENT DATE UNDER PARAGRAPH "I" IS 4/9/2007.  DO YOU

10   RECOGNIZE THIS DOCUMENT?

11       A        YES, SIR.

12       Q        OKAY.  HOW DO YOU RECOGNIZE THIS DOCUMENT?

13       A        AS THE CLOSING STATEMENT FOR THIS LOAN BEING

14   DISCUSSED.

15       Q        NOW, I NOTICE ON THIS CLOSING STATEMENT THAT THE

16   SETTLEMENT DATE OF APRIL 9, 2007, IS DIFFERENT THAN THE PRORATION

17   DATE OF AUGUST 26, 2006.  WHAT IS THE – WHAT DOES THAT MEAN?

18       A        THAT THERE WAS A DELAY IN FUNDING.  SETTLEMENT

19   MEANS FUNDING DATE.

20       Q        OKAY.  DO YOU HAVE ANY RECOLLECTION AS TO WHAT

21   CAUSED THE DELAY IN FUNDING?

22       A        MY RECOLLECTION WOULD BE THE – THE CONFIRMING THAT

23   THE LEGAL DESCRIPTIONS WERE CORRECT.

24       Q        AND WHEN YOU CONFIRMED THAT THE LEGAL DESCRIPTIONS

25   WERE CORRECT, YOU WENT AHEAD AND CLOSED AND FUNDED THE LOAN,

71

1    CORRECT?

2         A     VIA THE TITLE COMPANY, YES.

3         Q     OKAY.  AND THOSE WOULD BE THE LEGAL DESCRIPTIONS

4    TAKEN FROM THE SKETCH.  IS THAT CORRECT?

5         A     I DON'T KNOW WITHOUT SEEING THE – THIS REFERENCES

6    FOUR PARCEL ID'S.  SO, I DON'T HAVE THOSE AS PART OF THIS

7    DOCUMENT.

8         Q     OKAY.  BUT YOU HAD TESTIFIED THAT THE SKETCH

9    REPRESENTED WHAT YOU OR THE BANK BELIEVED YOUR COLLATERAL

10   TO BE FOR THIS LOAN?

11        A     THAT IS CORRECT.

12        Q     NOW, YOU HAD SAID THAT THE TITLE COMPANY CLOSED

13   THIS.  DID THE TITLE COMPANY PRODUCE THIS?

14        A     YES.

15        Q     OKAY.  SO, THE TITLE COMPANY IS THE ONE THAT FILLED IN

16   ALL THIS INFORMATION?

17        A     YES.

18        Q     OKAY.  AND FOUR PARCEL ID'S, I MEAN, THAT'S SOMETHING

19   THAT CAME FROM THEM?

20        A     YES.

21              MR. WEBBER:  EXCUSE ME.  WHERE'S THE FOUR PARCEL ID'S?

22              MR. JONES:  HERE.

23              MR. WEBBER:  THANK YOU.

24              MR. JONES:  YOUR HONOR, DO YOU SEE THAT?

25              THE COURT:  YES, I DO.

72

1          MR. JONES:  OKAY.

2     BY MR. JONES:

3          Q     MS. GIEL, COMING FORWARD AFTER CLOSING THE LOAN, AND

4     I – PARDON ME, I DON'T RECALL THE EXACT DATE, BUT AT SOME POINT IN

5     TIME, THE MACHADO FAMILY LIMITED PARTNERSHIP ACQUIRED THIS

6     LOAN FROM THE BANK, DIDN'T THEY?

7          A     YES, SIR.

8          Q     OKAY.  AT THE TIME THAT THEY ACQUIRED THIS LOAN FROM

9     THE BANK, WERE YOU AWARE OF ANY PROBLEM WITH THE LEGAL

10    DESCRIPTION?

11         A     NO, SIR.

12         Q     OKAY.  TODAY, ARE YOU AWARE OF A PROBLEM WITH THE

13    LEGAL DESCRIPTION?

14         A     I BELIEVE THAT IS WHY I AM HERE.

15         Q     DO YOU RECALL BEING SERVED WITH A SUBPOENA FROM MY

16    OFFICE – IT'S  BEEN ABOUT A YEAR AGO – REQUESTING THE CONTENTS OF

17    THE LOAN FILE?

18         A     YES.

19         Q     AND AT THAT POINT IN TIME, EITHER YOU OR MR. ROY – NOT

20    MR. ROY – MR. SAXTON PRODUCED THE LOAN FILE.  IS THAT ACCURATE?

21         A     YES.

22         Q     NOW, ALONG WITH THAT, YOU ALSO NOTIFIED US THAT THE

23    BANK WAS MAKING TITLE CLAIM.  IS THAT TRUE?

24         A     NOT AT THAT TIME.

25         Q     OKAY.  DID THE BANK EVER MAKE A TITLE CLAIM?

73

1        A        I DON'T KNOW HOW TO SPEAK TO THAT, BECAUSE THAT IS

2    SOMETHING THAT WAS HANDLED BY THE ATTORNEY'S OFFICE; SO, I

3    CAN'T SIT HERE AND SPEAK INTELLIGENTLY ABOUT IT, SO I'D RATHER

4    NOT.

5        Q        OKAY.  WELL, ARE YOU AWARE THAT THERE IS A TITLE

6    CLAIM PENDING?

7        A        YES, SIR.

8        Q        ARE YOU AWARE THAT THE BANK INITIATED A TITLE CLAIM?

9        A        THE – OUR ATTORNEY DID ON BEHALF OF THE BANK.

10        Q        OKAY.  YOUR ATTORNEY INITIATED IT ON BEHALF OF THE

11    BANK; AND THAT WAS BECAUSE YOU BELIEVED THERE TO – OR SOMEONE

12    ON THE BANK SIDE BELIEVED THERE TO BE AN ERROR IN THE LEGAL

13    DESCRIPTION?

14        A        YES, SIR.

15            MR. JONES:  I DON'T HAVE ANY FURTHER QUESTIONS.

16            THE COURT:  MR. WEBBER?

17                    CROSS-EXAMINATION

18    BY MR. WEBBER:

19        Q        GOOD AFTERNOON.

20        A        HELLO.

21        Q        TALKING ABOUT JUST A COUPLE OF THINGS THAT WE'VE

22    JUST GONE OVER, DO YOU REMEMBER WE LOOKED AT THE SKETCH,

23    WHICH WAS MACHADO EXHIBIT NUMBER THREE?

24        A        YES, SIR.

25        Q        AND YOU LOOKED AT THE "A" PARCEL.  DO YOU HAVE THAT

1    IN FRONT OF YOU?

2         A      I DO.  I DO.

3         Q      AND IS THERE SOME OF YOUR HANDWRITING ON HERE, MS.

4    GIEL?

5         A      YES, SIR.

6         Q      OKAY.  LET'S SEE.  KIND OF IN THE MIDDLE TO THE LEFT –

7         A      YES, SIR.

8         Q      -- CAN YOU READ THAT WRITING – WELL, FIRST OF ALL, IS

9    THAT YOUR WRITING?

10        A      YES, SIR.

11        Q      OKAY.  WOULD YOU PLEASE READ THAT FOR THE JUDGE,

12   BECAUSE I CAN'T.

13        A      " 'A' IS ACTUALLY THREE SEPARATE PARCELS ON THE TAX

14   ROLLS."

15        Q      OKAY.  SO, PARCEL "A" IS THREE SEPARATE PARCELS ON THE

16   TAX ROLLS.  AND WE JUST LOOKED AT THE SETTLEMENT STATEMENT

17   AND SAID THERE WERE FOUR PARCEL ID NUMBERS, RIGHT?  YOU

18   REMEMBER THAT?

19        A      YES, SIR.

20        Q      DO YOU THINK THESE ARE THREE OF THOSE FOUR?

21        A      I WOULD –

22        Q      DO YOU KNOW?

23        A      I DO NOT KNOW.

24        Q      OKAY.  ALL RIGHT.  NOW IF YOU WOULD LOOK OVER WHERE

25   THERE'S THE FEE IN PAREN – EXCUSE ME – QUOTES.  IT'S IN THE MIDDLE.

75

1   WHAT IS THAT WORD – FIRST OF ALL, IS THAT YOUR WRITING ABOVE THE

2   "V"?

3        A    YES, SIR.

4        Q    WHAT DOES THAT WORD SAY?

5        A    IT SAYS "GROVE."

6        Q    GROVE?

7        A    YES.

8        Q    LIKE ORANGE GROVE?

9        A    YES.

10       Q    AND "D" WAS NOT COUNTED, RIGHT?

11       A    CORRECT.

12       Q    NOT – OKAY.  AND THEN, UP – UP BY WHERE IT HAS "C," IS

13   THAT YOUR WRITING?

14       A    YES, SIR.

15       Q    WHAT DOES THAT SAY?

16       A    "TRUST MTG."  I'M THINKING TRUST MORTGAGE.

17       Q    TRUST MORTGAGE.  THAT WOULD BE THE O'BERRY TRUST?

18   IS THAT YOUR RECOLLECTION?  OR DO YOU KNOW?

19       A    I – I DON'T RECOLLECT.

20       Q    OKAY.  NOW, IF YOU LOOK DOWN AT THE BOTTOM OF THIS

21   SKETCH, YOU'LL SEE A BIG SECTION TWO THREE – BOTTOM RIGHT,

22   MIDDLE, BOTTOM RIGHT.  DO YOU SEE THAT?

23       A    YES.

24       Q    AND YOU SEE THAT THERE'S A BOX THERE IN THE LEFT

25   CORNER?

76

1    A    YES.

2    Q    COULD YOU READ WHAT IT SAYS INSIDE THAT BOX?

3    A    THIS BOX RIGHT HERE?

4    Q    YES, MA'AM.

5    A    "THE NORTHEAST QUARTER OF SECTION 24."

6    Q    NOW, WE LOOKED AT THESE APPRAISALS; AND AGAIN, I'M

7    TRYING TO STAY RIGHT NOW WITH WHAT WE JUST LOOKED AT SO IT'S

8    ALL FRESH IN OUR MINDS.  WE LOOKED AT MACHADO EXHIBIT NUMBER

9    TWO, WHICH HAD LEGAL DESCRIPTION ON PAGE ONE.  SO, IF YOU WOULD

10   – FOR THE RECORD, IT'S THE ONE DATE OF REPORT 9/1/2006.  WELL, FIRST

11   OF ALL, RIGHT IN THE BEGINNING THERE, WHO'S SUSIE MCMILLAN?

12   A    SHE WAS A LOAN PROCESSOR FOR THE BANK.

13   Q    OKAY.  AND IF YOU FLIP TO THE NEXT PAGE, WHAT WAS THE

14   VALUE OF THIS ACREAGE?

15   A    EIGHT MILLION, THREE HUNDRED THIRTY-FIVE THOUSAND.

16   Q    AND YOU WERE LENDING 1.4 MILLION?

17   A    YES, SIR.

18   Q    AND IF WE GO TO PAGE ONE WHERE IT SAYS "THE LEGAL

19   DESCRIPTION."  CAN YOU READ THE FIRST THREE LINES, ENDING ON THE

20   SEMICOLON?

21   A    "THE SOUTH HALF OF SECTION 13, THE NORTH HALF OF

22   SECTION 24 ALL IN TOWNSHIP 27 SOUTH, RANGE 31 EAST, OSCEOLA

23   COUNTY, FLORIDA."

24   Q    OKAY.  DO YOU SEE ANYWHERE IN THAT LEGAL DESCRIPTION

25   SECTION 23, ANYWHERE?

77

1       A       NO, SIR.

2       Q       OKAY.  NOW, YOU WERE ASKED BY MR. JONES WHETHER OR

3  NOT THE TITLE COMPANY OR THE BANK OR IN CONJUNCTION USED THE

4  LEGAL DESCRIPTIONS OFF THE SKETCH.  REMEMBER THAT QUESTION?

5       A       YES.

6       Q       DO YOU KNOW IF ANY OF THE LEGAL DESCRIPTIONS WERE

7  USED FROM THE APPRAISALS?

8       A       I DON'T RECALL, BUT THAT WOULD HAVE HAD TO HAVE

9  BEEN THE BEGINNING POINT.

10      Q       RIGHT.  AND THAT'S WHY YOU – THESE APPRAISALS ARE

11 FROM YOUR FILES, RIGHT?

12      A       YES.

13      Q       SO, THESE ARE BANK RECORDS?

14      A       YES.

15      Q       LET'S GO BACK TO ONE – MACHADO ONE, SINCE WE JUST

16 LOOKED AT THAT, AS WELL.  AND THIS WAS DATED [SIC] TO YOU, RIGHT?

17 THE LETTER?

18      A       YES.

19      Q       AND THE VALUE ON THE NEXT PAGE, HOW MUCH IS THAT?

20      A       FOUR MILLION, TWENTY THOUSAND.

21      Q       SO, IF YOU ADD THOSE APPRAISALS TOGETHER, BECAUSE

22 YOU SAID THEY WERE SEPARATE PROPERTIES, THAT'S TWELVE MILLION

23 FOR A 1.4 MILLION-DOLLAR LOAN?

24      A       YES, SIR.

25      Q       OKAY.  AND I WAS LOOKING AT PAGE ONE, THE LEGAL

78

1    DESCRIPTION ON – AND I DON'T WANT YOU TO READ IT.  I DON'T WANT TO

2    TAKE THE COURT'S TIME.  IT'S IN THE EVIDENCE.  BUT I'M JUST LOOKING

3    REAL FAST, DO YOU SEE SECTION 23?

4        A      NO, SIR.

5        Q      I DON'T, EITHER.  OKAY.  ALL RIGHT.  NOW, YOU KNOW THE

6    LITTLE SKETCH WE'VE BEEN TALKING ABOUT?

7        A      YES.

8        Q      AND I KNOW WE HAVE THE ORIGINAL LOAN FILE HERE; AND I

9    KNOW IT'S GOT A LITTLE RAISED BUMP ON IT, BUT IT'S NOT CERTIFIED TO

10   THE TITLE COMPANY, IS IT?

11       A      NO.

12       Q      OKAY.  AND THE TITLE COMPANY IN THIS CASE IS?

13       A      STEWART TITLE.

14       Q      STEWART TITLE.  AND IT'S NOT CERTIFIED TO THE BANK, IS

15   IT?

16       A      NO, SIR.

17       Q      ISN'T IT NORMAL THAT WHEN YOU HAVE A TYPE OF

18   DOCUMENT LIKE THIS THAT IT WOULD BE CERTIFIED EITHER TO THE

19   TITLE COMPANY AND/OR THE BANK?

20       A      IF IT IS A CERTIFIED SURVEY, YES, SIR, IT IS.

21       Q      OKAY.  NOW, I HAVE THE ORIGINAL LOAN FILE IN MY HAND;

22   AND I AM LOOKING AT A DOCUMENT AND IT'S DATED MARCH 3, 2008, AND

23   IT SAYS "CENTER STATE BANKS (PLURAL) OF FLORIDA "CENTER COURT

24   REPORT."  DO YOU KNOW WHAT A CENTER COURT REPORT IS?

25       A      YES, SIR.

1      Q      WHAT IS THAT?

2      A      IT'S A REVIEW OF LOANS THAT WERE IN A SUBSTANDARD

3  CATEGORY.

4      Q      OKAY.  NOW, LET'S BACK UP A LITTLE BIT HERE.  I MEAN, WE

5  LOOKED AT THE HUD.  THIS WAS A CONSOLIDATION OF SEVERAL

6  OUTSTANDING O'BERRY LOANS BY CENTER STATE BANK.  IS THAT TRUE?

7      A      YES, SIR.

8      Q      DO YOU REMEMBER HOW MANY?

9      A      THE HUD INDICATES THREE.

10     Q      OKAY.  THE HUD INDICATES THREE.  ONE POINT FOUR

11  MILLION FUNDED.  WHAT WAS THE NET TO THE O'BERRYS AFTER ALL THE

12  OTHER LOANS WERE PAID OFF?

13     A      THE HUD INDICATES $300,000.

14     Q      CORRECT.  NOW, ON THIS, THIS CENTER COURT REPORT THAT

15  I'M LOOKING AT, IT SAYS "COLLATERAL" AND IT HAS "REAL ESTATE

16  CHECK."  AND I CAN SHOW THIS TO YOU, IF YOU'D LIKE, BUT IT SAYS

17  "FIRST MORTGAGE ON EIGHT EIGHT SEVEN ACRES LOCATED IN HOLOPAW,

18  FLORIDA."  AND THAT WOULD MATCH UP WITH ONE OF THE APPRAISALS,

19  RIGHT?

20     A      YES, SIR.

21     Q      AND I'M TURNING TO ANOTHER PAGE IN HERE.  I DON'T SEE A

22  DATE.  OH, 12/27/07.  THAT SEEMS LATE, BUT IT SAYS – OH, THIS IS A

23  RENEWAL.  IT SAYS "FIRST MORTGAGE ON A THOUSAND ACRES LOCATED

24  AT 8 MILE RANCH ROAD, ST. CLOUD, FLORIDA."  SO, THIS – AND IT HAS 1.4

25  MILLION FOR THE AMOUNT UP ABOVE THAT.  I'D BE HAPPY TO SHOW THIS

1    TO YOU IF YOU NEED TO SEE IT.  AND IT COMES OUT TO ABOUT 9,000 PER

2    ACRE.  LOAN TO VALUE IS 16 PERCENT.

3            SO, WAS IT YOUR UNDERSTANDING THAT CENTER STATE BANK

4    WAS GOING TO BE GETTING ABOUT A THOUSAND ACRES IN COLLATERAL

5    FOR THE 1.4 MILLION-DOLLAR LOAN?

6        A    I'M SURE THAT WAS DISCUSSED IN ROUND NUMBERS.

7        Q    ROUND NUMBERS.  OKAY.  IT DOESN'T SAY 1,300; IT DOESN'T

8    SAY 1,600.  IT SAYS A THOUSAND.

9        A    YES, SIR.

10       Q    ALL RIGHT.  NOW, DO YOU KNOW – HAVE YOU EVER MET THE

11   MACHADOS?

12       A    YES, SIR.

13       Q    LUIS AND CEFERINO?

14       A    YES, SIR.

15       Q    AND HOW DID YOU – TELL THE COURT HOW YOU MET THEM.

16   OR WHEN YOU FIRST MET THEM.

17       A    IT WAS PROBABLY IN 2007 OR 2008 IN TEXAS ON A RANCH.

18       Q    WHAT WERE YOU DOING IN TEXAS ON A RANCH?

19       A    I WAS VISITING THE O'BERRYS AT THEIR RANCH.

20       Q    DID THAT HAVE TO DO WITH BANK BUSINESS?

21       A    NO, SIR.

22       Q    THE MACHADOS HAVE FILED SOME PLEADINGS IN THIS CASE;

23   AND THIS IS DOCUMENT NUMBER 170, FILED ON JANUARY 30, 2015, PAGE 5

24   OF 27.  PAGE FIVE.  IT SAYS:  "THE DEBTOR WILL ARGUE THAT SECTION 23

25   LAND WAS NEVER INTENDED TO BE INCLUDED UNDER THE MORTGAGE.

81

1    AND TO THIS POINT, DEBTOR WILL INTRODUCE THE SELF-SERVING

2    TESTIMONY OF MS. GIEL OF CENTER STATE BANK WHO HAS BEEN

3    SERVING AND PROFITING FROM THE O'BERRY FAMILY FOR MANY, MANY

4    YEARS."

5            DID YOU KNOW THAT THE MACHADOS SAID THAT ABOUT YOU?

6        A    PROFITING.  WHAT DOES PROFITING MEAN?

7        Q    I DON'T KNOW.  YOU HAD SOME LOANS AND BANKING

8    RELATIONSHIPS, I THINK YOU SAID SINCE '06 OR BEFORE.

9        A    I DIDN'T PERSONALLY PROFIT.  THE BANK WOULD HAVE

10   PROFITED.

11       Q    AND YOU'RE HERE AND YOU'RE GIVING TRUTHFUL

12   TESTIMONY, AREN'T YOU, MR. GIEL?

13       A    ONLY.

14       Q    OKAY.  NOW, LET'S TALK ABOUT THE 161 ACRES.  IF YOU

15   LOOK AT THAT DEMONSTRATIVE EXHIBIT WHICH IS NEXT TO YOU ON THE

16   WITNESS STAND, THERE IS A SQUARE TO THE FAR LEFT THAT HAS A

17   GREEN LINE TO THE FAR RIGHT.  DO YOU SEE THAT?

18       A    YES.

19       Q    OKAY.  AND TAKE MY WORD FOR IT, THAT'S 161-PLUS-OR-

20   MINUS ACRES.  DID YOU EVER HAVE A DISCUSSION WITH JOE O'BERRY OR

21   MARSHA O'BERRY ABOUT INCLUDING OR NOT INCLUDING THAT 161

22   ACRES?

23       A    NO, SIR.

24       Q    DON'T REMEMBER?

25       A    NO, SIR.

82

1    Q    OKAY.  ALL RIGHT.  BUT YOU ONLY NEED A THOUSAND

2    ACRES FOR COLLATERAL FOR YOUR MORTGAGE?

3    A    IT WAS WHAT WAS OFFERED, AGAIN, IN ROUND NUMBERS.

4    Q    OKAY.  AND I THINK YOU DON'T – YOU DON'T REMEMBER

5    WHY IT WASN'T FUNDED RIGHT AWAY FOR SURE?

6    A    AFTER REVIEWING THE FILE, MY RECOLLECTION IS THAT

7    THERE WERE ISSUES ON CONFIRMING THE LEGAL DESCRIPTION.

8    Q    OKAY.  AND THE TITLE COMPANY CLOSED THE LOAN.

9    A    YES, SIR.

10    Q    IS THAT NORMAL PROCEDURE?

11    A    YES, ESPECIALLY ON A LOAN OF THIS SIZE.

12    Q    YES.  OKAY.  NOW, THERE'S BEEN A LOT OF ALLEGATIONS

13    ABOUT ADDRESSES OUT HERE ON THIS PROPERTY OUT HERE IN

14    HOLOPAW.  I THINK YOUR FILE SAID "8 MILE RANCH ROAD."  I THINK I'VE

15    USED 5400 8 MILE RANCH ROAD.  ARE THERE ANY ADDRESSES OUT HERE

16    FOR THIS PROPERTY?

17    A    I BELIEVE IF YOU GO TO THE PROPERTY APPRAISER'S

18    WEBSITE, I WOULD THINK YOU WOULD NOT FIND AN ADDRESS.

19    Q    FOR THIS – THESE –

20    A    CORRECT.

21    Q    THIS LAND.

22    A    5400 8 MILE RANCH ROAD IS THE O'BERRY'S HOME ADDRESS.

23    Q    THAT'S WHERE THEIR HOMESTEAD IS.

24    A    YES.

25    Q    THAT'S WHERE THEY GET THEIR MAIL.

83

1      A      YES.

2      Q      OKAY.  NOW, WHAT WAS THE PRIMARY REPAYMENT FOR THE

3  LOAN?  WHAT WAS THE PRIMARY SOURCE OF REPAYMENT?  WHAT WAS

4  MR. O'BERRY'S OCCUPATION?

5      A      HE IS A CATTLE RANCH, BUT I HESITATED BECAUSE I

6  WANTED TO MAKE SURE IN MY MIND THAT WAS WHAT HAD BEEN

7  DISCUSSED.

8      Q      AND HE WAS RUNNING CATTLE ON THIS PROPERTY.

9      A      HE – HE ALSO IS A FARMER OF SORTS, SO THERE COULD BE –

10     Q      A GRASS FARM, RIGHT?  WOULD YOU CALL IT A – I MEAN,

11  HAY, THAT KIND OF STUFF WHEN I MEAN TO SAY GRASS?

12     A      SOME CROPS.

13     Q      AND SO, THE PRIMARY SOURCE OF REPAYMENT FOR THE 1.4

14  MILLION-DOLLAR LOAN WOULD HAVE BEEN WHAT?

15     A      THE SALE OF CATTLE.

16     Q      OKAY.  WHAT WAS THE SECONDARY SOURCE?

17     A      WOULD HAVE BEEN SALE OF THE LAND.

18     Q      OKAY.  AND WAS THERE ANY TERTIARY GUARANTEE

19  SOURCE?

20     A      NONE AVAILABLE, REALLY.

21     Q      SEE, THE O'BERRY'S DIDN'T PERSONALLY GUARANTEE THE

22  LOAN.

23     A      NO, THEY DID.

24     Q      THEY SIGNED INDIVIDUALLY.

25     A      RIGHT.

1      Q      BUT YOU DIDN'T HAVE A THIRD-PARTY COMPANY OR

2  SOMEBODY ELSE –

3      A      NO, SIR.

4      Q      -- EXECUTE A GUARANTEE?

5      A      NO, SIR.

6      Q      DO YOU KNOW WHO DRAFTED THE MORTGAGE?  AND IF YOU

7  WOULD LOOK IN THE OTHER BOOK.  I THINK IT'S NUMBER TWO, MS. GIEL.

8      A      THERE'S A MORTGAGE IS ONE AND THERE'S –

9      Q      I'M SORRY.  MORTGAGE IS ONE.  I APOLOGIZE.  THAT'S WHAT

10  I WANT YOU TO GO TO.  AND IF YOU GO TO THE – THIS IS DEBTOR'S ONE.

11  IF YOU GO TO PAGE 8 OF 8, OR THE LAST PAGE OF THE EXHIBIT RIGHT

12  NEXT TO TAB TWO, WHATEVER IS EASIEST FOR YOU.  WHO PREPARED

13  THIS MORTGAGE FOR THE BANK?

14      A      THE MORTGAGE WAS PREPARED IN THE BANK WITH THE

15  LEGAL DESCRIPTION ATTACHED BASED ON COPYING WHAT WAS IN THE

16  TITLE COMMITMENT FROM THE TITLE COMPANY.

17      Q      OKAY.  SO, THE BANK ITSELF, CENTER – I MEAN, DID YOU

18  TYPE THIS UP AT CENTER STATE?

19      A      NO, SIR.

20      Q      WHO WOULD HAVE TYPED THIS UP?  YOUR ASSISTANT?

21      A      I WOULD ASSUME IT WAS TYPED AT THE TITLE COMPANY.

22      Q      AND THEN GIVEN TO YOU AT THE BANK?

23      A      YES, SIR.  YES, SIR.

24      Q      NOW, THE NOTICE TO THE TITLE COMPANY.  I THINK IN THE

25  BOOK YOU'RE IN, WE'VE GOT ONE.  LET ME SEE.  FOURTEEN.  IF YOU'D GO

85

1    TO, PLEASE, DEBTOR'S 14, JUST TO MAKE IT EASY FOR YOU.  THIS WAS A

2    NOTICE THAT YOUR LAWYERS DRAFTED ON MARCH 24, 2014, TO STEWART

3    TITLE, RIGHT?

4         A    YES, SIR.

5         Q    AND IT REFERENCES THAT ON APRIL 28, 2008, THE MORTGAGE

6    WAS ASSIGNED TO THE MACHADO FAMILY LIMITED PARTNERSHIP NO. 1.

7         A    YES.

8         Q    AND IT TALKS ABOUT LEGAL DESCRIPTION ERRORS, RIGHT?

9         A    YES.

10        Q    DO YOU KNOW IF THIS CLAIM IS BEING PURSUED BY THE

11   MACHADOS AS WE SIT HERE TODAY?

12        A    I DO NOT KNOW.

13        Q    NOW, WE ADDED UP ALL OF THE REAL – REAL ESTATE

14   ACREAGE IN THE TWO APPRAISALS; AND THAT WAS OVER 1,300, ROUGH

15   NUMBERS.  AND YOUR BANK SAYS IN ROUGH NUMBERS, YOUR BANK FILE,

16   A THOUSAND ACRES BEING PLEDGED.  IF THAT 161 ACRES IN SECTION

17   THREE ISN'T INCLUDED, YOU'D STILL HAVE OVER A THOUSAND PLEDGED

18   AS COLLATERAL.  IS THAT TRUE?

19        A    YES, SIR.

20             MR. WEBBER:  I THINK THAT'S MY QUESTIONS FOR MS. GIEL,

21        JUDGE.

22             THE COURT:  AND MR. JONES, ANYTHING FURTHER FOR MS.

23        GIEL?

24             MR. JONES:  JUST BRIEFLY, YOUR HONOR.

25             THE COURT:  CERTAINLY.

86

REDIRECT EXAMINATION

1

BY MR. JONES:

2

3    Q    OKAY, MS. GIEL, I JUST WANT TO GO BACK TO THIS

4  APPRAISAL, THE – I BELIEVE IT'S THE AUGUST APPRAISAL THAT MR.

5  WEBBER QUESTIONED YOU ABOUT.  ONE OF THE FIRST THINGS I WANT TO

6  ADDRESS IS, YOU KNOW YOU TALKED ABOUT THE THOUSAND ACRES WAS

7  IN ROUGH TERMS.  IT COULD HAVE BEEN MORE OR IT COULD HAVE BEEN

8  LESS.  IS THAT WHAT YOU'RE SAYING?

9    A    YES, SIR.

10    Q    OKAY.  AND THE APPRAISAL, YOU HAD MADE THE COMMENT

11  THAT THE LEGAL DESCRIPTION IN AN APPRAISAL – OR, IN THESE

12  APPRAISALS WAS A STARTING POINT.  IT WASN'T THE FINISHING POINT,

13  WAS IT?

14    A    NO, SIR.

15    Q    IN FACT, I BELIEVE YOU TESTIFIED THAT THE SKETCH IS

16  WHAT YOU WERE WAITING ON TO CONFIRM THE LEGAL DESCRIPTION.

17  ISN'T THAT ACCURATE?

18    A    NOT WAITING ON.  IT WAS FURTHER DOCUMENTATION,

19  BECAUSE THERE – THERE NEEDED TO BE ACCURACY IN THE LEGAL.

20    Q    WAS THERE ANYTHING ELSE THAT THE BANK RECEIVED

21  THAT YOU KNOW OF THAT FURTHER CHANGED THE LEGAL DESCRIPTION?

22    A    I DON'T RECALL.

23    Q    OKAY.  WHEN MR. WEBBER HAD ASKED YOU ON PAGE ONE OF

24  THE APPRAISAL FROM AUGUST OF 2006 IF SECTION 23 APPEARED UNDER

25  THE LEGAL DESCRIPTION; AND I BELIEVE YOUR ANSWER WAS IT DOES

1    NOT.  IS THAT CORRECT?

2         A      CORRECT.

3         Q      BUT THAT WASN'T – THAT WAS THE STARTING POINT,

4    CORRECT?

5         A      IT'S NOT IN – IT'S NOT INCLUDED IN THIS APPRAISAL LEGAL.

6         Q      BUT IT'S INCLUDED ON THE SKETCH.

7         A      IT IS.

8         Q      OKAY.  WOULD IT SURPRISE YOU TO FIND OUT THAT – IF I

9    WERE TO TELL YOU THAT THIS APPRAISAL REALLY ONLY APPRAISED 712

10   ACRES; AND NOT THE 886.67 ACRES?

11        A      YES, SIR.

12               MR. JONES:  I DON'T HAVE ANYTHING FURTHER, YOUR

13        HONOR.

14               MR. WEBBER:  JUDGE, I JUST HAVE A COUPLE.

15               THE COURT:  OKAY.

16                        RECROSS EXAMINATION

17   BY MR. WEBBER:

18        Q      AND AGAIN, JUST RELATING TO THE TESTIMONY THAT WE

19   JUST HAD, YOU – I THINK YOU HAD TESTIFIED EARLIER THAT YOU

20   WOULDN'T TAKE A MORTGAGE ON LAND FOR COLLATERAL THAT THE

21   O'BERRYS DIDN'T OWN.  IS THAT A TRUE STATEMENT?

22        A      YES, SIR.

23        Q      AND WHEN I SAY "YOU," I MEAN CENTER STATE BANK –

24        A      YES, SIR.

25        Q      -- JUST FOR THE RECORD, HERE.  AND THE SETTLEMENT

88

1    STATEMENT THAT WE LOOKED AT, YOU REMEMBER WE HAD A

2    PRORATION DATE AND THEN WE HAD – COULD YOU TELL THE JUDGE

3    WHAT THE SETTLEMENT DATE WAS?

4        A    THE SETTLEMENT DATE READS APRIL 9, 2007.

5        Q    APRIL 9TH OF 2007.  BUT WHAT'S THE PRORATION DATE GO

6    BACK TO?

7        A    AUGUST 26, 2006.

8        Q    AND THAT SKETCH THAT WE'VE ALL BEEN LOOKING AT,

9    THAT'S DATED SEPTEMBER OF 2006, RIGHT?

10       A    YES, SIR.

11       Q    DO YOU KNOW THAT MARSHA AND JOE O'BERRY DIDN'T

12   OWN SECTION 23 IN SEPTEMBER OF 2006?

13       A    I DID NOT.

14       Q    OKAY.  IF YOU WOULD TAKE A LOOK AT MACHADO SIX, AND I

15   – HERE, I CAN HAND YOU MINE – I HAVE A WITNESS STAND COPY, BUT –

16            MR. WEBBER:  JUDGE, MAY I APPROACH?  I'M GOING TO LEAN

17            OVER AND JUST TALK INTO THE MIC.

18   BY MR. WEBBER:

19       Q    MACHADO NUMBER SIX IS A TRUSTEE'S DEED DATED MARCH

20   23, 2007, AND RECORDED ON MARCH 28TH OF 2007.  DO YOU SEE THAT?

21       A    YES, SIR.

22       Q    AND WOULD YOU LOOK AT THE LEGAL DESCRIPTION?  IS

23   THAT THE SECTION 23 THAT WE'VE BEEN TALKING ABOUT?

24       A    IT READS:  SECTION 13.  OH –

25       Q    YOU CAN READ IT ALL, IF YOU WANT.

89

1     A     OKAY.  YES, IT MENTIONS – IT REFERENCES SECTION 23.

2     Q     THE NORTHEAST QUARTER OF SECTION 23, AND THEN LESS –

3     A     YES, SIR.

4     Q     OKAY.  SO, WHEN YOU WERE TALKING TO THE O'BERRYS

5     ABOUT THIS MORTGAGE AND THE LAND AND THE COLLATERAL THAT

6     THEY'D BE OFFERING IN 2006, THEY DIDN'T EVEN OWN SECTION 23, DID

7     THEY?

8     A     BASED ON WHAT I'VE JUST BEEN SHOWN, NO.

9           MR. WEBBER:  OKAY.  THANK YOU.

10          MR. JONES:  JUDGE?

11          THE COURT:  YES.  PLEASE GO AHEAD.  TAKE YOUR TIME.

12          MR. JONES:  I CAN'T LEAVE THAT.

13                    FURTHER REDIRECT EXAMINATION

14    BY MR. JONES:

15    Q     MS. GIEL, MR. WEBBER JUST SHOWED YOU – I DIDN'T HEAR

16    THE EXHIBIT NUMBER, BUT I BELIEVE IT WAS EXHIBIT SIX, THE TRUSTEE'S

17    DEED.  HERE'S THE CERTIFIED COPY OF IT.

18          MR. JONES:  IS THAT WHAT YOU SHOWED HER?

19          MR. WEBBER:  YES.

20          MR. JONES:  OKAY.  I'M GOING TO PUT THAT RIGHT IN THE

21    CLERK'S OFFICE.

22    BY MR. JONES:

23    Q      MS. GIEL, WHAT DATE WAS THAT TRUSTEE'S DEED

24    EXECUTED?

25    A     MARCH 23, 2007.

1      Q      WHAT DATE WAS IT RECORDED?

2      A      MARCH 28, 2007.

3      Q      SO, BY MARCH 28, 2007, JOE AND MARSHA O'BERRY OWNED

4  SECTION 23.  IS THAT CORRECT?

5      A      THE NORTHEAST QUARTER OF SECTION 23.

6      Q      THE NORTHEAST QUARTER.  I APOLOGIZE.  NORTHEAST

7  QUARTER.  SO, TO RESTATE, BY THE END – MARCH 28, 2007, JOE AND

8  MARSHA O'BERRY OWNED THE NORTHEAST QUARTER OF SECTION 23?

9      A       ACCORDING TO THIS DOCUMENT.

10      Q      OKAY.  AND YOU FUNDED THIS LOAN ON APRIL 9, 2007,

11  WHICH, ACCORDING TO MY MATH, 31 DAYS, 28 – NINE – 12 DAYS AFTER

12  THAT DEED WAS RECORDED, VESTING THE NORTHEAST QUARTER OF

13  SECTION 23 IN JOE AND MARSHA O'BERRY, YOU FUNDED THIS LOAN.

14  ISN'T THAT ACCURATE?

15      A      I'D HAVE TO SEE THE PARCEL ID'S BEING REFERENCED ON

16  THE HUD.

17      Q      BUT YOU FUNDED THIS LOAN, THOUGH, ON APRIL 9, 2007.  IS

18  THAT CORRECT?

19      A      BASED ON THE SETTLEMENT STATEMENT, THAT WAS

20  CORRECT.

21      Q      ALL RIGHT.  THANK YOU.  I APPRECIATE THAT.

22          THE COURT:  ANYTHING FURTHER FOR MS. GIEL?

23          MR. WEBBER:  NO FURTHER QUESTIONS, YOUR HONOR.

24          MR. JONES:  NO FURTHER QUESTIONS, YOUR HONOR.

25          THE COURT:  THANK YOU.  I KNOW IT WAS A LONG

1    AFTERNOON, BUT WE APPRECIATE YOUR TIME; AND YOU ARE

2    DONE.  THAT'S MORE THAN I CAN SAY FOR THE REST OF YOU GUYS.

3    IT IS 4:30; AND WE HAVE NOT GOTTEN TO THE TWO PRINCIPAL

4    WITNESSES.  SO, WHAT WOULD WE LIKE TO DO?  YOU ALL WILL BE

5    OUT OF THIS BUILDING BY FIVE P.M.  SO, THAT'S ALL YOU GOT.

6              THE WITNESS:  MAY I STEP DOWN?

7              THE COURT:  AND YOU CAN GO.  YOU'RE DONE.  THANK YOU

8    SO MUCH.

9              MR. WEBBER:  THANK YOU.

10             THE COURT:  I DON'T KNOW WHAT YOUR SCHEDULES AND

11   SUCH IS.  YOU ARE WELCOME TO COME BACK TOMORROW, BUT

12   YOU ALL ALSO HAVE BUSY LIVES AND I DON'T KNOW IF THAT

13   WORKS WITH ANYBODY ELSE.  IF NOT, WE'LL BE GLAD TO HAVE

14   OTHER DATES THAT WE CAN BRING YOU BACK.

15             MR. WEBBER:  I'D LIKE TO TRY TO – I THINK HE SAID MR.

16   MACHADO WAS SHORT.  MR. O'BERRY, I SAID ABOUT A HALF HOUR.

17   THAT WOULD GET US RIGHT TILL FIVE.  I DON'T KNOW WITH CROSS.

18   SO, IF MAYBE WE COULD DO MR. MACHADO.  I CAN COME BACK

19   TOMORROW.  JUST DEPENDS ON WHAT TIME.  I AM EMERGENCY

20   COVERING FOR MR. MEININGER ON THURSDAY.  HE'S ILL.  SO, I'VE

21   CANCELED A FEW THINGS AND STEPPED IN ON THURSDAY

22   MORNING, BUT I HAVE SOME TIME TOMORROW THAT I COULD BE

23   HERE.

24             THE COURT:  WHAT WOULD YOU ALL PREFER?  IT'S REALLY

25   UP TO YOU GUYS.  AND I WOULD LET YOU STAY, BUT WE CLOSE THE

92

1         COURTHOUSE AND WE DON'T HAVE ANY DISCRETION AT ALL.

2              MR. JONES:  WELL, I DROVE MR. KILLIAN DOWN, SO I WOULD

3         HAVE TO DRIVE HIM BACK.

4              THE COURT:  WHY DON'T WE TAKE – WITH ALL DUE RESPECT,

5         MR. WEBBER, I'M NOT GOING TO PUT ONE OF THE PRINCIPALS ON,

6         BECAUSE IT IS ALREADY 4:30.  WITH CROSS AND DIRECT, IT ISN'T

7         GOING TO BE DONE IN TIME FOR ME TO GET YOU OUT OF THE

8         BUILDING BY FIVE.  THAT'S JUST – UNLESS YOU HAVE TWO

9         QUESTIONS AND – WHAT DO YOU THINK, MR. JONES?

10             MR. JONES:  I'VE GOT TWO QUESTIONS.

11             THE COURT:  THAT'S ALL YOU HAVE?

12             MR. JONES:  I CAN'T THINK OF ANY MORE.

13             THE COURT:  AND YOU HAVE LIMITED?

14             MR. WEBBER:  I HAVE LIMITED.

15             THE COURT:  OKAY.  LET'S DO THAT.  AND THEN WE'LL SEE

16        WHERE WE GO.

17             MR. JONES:  CALL LUIS MACHADO, PLEASE.

18             THE COURT:  IF YOU'D COME FORWARD, SIR, AND BE SWORN.

19             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.  DO YOU

20        SOLEMNLY SWEAR THE TESTIMONY YOU'RE ABOUT TO GIVE WILL

21        BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

22        SO HELP YOU GOD?

23             THE WITNESS:  I DO.

24                         LUIS MACHADO,

25        HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

93

1   FOLLOWS:

2           THE CLERK:  PLEASE STATE YOUR NAME AND ADDRESS FOR

3       THE RECORD.

4           THE WITNESS:  LUIS MACHADO, 5746 SOUTHWEST 100TH

5       STREET, MIAMI, FLORIDA, 33156.

6           THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

7                           DIRECT EXAMINATION

8   BY MR. JONES:

9       Q       GOOD AFTERNOON, MR. MACHADO.

10      A       GOOD AFTERNOON.

11      Q       WHEN THE MACHADO FAMILY LIMITED PARTNERSHIP NO. 1

12  ACQUIRED THIS LOAN FROM CENTER STATE BANK, DID YOU HAVE ANY

13  DOUBT IN YOUR MIND THAT IT ENCOMPASSED SECTION 23?

14      A       I DID NOT HAVE ANY DOUBT.

15      Q       AT ANY POINT DURING THIS ENTIRE PROCEEDING, THIS

16  BANKRUPTCY CASE, STATE COURT CASES, AT ANY POINT DID YOU AGREE

17  THAT MR. O'BERRY WOULD BE ABLE TO RETAIN SECTION 23 LAND?

18      A       NEVER.

19          MR. JONES:  I DON'T HAVE ANY FURTHER QUESTIONS, YOUR

20      HONOR.

21          THE COURT:  MR. WEBBER.

22                          CROSS-EXAMINATION

23  BY MR. WEBBER:

24      Q       YOU REMEMBER THE MEDIATION THAT WE WENT TO?  WE

25  WERE THERE ALL DAY.  I THINK YOU WERE THERE AND YOUR DAD

94

1    WASN'T THERE.  DO YOU REMEMBER THAT?

2          A       I DO.

3          Q       THERE'S A BOOK THERE IN FRONT OF YOU.  IF YOU WOULD

4    PLEASE TURN TO EXHIBIT SIX IN THAT BOOK.

5          A       I'M HERE.

6          Q       ARE THOSE YOUR INITIALS ON THOSE PAGES?

7          A       EXHIBIT SIX.

8          Q       IT'S THE MEDIATED SETTLEMENT AGREEMENT?

9          A       YES, THEY ARE.

10         Q       AND WHICH ONE IS IT?  THE ONE ON THE LEFT OR THE ONE ON

11   THE RIGHT?

12         A       PAGE ONE, THE ONE ON THE RIGHT.  PAGE TWO ON THE

13   RIGHT.  PAGE THREE ON THE RIGHT.  PAGE FOUR ON THE RIGHT.

14         Q       OKAY.  SO, YOU'RE ALL ON THE RIGHT.  IS THAT YOUR

15   SIGNATURE ON PAGE FIVE?

16         A       YES, IT IS.

17         Q       YOU'RE A PARTNER FOR MACHADO NO. 1 AND PARTNER FOR

18   MACHADO NO. 3.  IS THAT RIGHT?

19         A       THAT IS CORRECT.

20         Q       NOW, IF YOU WOULD TURN TO PAGE TWO.  AND WE'VE

21   HEARD THE TESTIMONY HERE TODAY THAT 5400 8 MILE RANCH ROAD IS

22   THE O'BERRYS' HOMESTEAD.

23         A       I HAVE.

24         Q       AND THEN YOU SAW THAT WE TALKED ABOUT THE LAND

25   THAT IS ENCUMBERED BY THE MORTGAGE.  DO YOU REMEMBER THE

1   INCLUSION OF THAT LANGUAGE AT THE MEDIATION?

2       A      REPEAT THAT.  INCLUSION OF WHAT LANGUAGE?

3       Q      THAT IS ENCUMBERED BY THE MORTGAGE.  THE WORD – ONE,

4   TWO, THREE, FOUR, FIVE, SIX WORDS.

5       A      I DO.

6       Q      OKAY.  AND THAT WAS REQUESTED BY THE DEBTOR.  DO YOU

7   REMEMBER THAT?

8       A      I'M NOT SURE WHO REQUESTED IT.

9       Q      OKAY.  BUT YOU REMEMBER DISCUSSING IT AND PUTTING IT

10  IN HERE?

11      A      IF IT'S HERE, I DISCUSSED IT, BUT I CAN'T TELL YOU WHO

12  REQUESTED FOR IT TO BE –

13      Q      THAT'S FINE.

14      A      -- IN THE AGREEMENT.

15      Q      THEN YOU SEE THE NEXT LINE DOWN WHERE IT SAYS "THE

16  DESCRIPTIONS ARE ATTACHED HERETO AS EXHIBIT 1 (COLLECTIVELY THE

17  "PROPERTY")."

18      A      YOU'RE ON NUMBER ONE, WHAT SENTENCE?  WHAT LINE?

19      Q      JUST THE ONE TWO BELOW WHERE WE WERE JUST LOOKING.

20  WHERE IT SAYS "EXHIBIT 1" AND THEN THE PAREN.  DO YOU SEE THAT?

21      A      WANT TO SHOW ME?  PLEASE.

22      Q      SURE.

23              MR. WEBBER:  JUDGE, MAY I APPROACH?

24              THE WITNESS:  THAT WOULD BE WONDERFUL.

25  BY MR. WEBBER:

1      Q      DO YOU SEE THAT?

2      A      I DO.

3      Q      AND THEN, IF WE GO TO THE BACK OF THIS, YOU'LL SEE

4   THERE'S AN EXHIBIT A.

5      A      I'M SORRY.  WHEN YOU SAY "THE BACK OF THIS," DO YOU

6   MEAN THE BACK OF THE BOOK OR THE BACK OF –

7      Q      YEAH.  LOOK UP AT THE TOP RIGHT.  MAYBE THIS WILL HELP

8   YOU.  SEE WHERE IT SAYS PAGE 7 OF 12 UP AT THE TOP RIGHT?  SEE THOSE

9   NUMBERS AT THE TOP?

10     A      I DO.

11     Q      LET'S TRY THOSE.  PAGE 7 OF 12.  ARE YOU THERE?

12     A      I AM.

13     Q      AND IT'S A FULL PAGE OF LEGAL DESCRIPTIONS, RIGHT?

14     A      THAT IS CORRECT.

15     Q      IT SAYS "EXHIBIT A" AT THE TOP?

16     A      YES.

17     Q      DO YOU SEE SECTION 23 ANYWHERE ON EXHIBIT A?  TAKE A

18   MINUTE TO LOOK AT IT.

19     A      I DO NOT.

20     Q      OKAY.  AND THEN, YOU REMEMBER WE ALSO ATTACHED THE

21   QUIT CLAIM DEEDS.  DO YOU REMEMBER THAT DISCUSSION AT THE

22   MEDIATION?

23     A      IT'S BEEN OVER A YEAR THAT WE HAD THAT MEDIATION, SO I

24   REALLY CAN'T – I REALLY CAN'T TELL YOU EXACTLY WHAT WE OR

25   WHAT DOCUMENTS YOU PRODUCED AT THAT TIME.

1    Q    OKAY, BUT WE DID ATTACH LEGALS AND YOU SAW THAT.

2    A    OH, THEY'RE HERE.  OBVIOUSLY, THEY'RE HERE.

3    Q    OKAY.  AND THEN, IF YOU'D FLIP TO THE NEXT ONE, 8 OF 12,

4  JUST THE NEXT PAGE.  ARE YOU THERE?

5    A    I AM.  QUIT CLAIM DEED?

6    Q    YEAH.  IS THAT YOUR SIGNATURE THERE?

7    A    YES, IT IS.

8    Q    OKAY.  AND YOU WERE QUIT CLAIMING LAND OUT OF 8 MILE

9  RANCH?

10   A    I DID.

11   Q    AND WHO DID YOU TRANSFER IT TO?  MACHADO NO. 3?

12   A    TO THE PARTNERSHIP NO. 3.

13   Q    NOW, IF WE GO TO THE NEXT PAGE, 9 OF 12.  JUST FLIP THE

14  PAGE.

15   A    YES, SIR.

16   Q    IS THAT YOUR SIGNATURE?

17   A    IT IS.

18   Q    AND 8 MILE RANCH, YOU'RE DEEDING IT OUT TO –

19   A    PARTNERSHIP NO. 3.

20   Q    OKAY.  AND THERE'S A LEGAL THERE.  DO YOU SEE IT IN THE

21  MIDDLE?

22   A    I DO.

23   Q    OKAY.  AND THEN IF YOU GO TO 11 OF 12, DO YOU SEE THAT

24  QUIT CLAIM DEED?

25   A    I DO.

98

1    Q    IS THAT YOUR SIGNATURE?

2    A    IT IS.

3    Q    AND YOU'RE DEEDING FROM THE DEBTOR OUT TO NO. 3.

4    A    THAT IS CORRECT.

5    Q    AND THERE'S LEGALS IN THE MIDDLE, YES?

6    A    THAT IS CORRECT.

7    Q    AND THEN IF WE GO TO 12 OF 12, WHICH WILL BE THE LAST

8    PAGE OF THIS EXHIBIT, YOU'LL SEE A QUIT CLAIM DEED THERE.

9    A    I DO.

10   Q    OKAY.  AND IS THAT YOUR SIGNATURE?

11   A    YES, IT IS.

12   Q    AND IS THERE A LEGAL IN THE MIDDLE?

13   A    YES, THERE IS.

14   Q    OKAY.  NOW, LOOKING AT THOSE, AND YOU CAN TAKE A

15   MINUTE TO GO BACK AND LOOK, BUT I DIDN'T SEE SECTION 23 IN ANY OF

16   THOSE QUIT CLAIM DEED LEGAL DESCRIPTIONS.  AND JUST TAKE A

17   MINUTE TO CHECK THEM ALL OUT.  I THINK THERE'S FOUR OR FIVE.

18   A    SECTION 19.  SECTION 19.  SECTION 19.  NINETEEN.

19   Q    OKAY.  NOW, YOU'RE SUPPOSED TO GET DEEDS FROM THE

20   DEBTOR TO SATISFY THE $3 MILLION IN DEBT TO MACHADO NO. 1 AND

21   MACHADO NO. 3.  AND I'M PURPOSEFULLY MAKING THOSE NAMES SHORT

22   NOW.  THEY'RE OBVIOUSLY LARGER NAMES.  IS THAT TRUE?  UNDER THE

23   PLAN?

24   A    THAT IS ACCURATE.

25   Q    AND MY UNDERSTANDING IS THERE WAS A 1.4 MILLION-

99

1    DOLLAR PRINCIPAL.  AND HOW DO WE GET TO THREE MILLION?

2         A      SOMETHING CALLED INTEREST AND DEFAULT INTEREST.

3         Q      OKAY.  INTEREST.

4         A      SOMETHING LIKE THAT.

5         Q      ALL RIGHT.  AND YOU HEARD MR. GIEL TESTIFY THAT THE

6    BANK WAS THINKING ABOUT A THOUSAND ACRES, 12 MILLION-DOLLAR

7    APPRAISAL, SO WHAT DO YOU THINK?  PRETTY GOOD DEAL?  TEN

8    MILLION FOR THREE MILLION?

9         A      THAT'S A VERY SUBJECTIVE QUESTION.

10        Q      BUT I'M JUST ASKING YOU IF THE MATH IS A GOOD DEAL?

11        A      THERE'S VARIABLES, AS YOU KNOW, IN CONSIDERING A

12   GOOD DEAL AND A BAD DEAL.

13        Q      BUT THE DEEDING OF THE PROPERTY SATISFIES THAT THREE

14   MILLION-DOLLAR CLAIM IN FULL, NO. 1 AND NO. 3.  YOU GUYS GO HOME,

15   TAKE YOUR DEED, AND THAT'S IT.

16        A      I'M NOT SURE ABOUT THAT.

17        Q      YOU'RE NOT SURE ABOUT THAT?

18        A      I'M NOT SURE ABOUT THAT.

19        Q      WELL, YOU GUYS JOINED IN THE PLAN OF LIQUIDATION.

20        A      THAT WAS OVER A YEAR AGO.

21        Q      OKAY.  ALL RIGHT.  NOW, YOU KNOW THAT THERE'S OTHER

22   UNSECURED CREDITORS IN THIS CASE.  MACHADO IS A SECURED CLASS,

23   BUT YOU KNOW THERE'S UNSECURED CREDITORS, RIGHT?

24        A      I HEARD YOU SAY THAT EARLIER.

25        Q      AND DO YOU REMEMBER THAT – WERE YOU AT THE

1   CONFIRMATION HEARINGS?  I COULD LOOK IN THE TRANSCRIPTS TO SEE

2   WHO WAS PRESENT.   I JUST DON'T RECALL.

3       A      POSSIBLY.

4       Q      NOW.  ARE YOU –

5       A      ACTUALLY – EXCUSE ME.  YOU KNOW, WHEN IT COMES TO

6   CONFIRMATION HEARING, I'VE BEEN TO THIS COURT ONCE. --

7       Q      OKAY.

8       A      -- AND IT WAS THE DAY THAT WE HAD THE SETTLEMENT

9   AGREEMENT DRAFTED AND SIGNED.  AFTER THAT, I HAVE NOT BEEN TO

10  THIS COURT AGAIN.

11      Q      AND WE ARE IN A DIFFERENT BUILDING, TOO.

12      A      WELL, WHEN I SAY – I SAY RESPECTFULLY I'VE BEEN IN

13  FRONT OF THE JUDGE ONCE BEFORE.

14      Q      THAT'S FINE.  AND THAT'S A GOOD ANSWER.  ARE YOU

15  PROSECUTING,  YOU MACHADO NO. 1 AND MACHADO NO. 3, THE CLAIM

16  AGAINST STEWART TITLE?

17              MR. JONES:  OBJECTION, YOUR HONOR.  RELEVANCE?

18              THE COURT:  I WILL OVERRULE.  YOU CAN ANSWER THAT, IF

19      YOU ARE, SIR.

20              THE WITNESS:  WE PRESENTLY DON'T HAVE ANY KIND OF

21          ONGOING PROSECUTION.

22  BY MR. WEBBER:

23      Q      NOW, THE MEDIATED SETTLEMENT AGREEMENT, IT WAS A

24  GLOBAL SETTLEMENT, RIGHT?  IT SETTLED FIVE LAWSUITS?  WE CAN GO

25  BACK AND LOOK AT THEM.

1      A      THAT'S WHAT WE THOUGHT, OVER 15 MONTHS AGO.  WE'RE

2   STILL HERE, SO I'M NOT SURE WHAT IT SETTLED.

3      Q      OKAY.  BUT THAT'S WHAT IS SAYS, THOUGH, RIGHT?

4      A      IT SAYS – IT SAYS SOMETHING LIKE THAT.  YES, SIR.

5      Q      AND THE OSCEOLA COUNTY LITIGATION, THE 2011 OSCEOLA

6   COUNTY LITIGATION, THAT WAS SETTLED?

7      A      I THINK IT SETTLED ALL THE LITIGATION THAT WE HAD

8   ONGOING WITH THE O'BERRYS AND 8 MILE AT THE TIME, UP TO THAT

9   TIME.

10     Q      OKAY.

11     A      UP TO THAT TIME.

12     Q      SETTLED IT ALL.  GLOBAL – GLOBAL SETTLEMENT.

13     A      THAT WAS THE INTENTION, SIR.

14     Q      OKAY.  AND THE 2011 OSCEOLA COUNTY CASE IS THE

15   REFORMATION OF MORTGAGE COUNT, RIGHT?

16     A      I COULDN'T TELL YOU EXACTLY WHICH ONE IT IS.

17     Q      WELL, LET'S LOOK AT IT, THEN.

18     A      DO YOU WANT TO SHOW ME THAT?

19     Q      YEAH, WE'LL LOOK AT IT REAL QUICK.  LET'S SEE.  IF YOU GO

20   TO 4A – DEBTOR'S 4A IN THAT BOOK RIGHT THERE.  YOU'LL SEE A

21   NUMBER 4 AND THEN YOU'LL SEE A CAPITAL A.

22     A      I SEE 4A.  YES, SIR.

23     Q      OKAY.  AND YOU SEE PAGE THREE?  WOULD YOU READ

24   PARAGRAPH SIX?

25     A      "THE DESCRIPTION OF PARCEL ONE AND PARCEL TWO IN THE

1   MORTGAGE INCORRECTLY DESCRIBED PROPERTY THAT WAS INTENDED

2   BY CENTER STATE, RUBEN JOSEPH O'BERRY, MARSHA O'BERRY TO BE

3   ENCUMBERED BY THE MORTGAGE."

4       Q      NOW, YOU'VE HEARD ALL THE TESTIMONY TODAY, BECAUSE

5   YOU'RE A PARTY, RIGHT?

6       A      I HAVE.

7       Q      AND WE'RE ARGUING ABOUT PARCEL ONE, RIGHT?  DO YOU

8   KNOW WHY PARCEL TWO IS MENTIONED IN THIS PARAGRAPH?

9       A      WE'RE HERE, AS FAR AS I UNDERSTAND, SIR, DISCUSSING THE

10  161 ACRES THAT YOUR PARTY CLAIMS WAS NOT PART OF THE

11  SETTLEMENT.

12      Q      AND NOT PART OF THE MORTGAGE.  IS THAT RIGHT?

13      A      THAT'S WHAT THEY CLAIM.

14      Q      OKAY.  NOW, THAT'S PARCEL ONE.  TAKE MY WORD FOR IT.

15      A      I'M NOT SURE ABOUT THAT.

16      Q      OKAY.  WELL, I'M THE ONE ASKING --

17      A      BUT IF YOU'RE TELLING ME –

18      Q      -- THE QUESTIONS.

19      A      AND I'M ANSWERING THE QUESTIONS, SIR.

20      Q      ASSUME PARCEL ONE IS WHAT WE'RE TALKING ABOUT THAT

21  HAS THE INCORRECT LEGAL, YOU GUYS SAYING; WE SAY NOT INTENDED.

22  DO YOU KNOW WHY PARCEL TWO –

23      A      ARE YOU REFERRING TO THE PARCEL THAT IS STATED TO BE

24  SECTION 24 AND SECTION 23?

25      Q      ABSOLUTELY WHAT I'M TALKING ABOUT.

1    A    OKAY.

2    Q    THAT'S PARCEL ONE.

3    A    THAT'S PARCEL ONE.  OKAY.

4    Q    DO YOU KNOW WHY PARCEL TWO IS IN HERE?  IS THERE ANY

5    COMPLAINT ABOUT LAND IN PARCEL TWO?  DO YOU KNOW, SITTING HERE

6    TODAY, OF ANY COMPLAINT ABOUT PARCEL TWO?

7    A    AT THIS TIME, I ONLY KNOW ABOUT THE COMPLAINT OF THE

8    161 ACRES, SIR.

9    Q    AND IF YOU WOULD GO TO PAGE 5, READ PARAGRAPH 9.

10   A    "THE FAILURE OF THE MORTGAGE TO CORRECTLY DESCRIBE

11   PARCEL ONE AND PARCEL TWO WAS A RESULT OF A MUTUAL MISTAKE BY

12   RUBEN JOSEPH O'BERRY, MARSHA O'BERRY, AND CENTER STATE, AND AS

13   A RESULT, THE MORTGAGE DOES NOT ACCURATELY EXPRESS THE TRUE

14   INTENTION AND THE AGREEMENT OF SAID PARTIES."

15   Q    OKAY.  AGAIN, QUESTION:  DO YOU KNOW WHY PARCEL TWO

16   IS INCLUDED IN THAT PARAGRAPH?

17   A    NO, SIR.

18   Q    WERE YOU IN ANY OF THE NEGOTIATIONS WITH RUBEN

19   JOSEPH O'BERRY, MARSHA O'BERRY, OR CENTER STATE BANK ABOUT

20   GETTING THE 1.4 MILLION-DOLLAR MORTGAGE?

21   A    NO.  I MET MR. O'BERRY SUBSEQUENT TO THAT, SIR.

22   Q    OKAY.  NOW, YOU – YOU HAVE COMPLETED A SURVEY.

23   WHEN I SAY "YOU," MACHADO –

24   A    I'M NOT A SURVEYOR, SIR.

25   Q    OKAY.

104

1        A        I'VE NEVER COMPLETED A SURVEY.

2        Q        BUT DID YOUR COMPANY PERFORM – OR, HIRE TO HAVE A

3 SURVEY DONE?  IF YOU'D TURN IN THAT BOOK TO DEBTOR'S EXHIBIT 16.

4        A        YES, SIR.

5        Q        HAVE YOU SEEN THAT SURVEY BEFORE?

6        A        I HAVE SEEN THIS.

7        Q        OKAY.  AND I CAN'T READ THE MIDDLE DATE.  I APOLOGIZE.

8 MY EYES ARE OLD.

9        A        THAT'S OKAY.

10        Q        AUGUST 2014, AND I DON'T KNOW WHAT DAY.  BUT WAS

11 THAT ABOUT THE DATE AND TIME YOU GOT THIS SURVEY?

12        A        I'M NOT SURE WHEN I SAW THIS SURVEY.  I'VE SEEN THIS

13 SURVEY BEFORE, BUT I COULDN'T TELL YOU IF IT WAS AUGUST 14TH OR

14 THE 17TH OR THE 26TH.

15        Q        DID THE MACHADOS NO. 1, NO. 3, OR YOU OR YOUR DAD

16 ORDER THIS SURVEY?

17        A        NO, SIR.

18        Q        OKAY.  THIS WAS PRODUCED TO ME BY YOUR COUNSEL.  DO

19 YOU KNOW WHERE THEY GOT THIS SURVEY?  DID THEY ORDER IT?

20        A        IT SAYS "PREPARED FOR O'BERRY."

21        Q        IT SAYS THAT, BUT MR. O'BERRY WILL TESTIFY HE DIDN'T

22 ORDER A SURVEY IN AUGUST OF 2014.  SO, WHO ORDERED THIS SURVEY?

23        A        I COULDN'T TELL YOU WHO ORDERED THIS SURVEY BACK IN

24 AUGUST OF '14.

25        Q        WOULD YOU DISAGREE WITH ME IF I TOLD YOU YOUR

1   COUNSEL –

2       A       OKAY.  EXCUSE ME ONE SECOND IF I MAY CLARIFY

3   SOMETHING?

4       Q       SURE.  SURE.

5       A       THIS IS THE SAME O'BERRY THAT WAS – THE SAME SURVEY

6   THAT WAS PRODUCED WAY BACK.  THIS WAS PROVIDED TO US BY MR.

7   BEEKMAN.  IT'S A COPY OF THE SURVEY HAD BEEN PRODUCED IN THE

8   PAST.  THAT'S WHY IT STILL STATES "MR. O'BERRY" OR "FOR O'BERRY."

9       Q       OKAY, BUT THE DATE DOESN'T WORK.  AUGUST OF 2014.

10      A       UNDERSTOOD.  YOU JUST – IT'S THE SAME SURVEY THAT WE

11  GOT FROM THE PAST WITH A NEW DATE ON IT.

12      Q       SO, SOMEBODY HAD TO REQUEST IT, THEN.  DO YOU KNOW

13  WHO REQUESTED IT?

14      A       I DO NOW UNDERSTAND WHAT SURVEY I'M LOOKING AT.  I

15  WASN'T LOOKING AT THE DATE.  MAYBE MY EYES ARE GETTING AS BAD

16  AS YOURS, OKAY?  BUT I NOW – WHEN YOU SAID IT WAS THE 14TH, OR THE

17  – AUGUST THE 14TH, IT WAS – I WOULD ASSUME BY THIS TIME MR.

18  BEEKMAN'S NOT SPEAKING TO MR. O'BERRY ABOUT NEW SURVEYS.  IT

19  WAS ME THEN.

20      Q       IT WAS YOU?

21      A       IT HAD TO BE ME.

22      Q       OH, IT HAD TO BE YOU.  OKAY.

23      A       OR INSTRUCTED BY ME.

24      Q       OKAY.  AND WHY WERE YOU ORDERING THIS SURVEY?

25      A       BECAUSE I EXPECT TO SHORTLY OWN THIS PROPERTY AND I

1   WANT AN UPDATED SURVEY.  THAT WAS BASICALLY IT.

2          Q      OKAY.  ANYTHING TO DO WITH THE TITLE COMPANY CLAIM?

3          A      AT THE PRESENT TIME, I DON'T HAVE AN ONGOING CLAIM

4   WITH THE TITLE COMPANY.

5          Q      BUT THERE'S BEEN A NOTICE PROVIDED ON YOUR BEHALF.

6          A      POSSIBLY.

7                 MR. WEBBER:  JUDGE, AND I'M ALMOST DONE, JUDGE.  I JUST

8   NEED TO FIND ONE THING, AND I THINK I'M DONE.  SO GIVE ME A

9   MINUTE HERE.  IT'S IN THE PLEADINGS.

10                THE COURT:  I'M SO SORRY, WE'VE RUN OUT OF TIME.  YOU

11  ALL HAVE TO BE OUT OF THE BUILDING –

12                MR. WEBBER:  I'M DONE.  I'M DONE.

13                THE COURT:  -- AT FIVE.

14                MR. WEBBER:  I KNOW.  I KNOW.

15                THE COURT:  DO YOU HAVE QUESTIONS FOR MR. MACHADO,

16  MR. JONES?

17                MR. JONES:  NO.

18                MR. WEBBER:  OKAY, GOOD.  HE'S DONE.

19                THE COURT:  YOU'RE DONE, THEN.

20                THE WITNESS:  SORRY, YOUR HONOR, IT TOOK SO LONG.

21                THE COURT:  NO, YOU'RE FINE.  YOU'RE FINE.  WHEN WOULD

22  YOU GUYS LIKE TO COME BACK?  I'LL LEAVE IT UP TO YOU.

23  YOU'RE THE TRAVELING CREW AND THE REST ARE FAIRLY A LOT

24  EASIER TO ACCOMMODATE.

25                MR. KILLIAN:  I WOULD LOVE TO BE HERE TOMORROW

1        MORNING, BUT I'M SCHEDULED FOR SURGERY AT EIGHT O'CLOCK.

2              THE COURT:  WELL, WE WON'T BE COMING BACK –

3              MR. KILLIAN:  MINOR SURGERY.

4              THE COURT:  WELL, I'M GLAD TO HEAR IT'S VERY MINOR.  I

5        HOPE YOU'RE BEING TRUTHFUL.  BUT I WILL BE DONE FOR A BIT.

6        WE WILL NEED TO COME BACK.  AND I NEED TO HEAR CLOSING

7        ARGUMENTS, ANYWAY, SO THERE'S NO WAY TO – WE DON'T NEED

8        TO RUSH ANYTHING.  WHEN WOULD YOU – HOW FAR OUT WOULD

9        YOU LIKE ME TO SET IT?  I MEAN, IT'S –

10             MR. JONES:  JUDGE, I KNOW THAT I AM OUT THE WEEK OF THE

11       15TH.

12             THE CLERK:  WE'RE NOT GOING TO HAVE ANYTHING UNTIL

13       THE END OF APRIL, ANYWAY.

14             THE COURT:  WE'LL WORK – WE'LL MAYBE FIND SOMETHING,

15       BUT I'M THINKING THAT WE'LL RESERVE TWO HOURS.  THAT

16       WOULD GIVE US TIME FOR CLOSING, AS WELL AS COMPLETION.

17       NOW, I WANT TO KNOW IF YOU THINK THAT'S REALISTIC.

18             MR. WEBBER:  WE CAN DO – I KNOW THAT PROBABLY – I

19       DON'T KNOW HOW MUCH CROSS YOU HAVE FOR MR. O'BERRY, BUT

20       I HAVE A HALF HOUR OF DIRECT.

21             MR. JONES:  DEPENDING ON WHAT HE ASKS ON DIRECT, I MAY

22       HAVE NO CROSS.  BUT AS LONG AS WE'RE ON THE CLOCK, A HALF

23       HOUR, BECAUSE I REALLY DON'T TO HAVE TO –

24             THE COURT:  NO, YOU DEFINITELY DON'T.

25             MR. JONES:  -- DON'T WANT TO HAVE TO COME BACK AGAIN

108

1       AND –

2               THE COURT:  I WOULD THINK –

3               MR. WEBBER:  I THINK TWO IS GOOD.

4               THE COURT:  AND USUALLY WHEN YOU HAVE TWO, YOU

5       REALLY HAVE A LITTLE LONGER.

6               MR. JONES:  YOU'RE CLOSING, SO –

7               MR. KILLIAN:  I DON'T TALK LONG.

8               MR. WEBBER:  WHICH DAY?

9               THE COURT:  I KNOW I HAVE TIME ON MARCH 25TH.  LET'S SEE.

10      AND YOU KNOW WHAT?  I HAVE TIME ON MARCH 16TH, IF THAT

11      WORKS.  THAT'S THE WEEK YOU'RE OUT?

12              MR. JONES:  YES, YOUR HONOR.

13              MR. WEBBER:  SO, 16 NO GOOD.  WHAT'S THE OTHER DAY,

14      JUDGE?

15              THE COURT:  THE 25TH I HAVE TIME.

16              MR. WEBBER:  I AM AVAILABLE.  IT'S WEDNESDAY, RIGHT,

17      JUDGE?

18              THE COURT:  THE 25TH IS WEDNESDAY.

19              MR. WEBBER:  I'M AVAILABLE ALL DAY.

20              MR. KILLIAN:  I CAN'T SAY I WOULD BE AVAILABLE ON THE

21      25TH, BECAUSE I HAVE A MEDIATION IN TAMPA ON THE 24TH.

22              THE COURT:  AND IT MAY OR MAY NOT FINISH.  WHY DON'T

23      WE DO – WHAT ABOUT ON THE 30TH?

24              MR. WEBBER:  IS THAT MONDAY?

25              THE COURT:  THAT'S A MONDAY.

1          MR. WEBBER:  I AM WIDE OPEN.

2          MR. JONES:  I DON'T HAVE MY CALENDAR, BUT I'LL MAKE IT

3    WORK.

4          THE COURT:  WELL, IF YOU GO BACK AND YOU LOOK, PLEASE

5    JUST CALL AND WE'LL FIND SOMETHING THAT WILL WORK FOR

6    CERTAIN.  MR. O'BERRY – MR. AND MRS. O'BERRY, WILL YOU BE

7    ABLE TO GET BACK ON THE 30TH?

8          MR. O'BERRY:  YES, MA'AM.

9          MR. WEBBER:  I MAY HAVE MARSHA – SHE'S A SCHOOL

10   TEACHER.  SO, JOE IS TESTIFYING.

11         THE COURT:  IT WILL BE THE WEEK AFTER SPRING BREAK IF

12   IT'S LOCAL HERE, BUT ANYWAY.  SO, MARCH 30TH?

13         MR. WEBBER:  MARCH 30TH.

14         THE COURT:  SINCE YOU ALL WILL BE TRAVELING IN, WHY

15   DON'T WE DO IT IN THE AFTERNOON, START AT 1:00.  AND THAT

16   WAY, YOU'LL HAVE THE AFTERNOON AND STILL WON'T GET BACK

17   MAYBE TOO BAD.  IS THERE ANYTHING ELSE – WE WILL KEEP ALL

18   THIS STUFF, INCLUDING THIS – IF IT HASN'T BEEN MARKED OR

19   IDENTIFIED, SO I REALLY DON'T KNOW EXACTLY WHAT THIS IS,

20   BUT WE'LL KEEP THAT.

21         MR. JONES:  THAT WAS JUST SIMPLY A DEMONSTRATIVE

22   AIDE, JUDGE, TO GIVE YOU SOME –

23         THE COURT:  I WILL KEEP THAT.  AND ANYTHING ELSE WE

24   NEED TO DO?

25         MR. WEBBER:  I KNOW WE GOT TO GO, BUT THIS IS A

1              CERTIFIED COPY OF THIS; AND THEY HAD ORIGINALLY OBJECTED.

2                   THE COURT:  WE'RE NOT GOING TO ARGUE THAT RIGHT NOW,

3       MR. WEBBER.  YOU ALL HAVE EXACTLY SIX MINUTES TO GET OUT

4       OF THIS BUILDING.

5                   MR. WEBBER:  YES, MA'AM.

6                   THE COURT:  ANYTHING ELSE?  I'LL SEE YOU BACK AT 1:00 ON

7       MARCH THE 30TH UNLESS WE HEAR THAT THERE'S A CONFLICT.

8                   (WHEREUPON, THE PROCEEDINGS WERE CONTINUED TO

9       MARCH 30, 2015, AT 1:00 P.M.

10

111

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE


    I, SANDRA A. MOSER, NOTARY PUBLIC, CERTIFY THAT I WAS

AUTHORIZED TO AND MY OFFICE DID TRANSCRIBE, FROM CD-R, THE

FOREGOING PROCEEDINGS AND THAT THE TRANSCRIPT IS A TRUE

RECORD.

    I FURTHER CERTIFY THAT I AM NOT A RELATIVE, EMPLOYEE,

ATTORNEY OF COUNSEL OF ANY OF THE PARTIES, NOR AM I FINANCIALLY

INTERESTED IN THE ACTION.

    DATED THIS 20TH DAY OF APRIL, 2015.



            _____

            SANDRA A. MOSER, RPR, FPR

            NOTARY PUBLIC - STATE OF FLORIDA

            MY COMMISSION NO. FF113959

            MY COMMISSION EXPIRES:  5/6/2018